IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HAROLD JOSEPH KENDALL | ) | |
| individually, and as | ) | JURY TRIAL DEMANDED |
| the Administrator of the | ) | |
| ESTATE OF SHANE MIGUEL | ) | |
| KENDALL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1-23-CV-00416-JPB |
| | ) | |
| FULTON COUNTY, GEORGIA, | ) | |
| a political subdivision | ) | |
| of the State of Georgia; | ) | |
| NAPHCARE, INC., | ) | |
| an Alabama corporation, | ) | |
| SHERIFF PATRICK LABAT, | ) | |
| in his individual capacity as Sheriff | ) | |
| of Fulton County, Georgia, | ) | |
| LIEUTENANT JIMMY KENNEDY | ) | |
| of Fulton County's Sheriff's Office | ) | |
| in his individual capacity, | ) | |
| LIEUTENANT ROBERT GRADY | ) | |
| of Fulton County's Sheriff's Office | ) | |
| in his individual capacity, | ) | |
| Cadet ALBERNISHA BLACKMAN, | ) | |
| in her individual capacity, | ) | |
| Deputy RAYSHAUN CLARK, | ) | |
| in his individual capacity, | ) | |
| MICHAEL AGYEI, individually and, | ) | |
| EDITH NWANKWO, individually. | ) | |
| Defendants. | ) | |

1

## FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Joseph Kendall, individually and as Administrator of the Estate of Shane Kendall, by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 12(a)(1)(B) in response the various Answers and Motions to Dismiss filed by the Defendants, files this First Amended Complaint for Wrongful Death and Demand for Jury Trial against the above-named Defendants. Plaintiffs' First Amended Complaint, which adds several defendants, clarifies claims, and adds facts to support said claims, shows this Court as follows:

## I.     INTRODUCTION AND OVERVIEW

1.

All pretrial detainees, no matter their station in life, are entitled to constitutionally adequate medical care when confined behind bars, as well as medical care (including emergency medical treatment) that complies with accepted standards of care.

2.

This is an action under 42 U.S.C. § 1983 and under Georgia law arising from the events and circumstances leading up to and causing the attempted suicide and

eventual death of nineteen (19) year-old Shane Kendall ("Shane") on the morning of February 1, 2021, while he was an inmate in the custody of Fulton County Jail ("Jail"), located at 901 Rice Street, Atlanta, Georgia, 30318, Fulton County, Georgia.

3.

At age fifteen (15), in June of 2017, Shane was arrested and automatically charged as an adult for the homicide of his adopted mother, who neglected him, failed to provide him with his prescribed anti-psychotic and mood-stabilizing medications as instructed, and permitted her new partner to leave a loaded handgun lying around the home while Shane was there, unsupervised.

4.

Shane was a young man who had a lifelong history of severe mental illness and developmental delayed—having tested positive at birth for crack/cocaine and struggled socially, emotionally and academically his entire life.

5.

At the Jail, Shane was housed in general population despite his known diagnoses of bipolar disorder, schizophrenia, ADHD, and visual hallucinations.

6.

At the Jail. Shane was prescribed and administered high daily doses of Seroquel, Depakote and Benadryl, all of which are known to cause weight gain in patients.

7.

Even though medical providers knew that Shane lost more than fifty (50) pounds while in the Jail (and he was not overweight or needing to lose weight to begin with), medical providers nevertheless consistently noted that Shane was compliant with his medication regimen and not experiencing any side effects.

8.

Any competent medical provider would have realized that Shane was either not compliant with his medication regimen, not being properly nourished with food or he was experiencing abnormal side effects of his medication that required further medical evaluation. There was no inquiry or investigation into Shane's significant weight loss to ensure he received adequate healthcare or nourishment.

9.

Medical providers in the Jail knew of Shane's prior psychiatric hospitalizations, mental health diagnoses and developmental delay but did not keep him safe or adequately treat his serious health issues.

10.

In the early morning hours of February 1, 2021, jail staff located Shane, in his cell, hanging by a bed sheet, unconscious and in urgent need of medical attention and treatment.

11.

Jail staff responded to Shane's suicide slowly and ineffectively, walking around the pod, looking for a rescue tool to cut Shane down from the bedsheet tied to his bottom bunk.

12.

After several minutes, a rescue tool was finally brought to Shane's jail cell and he was removed from the makeshift noose.

13.

Instead of following standard emergency medical resuscitation procedures, which entails providing immediate, consistent CPR and utilizing an Automated External Defibrillator ("AED") device as soon as possible, jail staff stood around Shane's cell, casually walking in and out of it, and both failed to perform continuous CPR and failed to bring or use an AED to try and save Shane's life. The delay in providing adequate, continuous, urgent medical treatment to Shane during his medical emergency was unreasonable and unjustifiable.

14.

Far more shocking than the above-discussed deliberate indifference to Shane's obviously serious medical needs were the actions and inactions of Defendant NaphCare medical providers, Defendant Michael Agyei and Defendant Edith Nwankwo, both of whom were responsible for providing critical emergency medical care to Shane.

15.

Defendant Edith Nwankwo deliberately refused two different requests from jail staff to assist in resuscitating Shane during his obviously urgent medical emergency, telling jail staff that she had a bad knee and didn't want to bend over to assist with saving Shane.

16.

When Defendant Agyei finally appeared at Shane's cell with an AED and a stretcher, several minutes after Defendant Nwankwo showed up on scene, he briefly attempted two rounds of CPR on Shane but was physically unable to adequately provide such care to Shane, according to jail staff.

17.

By the time Defendant Agyei set up the AED, several minutes after his arrival, no shock was advised. Later in the hour, Shane was pronounced dead by responding EMS personnel.

18.

The claims herein arise from contemporaneous actions and inactions, constituting deliberate indifference, by the above-named Defendants, in response to Shane's attempted suicide.

19.

The above-named defendants individually contributed to and collectively caused Shane's tragic, untimely, and preventable death by failing to provide Shane with access to adequate emergency medical care, resuscitation efforts or life support during his obvious medical emergency.

20.

Shane's tragic death occurred at a time when Defendant Labat, Defendant Fulton County, and Defendant NaphCare were all well-aware of widespread practices within their organizations that contributed to their collective inability to fulfill constitutional obligations to mentally ill inmates at the Jail, like Shane.

21.

Defendant Fulton County engaged in a pervasive pattern of underfunding the Jail despite knowing the deplorable, unsafe conditions therein and learning from Defendant Labat, on several occasions, that he could not fulfill his constitutional obligations to inmates without additional funding from them.

22.

Defendant Labat knew that the Jail was severely overcrowded and understaffed.

23.

Defendant Labat knew that there was a widespread custom of housing mentally ill inmates amongst general population inmates in the Jail without alerting jail staff as to which inmates were mentally ill.

24.

Because jail staff were not properly notified of which inmates were mentally ill and needed to be treated accordingly, there was a pervasive pattern of failing to adequately supervise them, protect them or fulfill their constitutional obligations to them.

25.

Compounding the widespread safety concerns for mentally ill inmates in the Jail, Defendant Labat knew that his jail staff commonly ignored standard operating procedures and protocol regarding how to identify, interact, and discipline mentally ill inmates

26.

As a result, Defendant Labat knew that mentally ill inmates were customarily sentenced to long periods in solitary confinement without any consideration for their mental health, their safety or their well-being.

27.

Similarly, Defendant NaphCare knew that its staff provided inadequate medical care to mentally ill inmates in the Jail and failed to correct the situation.

28.

Less than two weeks before Shane's death, on January 20, 2021, during a Fulton County Board of Commissioners meeting, Defendant Labat explained that he could not fulfill his constitutional obligations at the jail without additional funding. He described the deplorable conditions therein as well his inability to

protect inmates - especially mentally ill ones - due to the jail being overcrowded,

understaffed and underfunded.


29.

Given the pervasive, unconstitutional practices known to be occurring in the

Jail and the failure of the Defendants to fix them, Shane's death, though

preventable, was tragically predictable and unsurprising.


30.

Such a callous disregard for human life by the named Defendants must not be

tolerated under our judicial system.


II.    FACTS


A. Shane's pre-trial incarceration in Fulton County


31.

Shortly after Shane's arrest in 2017, Shane was evaluated by a psychiatrist, Dr.

Shane Savage, at the request of his attorney, Daniel Kane, to determine whether

Shane was competent to stand trial.

32.

Upon Dr. Savage determining that Shane was not competent to stand trial, Shane was transferred from the youth detention center to a lockdown juvenile psychiatric facility called Pathways-Turner Center in Greenville, Georgia.

33.

Shane spent almost two years at Pathways-Turner Center, where he received mental health care, adequate supervision, and restoration services and curriculum (aimed at "restoring" him to competency).

34.

While at Pathways-Turner Center, Shane was evaluated by several medical providers, who diagnosed him with ADHD, schizophrenia, autism, bipolar and visual hallucinations.

35.

In August of 2019, after completing his restoration curriculum, Shane's first competency trial took place in Fulton County Superior Court before Judge Robert McBurney. The case ended in a mistrial due to a hung jury.

36.

Between his first competency trial and his second one in December 2019, Shane did not return to Pathways-Turner Center (because he completed his curriculum there) nor did he go to a youth detention center (because Shane was now seventeen (17)). Instead, Shane was housed in the Jail.

37.

In December of 2019, Shane's second competency trial took place and the jury found him competent to stand trial.

38.

Thereafter and until his death, Shane remained in the Jail, awaiting trial.

39.

When Shane arrived at the Jail, aging into it in 2019, Defendant NaphCare and
their medical providers (employees or hired independent contractors) documented
Shane's psychiatric problems including his recent psychiatric hospitalization, his
psychiatric diagnoses, his heavy medication regimen and his obvious need for
ongoing, regular mental health services.

40.

Despite NaphCare medical provider Wyakemia Holliday MHP  knowing all of
this, she still cleared him for general population housing.

41.

Defendant Fulton County, Defendant Labat, Defendant NaphCare, as well as
their employees and agents, knew that the Jail lacked the space, resources, staffing
and funding to provide adequate supervision or medical care to mentally ill
inmates in a manner consistent with their constitutional obligations, contractual
obligations, training and standard operating procedures.

42.

During Shane's incarceration in general population at the Jail, Shane was bullied by other inmates and physically assaulted on several occasions due to his perceived sexual orientation.

43.

In the months preceding Shane's death, the Jail staff assigned to 6-North knew this abuse was occurring and did nothing to stop the bullying or mistreatment of Shane by other inmates.

44.

Due to widespread overcrowding and understaffing issues, the Jail had no space to provide mentally ill inmates with safe housing, adequate supervision, or proper medical care.

45.

Instead, in violation of Fulton County Sheriff's written policies regarding the treatment of mentally ill inmates, jail staff ignored protocol when interacting with

him and disciplined Shane as if he were a typical inmate, taking swift action against him and sentencing him to long periods of solitary confinement, and ignoring his known, severe mental illnesses.

46.

During Shane's incarceration at the Jail, he was prescribed and medicated with increasingly high dosages of Depakote, Seroquel and Benadryl by NaphCare medical providers.

47.

NaphCare medical provider, Masresha Zenebe, PA, reported that Shane lost approximately 65 pounds between his initial incarceration in August 2019 (when he weighed 225 pounds) and then on July 14, 2020 (when he weighed just 168 pounds).

48.

NaphCare's "Pyschiatric Progress Notes" regarding Shane were sometimes auto-populated on at least two occasions with answers indicating Shane was

medication compliant and without side effects, even though admittedly they did

not actually see him in person (May 17, 2019 and August 9, 2019 reports by

NaphCare medical provider Jane Waweru NP).

49.

NaphCare medical providers failed to conduct periodic blood tests to

actually measure the levels strong cocktail of psychotropic medications in Shane's

body to ensure that he was medication compliant and that he was not experiencing

any other unintended side effects.

50.

At one point during Shane's incarceration, jail staff and medical providers

learned that Shane was giving away his medication to other inmates (likely to

avoid suffering further physical abuse at their hands) and in that sense, not

medication compliant. NaphCare medical providers and jail staff never attempted

to address this with Shane or others to determine what was happening with his

medication.

51.

Despite knowing that Shane, was, among other things, significantly mentally impaired, losing significant amounts of weight, physically deteriorating and possibly giving his medication to other inmates and/or not taking is medication, jail staff and medical providers failed to adequately monitor, treat and/or protect Shane.

52.

Shane was never seen by an actual doctor (M.D. or D.O.) during his entire incarceration at the Jail.

53.

Neither the Jail nor NaphCare had adequate staffing, funding or policies and procedures to ensure Shane and other similarly situated inmates received adequate mental health care and proper protection in a general population environment.

54.

Throughout Shane's incarceration., jail staff and NaphCare medical providers knew that he suffered from severe mental illness and was both physically

deteriorating and mentally decompensating but did nothing to keep him safe or address, treat or respond to his obvious medical needs in an adequate, timely manner.

55.

A month before Shane's death, on January 1, 2021, Jail employee, Lieutenant Jones, asked NaphCare. medical provider, Roberto Montana MHP, to clarify whether Shane's "issues" (which were clearly apparent to jail staff and medical providers as they were the subject of this conversation) were mental health or behavioral in nature. In response, Roberto Montana MHP told Lieutenant Jones that Shane suffered from mental health problems. Defendants Fulton County, Labat, and NaphCare were well-aware that Shane was mentally ill and decompensating in the general population environment.

B. A New Fulton County Sheriff

56.

Also, at the beginning of January 2021, a month before Shane's death, top leadership at the Jail changed; Defendant Sheriff Patrick Labat ("Defendant Labat"

took office as the newly-elected the Fulton County Sheriff after winning the

November 2020 election against the then-incumbent Fulton County Sheriff

Jackson.


57.

During his election campaign, Defendant Labat became personally acquainted

with Shane Kendall's father, Harold Joseph Kendall, and his partner, Margie

Thorpe.


58.

Since they were both deeply concerned for Shane's deteriorating condition and

well-being incarcerated at the Jail and very dissatisfied with how then-Sheriff

Jackson ran the jail, they took a special interest in learning more about Sheriff

Jackson's political opponent—Defendant Labat.


59.

Harold Joseph Kendall and Margie Thorpe were immediately impressed by

Defendant Labat and his political platforms—most importantly to them, his

promise to ensure mentally ill inmates received adequate care and protection in the jail—so they offered to do all they could to support him and his election campaign.

60.

Thereafter, Harold Joseph Kendall and Margie Thorpe donated to Defendant Labat's campaign, canvassed neighborhoods for him (and with him) and hosted a campaign dinner party on his behalf (with him attending) at their home during the summer of 2020.

61.

During conversations at campaign events and through regular phone communication, Defendant Labat learned a lot about Shane and his treatment at the Jail through Harold Joseph Kendall and Margie Thorpe.

62.

Plaintiff Harold Joseph Kendall and Margie Thorpe made sure to inform Defendant Labat all about Shane (his mental illness, developmental delays, criminal case, and profound vulnerability in the Jail).

63.

They specifically expressed serious concerns about Shane's safety and the adequacy of supervision, security, and medical care.  In essence, Defendant  Labat was very much aware of Shane Kendall, his presence in the Jail and the fact that he was severely mentally ill, developmentally delayed and for several reasons, unsafe in a general population jail environment.

64.

Defendant Labat promised them that he would look out for Shane and keep him safe.

65.

Once in office in early January 2021, Defendant Labat contacted Margie Thorpe for Shane's full name and booking information so he could personally check up on Shane.

66.

Between January 1, 2021 and January 5, 2021, Sheriff Patrick Labat personally visited Shane in his pod on one occasion.

67.

On January 6, 2021, there was a follow up conversation via text message wherein Margie Thorpe thanked Defendant Labat for personally visiting Shane, saying "Your presence is creating quite a buzz. Shane sounded like a life vest was just thrown to him."

68.

It is unclear whether Defendant Labat ever visited Shane again or whether he attempted to take any further action to ensure Shane's safety and improve the quality of his mental health care, knowing he was profoundly at risk.

69.

On January 14, 2021, NaphCare. provider, Pamela Nelome, NP, reported that Shane was medication compliant and had no side effects. She did not address Shane's substantial weight loss despite it being inconsistent with him being medication compliant. Also, in the same report, Pamela Nelome, NP, described Shane's affect as dysphoric and noted that Shane reported feeling depressed and asked for another increase in his Seroquel dosage. For reasons not provided in the

medical record, his prescription for Depakote (to manage bipolar disorder) increased.

70.

On January 20, 2021, less than two weeks before Shane's death, Defendant Labat addressed the Fulton County Board of Commissioners ("the Board") at a public meeting regarding the need for immediate additional funding for jail operations in order to fulfill his constitutional obligations. He described the deplorable conditions therein and admitted his inability to protect and supervise inmates, especially mentally ill ones due to the jail being overcrowded, understaffed and underfunded.

71.

On January 28, 2021, NaphCare provider, Brenda Dugan, MHP, conducted an annual mental health evaluation with Shane. Although Shane denied suffering from visual hallucinations or delusional thinking, Brenda Dugan, MHP indicated Shane did report feeling more depressed. Brenda Dugan, MHP reflagged Shane in NaphCare's internal system as suffering from Psychotic Disorders and Mood Disorders as well as Impulsiveness.

C. <u>January 31, 2021- The night before Shane's death</u>

72.

On January 31, 2021, the night before Shane's death, Fulton County Detention Officer Kawana Jenkins #D1453 (hereinafter "Officer Jenkins") and Officer Ebony Thomas #3362 (hereinafter "Officer Thomas") were conducting security rounds when they observed Shane balled up in a fetal position on the floor of his cell.

73.

Concerned about him, Officer Jenkins and Officer Thomas opened the door to Shane's cell, which he shared with another inmate at that time, and asked him what was going on with him.

74.

In response, Shane told Officer Jenkins and Officer Thomas that he was tired of being in his cell and wanted to be moved somewhere else.

75.

Officer Jenkins and Officer Thomas told Shane that he couldn't be moved because he did not like his cell. Then, they locked Shane back in his cell.

76.

Moments later, Shane assaulted his cellmate, Tyrell Curry.

77.

Tyrell Curry later reported that Shane told him he started a fight with him to get out of his cell. Shane told Tyrell Curry that he just really wanted to get out of there and knew that the physical altercation would cause jail staff to immediately remove them from the cell, at least for a short period of time. There were no reported injuries to either of them.

78.

Instead of requesting back up, calming the situation, avoiding abrupt actions towards him, ensuring he was properly supervised and talking to him in a gentle, caring manner about how he was feeling and why, Officer Jenkins and Officer

Thomas quickly provided a summary of what occurred with Shane so that their supervisor, Fulton County Detention Officer Willie Walker #3083 ("Officer Walker"), could create his supervisory investigation report and send the report up the pipeline for disciplinary review.

79.

Officer Walker determined that Shane assaulted his cell mate because he didn't want to be in his cell with anyone else. Based on his findings, Officer Walker also recommended that Shane be charged with Assault and Interference with Security Operations.

80.

By 10:30pm on January 31, 2021, Watch Commander, Burnice Howard #2797 ("Watch Commander Howard"), had approved the investigative findings of Officer Walker and sent the case along the path towards punitive, disciplinary action.

81.

At approximately 11:00pm, Shane received notice that he was being accused of Assault/Battery and Interference with Security Operations and faced forty-eight

(48) days in disciplinary lockdown (which, essentially, is twenty-four (24) hours in solitary confinement).

82.

It was a known, widespread practice for Jail Staff to ignore their training, protocol and standard operating procedures regarding mentally ill inmates and instead, take immediate, disciplinary action against them for violating jail rules (and/or behaving in manners consistent with and indicative of their mental illness and their obvious need for mental health treatment, not solitary confinement).

83.

Officers Jenkins and Thomas sent Shane to the medical floor, where NaphCare medical provider, Defendant Michael Agyei, PA-C, reportedly took Shane's vitals, which were normal, and noted he had no injuries.

84.

Defendant Michael Agyei failed to recognize or identify or treat Shane as a mentally ill inmate despite it being well-documented within Defendant NaphCare's internal file for Shane that he suffered the above-mentioned mental illnesses, had his psychotropic medication dosages increased by a NaphCare colleague less than

two weeks prior, was reflagged by a NaphCare colleague for psychotic and mood

disorders and impulsiveness less than three (3) days prior (at which time, he also

self-reported that he was feeling more depressed lately).

85.

Despite all of Shane's medical history and mental health treatment being readily

available to Defendant Michael Agyei, he opted to ignore it and failed to provide

Shane with adequate, if any, medical and mental health treatment that evening.

86.

Instead, Defendant Michael Agyei cleared Shane to be returned to his cell,

where he would remain alone until the following morning.

87.

As a direct result of Shane's severe mental illness (which was documented in

Defendant NaphCare medical records as including visual hallucinations in small,

closed, dark spaces), Shane was experiencing a strong, unrelenting fear of his assigned jail cell, which was dark due to the light in his cell being broken/out.

88.

Shane's very strange, fearful behavior (being balled up in the fetal position on the floor of his cell and then, assaulting his cell mate) was not reasonably commensurate with the current conditions he was actually in. His actions were consistent with the signs and symptoms of mental illness that the Jail Staff and medical providers are trained and responsible for seeing like acting inflexible and unreasonably rigid. Shane was solely focused on finding a way to get away from whatever scared him in his jail cell and did what it took to make that happen.

89.

In the early morning hours of February 1, 2021, at approximately 5:26am, jail staff conducted security rounds and noted no issues or concerns regarding Shane or anyone or anything else occurring in his pod area (6N400).

90.

Despite jail staff knowing that Shane was a mentally ill inmate who was being housed alone on February 1, 2021, facing forty-eight (48) days in disciplinary lockdown and who had shown obvious, concerning signs of mental disturbances within the last twenty-four (24) hours, jail staff did not increase the frequency of their security rounds for his cell to ensure he was properly supervised or safe.

D.  February 1, 2021-Response to Shane's attempted suicide

91.

At approximately 6:10am on February 1, 2021, Cadet Albernisha Blackman D3519 ("Defendant Blackman") and Detention Officer Rayshaun Clark D1492 ("Defendant Clark") while conducting their security rounds, walked past Shane Kendall's cell 6N402 and discovered him slouched over, with his feet on the ground and a blue bed sheet tied to the bunk and a knot around Shane's neck.

92.

Defendant Blackman put out an emergency call to the on-site medical providers at approximately 6:11am, asking for their immediate assistance and a stretcher for

an unconscious, breathing inmate, who had apparently attempted suicide in cell

6N402.


93.

In response to receiving this emergency call, NaphCare. medical provider, Edith

Nwankwo, RN ("Defendant Nwankwo") called her NaphCare colleague with

superior training and credentials, Michael Agyei PA-C ("Defendant Agyei") who

was also on duty at the Jail but did not answer her calls.


94.

During the evening of January 31, 2021 through the morning of February 1,

2021, NaphCare providers, Defendant Agyei and Defendant Nwankwo were

primarily responsible for providing adequate medical care, evaluation and

treatment to Fulton County inmates, including Shane.


'

95.

When Defendant Agyei failed to answer Defendant Nwanwko's calls,

Defendant Nwankwo did not take independent action or initiative to respond with

any urgency to Shane's known medical emergency.

96.

Fulton County Deputy Synclare Henry ("Deputy Henry"), who was assigned to

the medical floor during the early morning hours of February 1, 2021, had to

suggest to Defendant Nwankwo that they not wait for Defendant Agyei and should

instead respond to the emergency call without him.

97.

Only after this urging from Deputy Henry did Defendant Nwankwo agree to

head towards Shane's cell, which was just three (3) floors up from their location.

98.

Around the same time as the emergency call went out to the NaphCare medical providers, who slowly made their way to the floor, Defendant Blackman also radioed to have fellow jail staff open cell 6N402 and drop down the "9 key," an emergency key.

99.

For a minute or two thereafter, jail staff attempted to remove the bedsheet from Shane's neck but could not do so. They did not have a readily accessible rescue tool, which is specifically designed and used in such emergency situations. Instead, Jail staff had to go searching for the rescue tool before beginning any resuscitation efforts.

100.

Then, while one of the jail staff members walked away (presumably to find a rescue tool), the other jail staff stood around, outside Shane's cell, doing nothing.

101.

At approximately 6:16am, jail staff returned to Shane's cell at a normal pace with a knife/rescue tool, bringing it to the scene of his medical emergency with no sense of urgency.

102.

Defendant Blackman and Defendant Clark were then able to cut Shane down from the bedsheet, which was tied to the lower bunk bed, place Shane on the floor of his jail cell, and begin resuscitation efforts.

103.

Thereafter, sporadic, inadequate, inconsistent CPR was performed by Defendant Blackman and Defendant Clark as they waited for medical providers to arrive. They could not have performed continuous CPR on Shane as they kept walking in and out of his cell several times while supposedly providing emergency medical care.

104.

The Jail Staff did not have access to an AED and made no attempts to locate or administer one to Shane.

105.

Per widespread custom, the Jail Staff did not use AEDs to revive inmates in the Jail during their medical emergencies despite AEDs being an integral part of standard emergency medical care.

106.

Soon after 6:16am, Defendant Nwankwo arrived at Shane's cell, casually walking towards a known medical emergency. At that time, Defendant Nwanwko did not bring an AED with her.

107.

Pursuant to jail training and protocol as well as NaphCare's contractual obligations and policies, including but not limited to the Scope of Work, Paragraph G (Physical Health Service Requirements), Section 11 (Urgent/Emergency

Services), Defendant Nwankwo was obligated to take over for jail staff and provide emergency medical care to Shane as soon as she arrived.

108.

Instead, to the confusion, shock, and dismay of the jail staff on scene, Defendant Nwanwko refused to provide ANY medical treatment whatsoever to Shane, including but not limited to checking his breathing, checking his pulse, ensuring his airway was clear, administering CPR, or assisting AT ALL with resuscitation efforts.

109.

At that point, it was obvious to all jail staff and medical providers on scene that Shane was experiencing a life-threatening, serious medical need as he was unresponsive and no longer breathing.

110.

At 6:20 am, Lieutenant Robert Grady #2680 ("Defendant Grady") and Lieutenant Jimmy Kennedy #2804 ("Defendant Kennedy")  arrived at the scene of Shane's medical emergency, walking at a slow to normal pace. Both men appeared

to enter Shane's cell just briefly and then quickly exited less than twenty (20) seconds later. They pretty much stood outside Shane's cell the entire time and could not have performed continuous CPR on Shane, despite what they reported.

111.

At 6:21 am, a stretcher arrived along with the Automated External Defibrillator ("AED").

112.

When Defendant Agyei finally arrived at 6:22 am, he was walking at a slow to normal pace towards Shane's medical emergency. Once there, he walked in and out of Shane's cell several times before walking to the stretcher, which was outside Shane's cell, and then presumably was preparing the AED.

113.

During that time, Defendant Grady directed Defendant Nwanwko, a second time, to provide emergency medical aid to Shane but she refused to do so—again, pointing to her bad knee.

114.

At approximately 6:24 am, Defendant Grady directed Defendant Agyei to take over CPR for the jail staff per protocol.

115.

When Defendant Agyei tried to perform a cycle or two of CPR, jail staff observed that he was utterly incapable of performing that task. It was so insufficient that jail staff had to instruct him to stop and to let jail staff switch in instead.

116.

Defendant Grady described Defendant Agyei as appearing "somewhat disoriented" upon his arrival and throughout Shane's entire medical emergency.

117.

Around 6:25am, Defendant Agyei brought the AED into Shane's cell, more than fourteen (14) minutes after the call for emergency medical care went out. By that time, no shock was advised.

118.

At 6:36 am, EMS arrived and took over CPR.

119.

Then, at 6:49 am, EMS pronounced Shane dead.

120.

Defendant Nwankwo, and Defendant Agyei, each provided narrative reports about their involvement in response to Shane's medical emergency on February 1, 2021. Defendant Nwankwo and Defendant Agyei provided untruthful accounts of what occurred, conveniently omitting their unreasonable delay, their refusal and/or inability to provide medical care, and overall failure to provide adequate medical care to Shane, who was suffering from an obvious, life-threatening emergency medical needs.

121.

Conveniently, Defendant Nwankwo and Defendant Agyei were the only involved parties to report, in their witness statements regarding their involvement in Shane's medical emergency, that Shane's body was cold to the touch.

122.

An autopsy performed by Jacqueline Benjamin, M.D., of the Fulton County Medical Examiner's Office, listed Shane's cause of death as hanging.

123.

In the medical examiner's report, Jacqueline Benjamin, M.D. noted that there was faint red discoloration and abrasion on Shane's neck. She also noted the absence of petechiae or purpura on his skin, conjunctiva or oral mucosa.

124.

Shane's conditions were treatable and his death was preventable.

E.   Widespread customs and practices amounting to constitutional violations at the Fulton County Jail

125.

The Fulton County Jail ("Jail") has been troubled from the day it opened in 1989 and has a long history of problems providing health care for its inmates. Federal court oversight of the facility ended in 2015, eleven (11) years after the

Southern Center for Human Rights filed a lawsuit alleging crowded, deplorable and dangerous conditions. That lawsuit followed one the Southern Center for Human Rights brought in 1999 that claimed the jail provided inmates with inadequate health care. In 2015, the Fulton Sheriff's Office wanted to get rid of Corizon, the then-jail health provider, which they blamed for the jail's loss of accreditation.

126.

Inadequate supervision and understaffing have been an ongoing, acknowledged problem at the Jail and have been blamed for several deaths within the jail, before and after Shane's death.

127.

Between August and September of 2017, while Correct Care Solutions was the Jail's third-party medical provider, there were five deaths in the Jail. Three of the five deaths were suicide victims, Shannon Thompson, Bobby Fields and Vincent Williams. The other two deaths were Ligwenda Renee Metts and Willie Green, both of whom died due to egregious mistakes made by Correct Care Solutions medical personnel.

128.

These five (5) deaths were the catalyst behind Fulton County's decision to switch medical providers, replacing Correct Care Solutions with Defendant NaphCare, effective January 1, 2018.

129.

Upon Defendant NaphCare taking over contractual responsibilities as the medical provider at the Jail in 2018 (and ever since), the number of deaths in the Jail have steadily increased. The pervasive neglect of inmates in the Jail are glaringly obvious, unacceptable, and preventable.

130.

The following individuals died in the Jail as a direct and proximate result of Defendant NaphCare's widespread custom and practice of failing to provide proper mental health services and/or emergency medical care to inmates:

a)  Tyrique Tookes was eighteen (18) year old and detained in the Fulton County Jail for about two months when he was found dead, in his cell, on May 4, 2019. During the two weeks prior to his death, Tyrique Tookes complained to jail and medical staff about bad chest pains but Defendant

NaphCare failed to provide proper medical treatment to him. Tyrique

Tookes tragically died of an undetected ruptured aorta.

b) On July 22, 2019, William Barnett, died as a result of Defendant

NaphCare's failure to properly identify and treat his low-potassium

condition.

c) In January of 2022, a thirty-two (32) year-old veteran, who had been

detained for less than a week in the Jail, when he died by suicide.

d) In September of 2022, Lashawn Pannell Thompson, a thirty-five (35)

year-old mentally-ill inmate died in the Jail due to unconscionable living

conditions and grossly inadequate medical and mental health care.

According to an internal investigation by Defendant NaphCare into the

circumstances of Lashawn Pannell Thompson's death, his final days were

indicative of widespread neglect.

e) In October of 2022, an unnamed inmate who was being housed in the

mental health unit was found dead, with his wrists and ankles bound.


131.

The ongoing, widespread pattern of Defendant NaphCare and Defendant Labat

failing to provide proper medical treatment to mentally ill inmates in their care and

custody has been the subject of an ongoing class action lawsuit brought on behalf of female detainees housed at the South Fulton Annex jail in Union City, Georgia. See Georgia Advocacy Office et al v. Labat et al, NDGA, Case 1:19-cv-01634-WMR.

132.

The failure of Defendants Fulton County, Labat, and NaphCare to correct their egregious, widespread customs and practices, as described above and herein, demonstrated their willing, deliberate indifference with respect to Shane's constitutional rights and life.

133.

With regard to Defendant NaphCare, who provides medical care in jails and prisons throughout the country, has been repeatedly accused of neglecting the medical needs of detained people, with ongoing, catastrophic consequences and elevating inmate death rates. In a recent study, Defendant NaphCare had the highest death rates among the top five (5) jail healthcare businesses.

134.

Since entering office in January 2021, Defendant Labat has openly communicated to Defendant Fulton County, through their Board of Commissioners, Defendant NaphCare, and the media and general public that he had profound safety concerns for inmates in the Jail, especially mentally ill ones, due to severe overcrowding therein and the lack of adequate funding and space available to him.

135.

The Fulton County jail is designed to hold just over 2,500 inmates. However, since the COVID-19 pandemic hit in March 2020, upwards of 3,000 inmates, on average, are housed there.

136.

Despite this significant increase in the Jail's inmate population, Defendant Labat's ongoing request for more funding and more space to carry out his jail operations, and the known, imminent risk of death to Fulton County inmates if Defendant Fulton County failed to adequately fund Defendant Labat's constitutional obligations to inmates in his custody, proper funding was not provided by the Fulton County Board of Commissioners.

137.

Less than two months after Shane Kendall died, Defendant Labat told The Atlanta Journal-Constitution that "We have an obligation as a sheriff's office to treat people like they're humans." "He was also quoted saying that "he needs a new jail to offer the services that would help inmates, including proper mental health services and substance abuse care, because he can't provide them in the current space."

138.

While pleading for funding and additional space to house Fulton County inmates, Defendant Labat alerted Defendant Fulton County to the dire nature of his request for help, saying "I'm walking in a space where lives are at risk" and it "could be a life or death situation for thousands of people" if these obvious problems are not corrected immediately.

139.

In addition to pervasive inmate safety concerns due to understaffing, underfunding, and inadequate space, it was also known by Defendant Labat and Defendant Fulton County that Defendant NaphCare was unable to provide

adequate medical services to mentally ill inmates in the custody of the Fulton

County Sheriff's Office.

140.

Defendant NaphCare medical providers in the Fulton County jail engaged in

known, widespread practices of providing insufficient, inadequate mental health

services to mentally ill inmates.

141.

An internal report by Defendant NaphCare in 2022, following the death of

another mentally ill inmate in the Jail, described widespread, unimaginable neglect

of mentally ill inmates in the Fulton County jail, noting that that they were

collectively wasting away and living in unsanitary, deplorable housing conditions.

142.

In 2022, Labat said during at an Atlanta City Council meeting: "I've been

sounding this alarm for 365 days, if not longer.

143.

Defendants' actions and omissions led to the wrongful death of Shane, his pain and suffering before he died and the infliction of emotional distress of Plaintiff Joseph Kendall, Shane's father.

144.

As a direct, proximate, and foreseeable result of the negligent acts and omissions of the Fulton County jail and Defendant NaphCare., and/or their agents, servants and employees, in their medical negligence, negligence and deliberate indifference, as complained of herein, Shane suffered excruciating mental, physical and emotional pain up until the time of his tragic death.

145.

In accordance with O.C.G.A. §§ 36-11-1 and 50-21-26, on September 13, 2021, the appropriate Defendants were sent an Anti Litem Notice on via certified mail, return receipt requested (attached hereto as Exhibit 1).

III.   <u>JURISDICTION</u>

146.

Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §1983 and §1988 and 28 U.S.C. § 1331, §1343. Additionally, jurisdiction exists pursuant to 28 U.S.C. § 1332, as the matter in controversy: a) exceeds the sum or value of $75,000, exclusive of interest and costs, and b) is between citizens of different States, as the Plaintiff is a citizen of the State of Georgia and Defendant NaphCare is a citizen of Alabama; and, additionally Defendants Patrick Labat, Defendants Michael Agyei, Edith Nwankwo, Albernisha Blackman, Rayshaun Clark, Jimmy Kennedy and Robert Grady are citizens of Georgia.

147.

Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a) over the state law claims addressed herein.

148.

All relief available under the foregoing statutes is sought herein by Plaintiff.

IV.   <u>VENUE</u>

149.

Venue is proper pursuant to 28 U.S.C. § 139 (b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

150.

Assignment to the Northern District of Georgia is proper pursuant to Northern District of Georgia Local Rules, because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

V.   <u>TIMELINESS OF COMPLAINT</u>

151.

This lawsuit has been filed within the statute of limitations as provided by O.C.G.A. § 9-3-71 (...an action for medical malpractice shall be brought within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred."). See O.C.G.A. § 9-3-71.

VI.   <u>PARTIES</u>

A. <u>Plaintiff</u>

152.

Shane Miguel Kendall ("Shane") was at all times relevant to this Complaint a resident of the State of Georgia in the custody and care of the Fulton County Jail in Fulton County, Georgia.

153.

Plaintiff Harold Joseph Kendall ("Plaintiff") is a resident of the State of Georgia. Plaintiff is the adopted father and sole heir of Shane Miguel Kendall. Plaintiff is the Administrator of the Estate of Shane Kendall. Plaintiff brings this action individually and in his representative capacity on behalf of the Estate of Shane Miguel Kendall as the Administrator of the Estate of Shane Miguel Kendall.

B. <u>Named Defendants</u>

   i.   <u>Fulton County</u>

154.

Defendant Fulton County is a governmental entity and political subdivision of the State of Georgia and thus is constitutes a state actor.  Through its Board of

Commissioners, Defendant Fulton County provides funding to operate the Fulton County jail operations. Defendant Fulton County is subject to the jurisdiction of this Court, and venue is proper.

155.

Defendant Fulton County, as a persistent policy and customary practice, failed to adequately fund jail operations, which caused too few qualified employees, staff, and agents, including medical personnel and guards, to be hired at the Jail; caused the Jail to have inadequate space to enable it to perform adequate medical and mental care and security services to its inmates; caused the Jail to have inadequate resources to enable it to provide adequate medical care, mental health care and security services to inmates; caused the Jail to have inadequate training and supervision of its employees, staff and agents, including guards and medical personnel, resulting in the inadequate delivery of medical care, emergency responsiveness and protocols, provision of security, and inability to properly conduct the intake and classification of inmates.

156.

At all times relevant to this Complaint, Defendant Fulton County knew that the jail was overcrowded, understaffed, in deplorable condition and dangerous.

157.

At all times relevant to this Complaint, Defendant Fulton County knew that it was not providing adequate funding to ensure inmates received proper medical care, especially mentally ill inmates. It was known that there were inadequate housing options within the jail for mentally ill inmates.

158.

Defendant Fulton County's actions and inactions exhibited deliberate indifference to the safety and well-being of inmates at the Fulton County jail, including Shane, and subjected him to the unnecessary and wanton infliction of pain and ultimately, death, which constituted cruel and unusual punishment.

    ii.    NaphCare, Inc.

159.

NaphCare, Inc. ("Defendant NaphCare") is a foreign profit corporation, and is authorized to transact business in Georgia. NaphCare's principal office is located at: 2090 Columbiana Road, Suite 4000, Birmingham, AL, 35216.

160.

Defendant NaphCare may be served upon its registered agent, Corporation

Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia

30092, in Gwinnett County Georgia or through acknowledgment of counsel.

Defendant NaphCare is subject to the jurisdiction of this Court, and venue is

proper.

161.

Defendant NaphCare, entered into a contract entitled "17RFP07012016B-BR

Inmate Medical Services" with Defendant Fulton County effective January 1, 2018

with four renewal options to provide "physical and mental health services for

inmates at Fulton County Jail facilities." (hereinafter "NaphCare Contract").

162.

Exhibit C of the NaphCare Contract discussed the Scope of Work involved. It

also obligated Defendant NaphCare to "provide health services to inmates in

compliance with all applicable federal and state standards, statutes and regulations,

including, but not limited to, the U.S. Constitution and correctional health

standards of care."

163.

The Scope of Work also required all services to be in accordance with American Correctional Association (ACA), American Medical Association (AMA), American Psychiatric Association (APA) and the National Commission on Correctional Health Care (NCCHC) standards.

164.

Further, Defendant NaphCare was to secure and maintain NCCHC accreditation and reaccreditation at their own expense and to undertake any and all actions necessary to maintain NCCHC accreditation.

165.

Defendant NaphCare agreed, per the NaphCare Contract, to provide the Jail's inmates with twenty-four hours per day, seven days a week medical and mental health services including Intake screening and physical examinations; Emergency health care services; psychological and psychiatric Services, Behavior Management Program; Education, and In-service training.

166.

Under the "Protocols, Policies and Procedures" section of the NaphCare Contract, Defendant NaphCare was required to prepare and implement protocols, policies and procedures, which complied with the policies and procedures of the Fulton County Sheriff's Department.

167.

At all times relevant herein, Defendant NaphCare was responsible for administration, supervision and delivery of health and medical services at the Jail including the hiring, training, and supervising nurses and other healthcare professionals, regardless of whether they were employees or independent service providers.

168.

With regards to the individuals hired by Defendant NaphCare to act and perform in furtherance of the NaphCare Contract, Defendant NaphCare is required to "interview each staff candidate with special focus on technical expertise,

emotional stability, and motivation, and shall hire only those employees who are qualified and licensed in accordance with Section 11.7 of this Agreement." [1]

169.

Defendant NaphCare, at all times relevant to this Action, acted under the color of state law and assumed the public function of providing healthcare and medical services to county inmates in the and was legally responsible to comply with all requirements of the United States Constitution with regard to providing adequate medical care to inmates and detainees.

iii.  <u>Patrick Labat</u>

170.

At all times relevant to this Action, Patrick Labat was the Sheriff of Fulton County, Georgia ("Defendant Labat"). Defendant Labat was responsible for the

---

[1] Section 11.7 of the NaphCare Contract provides that "All personnel provided or made available by Service Provider to render services hereunder shall be licensed, certified, or registered, as appropriate, in their respective areas of expertise as required by applicable Georgia law, without any license, certification, or registration restriction whatsoever and as appropriate in their respective areas of expertise pursuant to applicable Georgia law, federal law, applicable standards and rules of the American Correctional Association ("ACA"), National Commission on Correctional Health Care ("NCCHC"), and the American Medical Association ("AMA"), to the extent such standards and rules exist during the term of this Agreement (including any modifications or extensions thereto), and any other applicable legal requirements."

operations of the Fulton County Sheriff's office, including the Fulton County Jail.

Defendant Labat was responsible for the day-to-day operations of the Jail,

including the provision of medical care to inmates in his custody.  As Sheriff, he

had custody, control and in charge of the Jail, jail staff, and inmates.

171.

At all relevant times Defendant Labat acted under the color of state law.

Defendant Labat is being sued for damages in his individual capacity.

172.

Defendant Labat is a resident and citizen of the State of Georgia, and may be

served with process at: 185 Central Ave. SW, 9th Floor, Atlanta, Georgia 30303 or

through acknowledgment of counsel. Defendant Labat is subject to the jurisdiction

of this Court, and venue is proper.

173.

As the Sheriff of Fulton County, Defendant Labat was responsible for

furnishing Fulton County jail inmates with medical aid and adequate treatment.

174.

Defendant Labat was an official with final responsibility for, and knowingly promulgated, enforced, and allowed to persist, policies and procedures of the Jail that, among other things:

a) Caused too few qualified employees, staff, and agents, including medical personnel and guards, to be hired at the Jail;

b) Caused the Jail to have inadequate space to enable it to perform adequate medical care and security services to its inmates;

c) Caused the Jail to have inadequate resources to enable it to provide adequate medical care and security services to inmates;

d) Caused the Jail to have inadequate training and supervision of its employees, staff and agents, including guards and medical personnel, resulting in the inadequate delivery of medical care, provision of security, and inability to properly conduct the intake and classification of inmates.

175.

Defendant Labat is also responsible for the training and supervision of Jail employees, staff and agents, including medical personnel.

176.

At all times relevant to this complaint, Defendant Labat knew that inmates at the Jail were not receiving adequate medical care for serious medical needs and failed to take reasonable steps to address the problem.

iv.   Lieutenant Jimmy Kennedy #2804

177.

At all times relevant to this Action, Lieutenant Jimmy Kennedy  #2804 ("Defendant Kennedy") was an employee of Fulton County Sheriff's Office.

178.

Defendant Kennedy was responsible for overseeing jail staff within the Fulton County Jail.

179.

Defendant Kennedy was responsible for ensuring jail staff complied with

Fulton County Sheriff's standard operating procedures and training.

180.

Defendant Kennedy supervised jail operations within the Fulton County jail.

181.

Defendant Kennedy responsible for acting in a manner consistent with his

training and the Fulton County Sheriff's standard operating procedures.

182.

At all relevant times Defendant Kennedy acted under the color of state law.

183.

Defendant Kennedy is being sued for damages in his individual capacity.

184.

Defendant Kennedy is a resident and citizen of the State of Georgia, and may be served with process at: 185 Central Ave. SW, 9th Floor, Atlanta, Georgia 30303 or through acknowledgment of counsel.

185.

Defendant Kennedy is subject to the jurisdiction of this Court, and venue is proper.

v.   Lieutenant Robert Grady #2680

186.

At all times relevant to this Action, Lieutenant Robert Grady #2680 ("Defendant Grady") was an employee of Fulton County Sheriff's Office.

187.

Defendant Grady was responsible for overseeing jail staff within the Fulton County Jail.

188.

Defendant Grady was responsible for ensuring jail staff complied with Fulton County Sheriff's standard operating procedures and training.

189.

Defendant Grady supervised jail operations within the Fulton County jail.

190.

Defendant Grady responsible for acting in a manner consistent with his training and the Fulton County Sheriff's standard operating procedures.

191.

At all relevant times Defendant Grady acted under the color of state law.

192.

Defendant Grady is being sued for damages in his individual capacity.

193.

Defendant Grady is a resident and citizen of the State of Georgia, and may be served with process at: 185 Central Ave. SW, 9th Floor, Atlanta, Georgia 30303 or through acknowledgment of counsel.

194.

Defendant Grady is subject to the jurisdiction of this Court, and venue is proper.

vi.    Cadet Albernisha Blackman D3519

195.

At all times relevant to this Action, Cadet Albernisha Blackman D3519

("Defendant Blackman").

196.

Defendant Blackman was an employee of Fulton County Sheriff's Office.

197.

At all relevant times, Defendant Blackman acted under the color of state law.

198.

As a Cadet, Defendant Blackman was responsible for supervising inmates

within the Fulton County jail and ensuring their safety and protection.

199.

Defendant Blackman was responsible for acting in a manner consistent with her training, jail procedures, protocol and customs, and relevant law.

200.

Defendant Blackman is being sued for damages in her individual capacity.

201.

Defendant Blackman is a resident and citizen of the State of Georgia, and may be served with process at: 185 Central Ave. SW, 9th Floor, Atlanta, Georgia 30303 or through acknowledgment of counsel.

202.

Defendant Blackman is subject to the jurisdiction of this Court, and venue is proper.

vii.    Detention Officer Rayshaun Clark D1492

203.

At all times relevant to this Action, Detention Officer Rayshaun Clark D1492 ("Defendant Clark") was an employee of Fulton County Sheriff's Office.

204.

At all relevant times, Defendant Clark acted under the color of state law.

205.

Defendant Clark was responsible for supervising inmates within the Jail and ensuring their safety and protection.

206.

Defendant Clark was responsible for acting in a manner consistent with his training, protocol and relevant law.

207.

Defendant Clark is being sued for damages in his individual capacity.

208.

Defendant Clark is a resident and citizen of the State of Georgia, and may be served with process at: 185 Central Ave. SW, 9th Floor, Atlanta, Georgia 30303 or through acknowledgment of counsel.

209.

Defendant Clark is subject to the jurisdiction of this Court, and venue is proper.

viii.   Michael Agyei, PA-C

210.

At all times relevant to this Complaint, Michael Agyei, PA-C ("Defendant Agyei") was employed by Defendant NaphCare, as a certified Physician's Assistant, and was responsible for providing medical services to inmates at the Jail.

211.

Upon information and belief, Defendant Agyei is a Physician's Assistant-Certified ("PA-C") licensed to practice in Georgia to diagnose and treat illness as

well as provide preventive care under physician supervision, at all times relevant herein.

## 212.

At all relevant times, Defendant Agyei acted under the color of state law and pursuant to a contract with the Jail. Defendant Agyei was an employee and/or agent and/or ostensible agent of Defendants Fulton County and NaphCare.

## 213.

Defendant Agyei is being sued for damages in his individual capacity.

## 214.

Defendant Agyei is a resident and citizen of the State of Georgia and may be served with process at 901 Rice Street, Atlanta, Georgia, 30318, Fulton County, Georgia or through acknowledgment of counsel.

## 215.

Defendant Agyei is subject to the jurisdiction of this Court, and venue is proper.

216.

At all times relevant to this Complaint, Defendant Agyei was responsible for the administration and delivery of health and medical services at the Jail.

    ix.    <u>Edith Nwankwo, RN</u>

217.

At all times relevant to this Complaint, Edith Nwankwo, RN ("Defendant Nwankwo") was employed by Defendant NaphCare, as a Registered Nurse, and was responsible for providing medical services to inmates at the Fulton County jail.

218.

Upon information and belief, Defendant Nwankwo is a Registered Nurse, licensed to provide nursing care in Georgia, at all times relevant herein.

219.

At all relevant times, Defendant Nwankwo acted under the color of state law and pursuant to a contract with the Jail. Defendant Nwankwo was an employee

and/or agent and/or ostensible agent of both Defendants Fulton County and NaphCare.

220.

Defendant Nwankwo is being sued for damages in her individual capacity.

221.

Defendant Nwankwo is a resident and citizen of the State of Georgia and may be served with process at 901 Rice Street, Atlanta, Georgia, 30318, Fulton County, Georgia or through acknowledgment of counsel.

222.

Defendant Nwankwo is subject to the jurisdiction of this Court, and venue is proper.

223.

At all times relevant to this Complaint, Defendant Nwankwo was responsible for the administration and delivery of health and medical services at the Jail.

## VII.   <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
### <u>(DEFENDANT FULTON COUNTY)</u>
### <u>42 U.S.C. §1983:  FOURTEENTH AMENDMENT VIOLATION</u>
### <u>"MONELL LIABILITY"</u>

224.

This private cause of action against Defendant Fulton County is based on the

holding in <u>Monell v. Dep't of Social Servs</u>., 436 U.S. 658, 691 (1978), where the

Court held that a state actor can be held liable under 42 U.S.C. §1983 "when

execution of a government's policy or custom" is responsible for the alleged

deprivation of civil rights. ("Monell Liability").

225.

A custom is defined "a longstanding and widespread practice that it is deemed

authorized by the policymaking officials because they must have known about it

but failed to stop it". <u>Craig v. Floyd County</u>, 643 F.3d 1306 (11th Cir. 2011).

226.

Defendant Fulton County is a governmental entity and political subdivision of the State of Georgia and thus is constitutes a state actor.

227.

Through its Board of Commissioners, Defendant Fulton County provides funding to operate the Fulton County jail operations.

228.

The standard for analyzing pretrial detainee claims under the Fourteenth (14th) Amendment is the same as claims made by prisoners under the Eighth (8th) Amendment. Goodman v. Kimbrough, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013).

229.

Pretrial detainees plainly have a Fourteenth (14th) Amendment due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide. Jackson v. West, 787 F.3d 1345 (11th Cir. 2015)

230.

Defendant Fulton County has a long, troubled history of providing inadequate funding for jail operations in the Fulton County Jail.  Plaintiff realleges and incorporates the allegations contained in Paragraphs 134 through 142 of this First Amended Complaint as if fully restated herein.

231.

Ever since the COVID-19 pandemic and the temporary shutdown of the Court system, Defendant Fulton County knew that the Jail was becoming increasingly overcrowded, understaffed and frankly, very dangerous.

232.

In January 2021, Defendant Labat notified Defendant Fulton County that he could not fulfill his constitutional obligations (to provide adequate supervision and medical care to inmates), without additional funding or space from Defendant Fulton County.

233.

In January 2021, Defendant Labat also notified Defendant Fulton County that he specifically feared for the safety of mentally ill inmates, telling the Fulton

County Board of Commissioners that the jail lacked adequate space, equipment, services or resources to properly protect, treat or provide medical care for mentally ill inmates.

234.

So, as early as January 2021 (but likely earlier), Defendant Fulton County knew of the deplorable conditions within the Jail and knew of Defendant Labat's inability to fulfill his constitutional obligations to inmates under then-existing conditions, without additional funding.

235.

Defendant Fulton County knew that their failure to provide proper funding for jail operations in 2021 would likely lead to imminent, predictable, senseless suffering and deaths of inmates and/or jail staff.

236.

Defendant Fulton County also knew that it could face potential liability for acknowledging both the atrocious conditions at the Jail and the imminent risk of injury and death to inmates due to those conditions but still decided not to provide adequate funds to correct/rectify the atrocious conditions therein.

237.

Under the above-discussed circumstances, by delaying the provision of desperately needed funds to Defendant Labat, Defendant Fulton County knowingly permitted the deplorable conditions to continue and knowingly accepted the risk of preventable suffering and death to at-risk inmates.

238.

Defendant Fulton County's unconstitutional practice of failing to provide necessary funding to Defendant Labat for jail operations deprived Shane of access to adequate mental health care (including supervision) and emergency medical treatment, which are protected by the Fourteenth (14th) Amendment of the United States Constitution and constitutes deliberate indifference to Shane's serious medical needs.

239.

Defendant Fulton County's widespread and sustained practice of failing to adequately fund jail operations directly contributed to Shane's death. Like a domino effect, Defendant Fulton County's failure to adequately fund operations directly led to the Jail's widespread inability to:

 a)  provide safe housing for mentally ill inmates, including Shane;

b)  provide adequate mental health care to mentally ill inmates, including Shane;

c)  provide readily accessible rescue tools and AED equipment in each jail pod in the event of an attempted suicide or medical emergency;

d)  provide adequate supervision of mentally ill inmates, including Shane; and,

e)  ensure that Jail staff and medical personnel acted in compliance with their training and baseline standards of care, including but not limited to being physically able to perform the tasks associated with their jobs.

240.

As a direct and proximate result of Defendant Fulton County violating Shane's Fourteenth (14th) Amendment rights, Shane suffered physical injuries, pain and suffering, and mental and emotional distress and, ultimately, death.

241.

As a result of Defendant Fulton County's actions and inactions, Plaintiff is entitled to compensatory damages for the loss of Shane's life and damages in an amount to be proven at trial for Shane's pain and suffering.

## COUNT II
## (DEFENDANT SHERIFF PATRICK LABAT,
## IN HIS INDIVIDUAL CAPACITY)
## 42 U.S.C. §1983: FOURTEENTH AMENDMENT VIOLATION
## "MONELL LIABILITY"

242.

This cause of action against Defendant Labat is brought against him in his individual capacity, based upon his "Monell Liability".

243.

At all times relevant to this action, Defendant Labat acted in a supervisory capacity as the elected Sheriff of Fulton County since January 1, 2021, overseeing all operations of the Jail.

244.

Supervisors can be held liable for the constitutional violations of their subordinates under § 1983 "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation. Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007)

245.

Defendant Labat's duties as a supervisor include:

a)  training its employees, staff, subcontractors and agents and establishing, monitoring and implementing policies that protect the rights guaranteed to pretrial detainees under the Fourteenth Amendment.

b)  directing, procuring, and ensuring that constitutionally adequate medical care is provided to inmates in his custody, including those will mental illness

c)  promulgating and enforcing policies and procedures regarding the provision of the mental health care and emergency medical care that meet or exceed accreditation standards.

d)  monitoring Defendant NaphCare's adherence and performance in furtherance of their obligations under the NaphCare Contract.

246.

Under the facts of Shane's case, Defendant Labat is liable as a supervisor under both types of § 1983 supervisor liability.

247.

In the context of supervisory liability, a causal connection exists when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. Mathews v. Crosby, 480 F.3d 1265 (11th Cir. 2007).

248.

First, Defendant Labat personally participated in constitutional violations which resulted in Shane's death because he had actual, personal knowledge of Shane's severe mental illness and vulnerability in general population housing and the inadequacy of the medical care and supervision provided to him.

249.

Defendant Labat knew about Shane because of his many interactions with Shane's adopted father, Plaintiff Harold Joseph Kendall and his partner, Margie Thorpe, wherein they described Shane's deteriorating condition in the Jail as well

his overall lack of safety while housed at the Jail and not properly identified or treated as a mentally ill inmate (despite all parties being aware of his severe mental illness).

250.

Defendant Labat socialized with Plaintiff Harold Joseph Kendall and Margie Thorpe and personally knew about Shane's unmet mental health needs in the Jail.

251.

Plaintiff realleges and incorporates the allegations contained in Paragraphs 56 through 68 of this Complaint as if fully restated herein.

252.

But, to reiterate, upon taking office in January 2021, Defendant Labat promised Plaintiff Harold Joseph Kendall and Margie Thorpe that he would personally look out for Shane in the Jail and keep him safe.

253.

Despite Defendant Labat's actual knowledge of Shane's condition in the Jail and his specific promises to the Plaintiff to make the jail safer for Shane and other

mentally ill inmates, and actually visiting Shane in his jail pod sometime between

January 1, 2021 and January 5, 2021, Defendant Labat did not use his authority or

supervisory powers to correct the widespread mistreatment of mentally ill inmates

nor did he protect Shane by fixing his Shane's housing assignment, supervision

level and classification within the Jail (such that his staff would also be well-aware

of Shane's mental illness and do all that they could, while supervising him, to keep

him safe).

254.

The tragic result of Defendant Labat's inactions with regards to correcting the

known, deficient supervision and care of Shane was that he died less than a month

later, due to inadequate supervision and egregiously improper medical and

emergency medical care by his own staff as well as by Defendant NaphCare

employees.

255.

Because of Defendant's actual knowledge, his promise to Plaintiff Harold

Joseph Kendall and Margie Thorpe to keep Shane safe, his ultimate operational

authority to fulfill this promise and his failure to take adequate corrective measures

to ensure Shane's safety and well-being, there is no doubt that Defendant Labat, himself, was a moving force behind the unconstitutional actions and inactions of jail staff and medical providers that caused Shane's death on February 1, 2021.

256.

Second, Defendant Labat is also liable as a supervisor under § 1983 because there was causal connection between his actions, as the supervising official, and the constitutional deprivations resulting in Shane's untimely death.

257.

At all times relevant to this action, Defendant Labat knew that the Fulton County Jail was dangerously overcrowded.

258.

At all times relevant to this action, Defendant Labat knew and openly admitted to the Fulton County Board of Commissioners during a public meeting in January 2021, while asking for additional funding, that the Jail was in bad shape due to

grossly insufficient staffing and insufficient space to safely house the inmates in his custody, especially those with mental illnesses.

259.

Defendant Labat knew that mentally ill inmates were not receiving adequate medical care or supervision in the Jail, especially the mentally ill inmates who were regularly housed in general population.

260.

Defendant Labat also knew that it was a widespread, customary practice in the Jail to house severely mentally ill inmates amongst general population inmates, without also ensuring that jail staff knew which inmates had severe mental illness and could provide them with necessary, additional supervision and security.

261.

Defendant Labat knew that this widespread practice of interspersing mentally ill inmates with general population inmates created a very dangerous environment for

all inmates and jail staff. Still, Defendant failed to take necessary, corrective action to protect these inmates.

## 262.

At all times relevant to action, Defendant Labat knew that he would not be able to fulfill his constitutional obligations to inmates without more funding, more staffing, more supervision, more training, more space, and better medical care.

## 263.

Defendant Labat permitted practice of not flagging or identifying mentally ill inmates living in general population such that jail staff would know who they were interacting with and could apply their training, supervise them appropriately and treat them accordingly.

## 264.

Defendant Labat permitted the widespread practice of jail staff and medical personnel ignoring standard operating procedures and written protocol regarding intake evaluations of inmates, suicide risk assessments and housing assignment determinations.

265.

Defendant Labat knew that the jail was not adequately equipped with ready access to proper rescue tools, AEDs and other medical equipment that would allow jail staff to promptly begin performing life-saving resuscitation efforts while waiting for trained senior medical personnel to arrive on scene during inmate medical emergencies.

266.

Defendant Labat knew that Defendant NaphCare and its medical providers were not performing adequately or in accordance with their contractual obligations to inmates at the Jail.

267.

Defendant Labat knew that Defendant NaphCare lacked competent medical personnel, adequate staffing, medical supplies, and resources to provide ongoing, mental health care to the inmates at the Jail.

268.

Defendant Labat also knew that Defendant NaphCare lacked competent medical personnel, adequate staffing, medical supplies, and resources to respond to inmates' medical emergencies within a reasonable time.

269.

These persistent and widespread abusive practices by Defendant NaphCare were known by Defendant Labat but not corrected by him, even though he had the ultimate authority to do so and clearly understood how the fatal risks associated with failing to correct them immediately.

270.

As a direct result of Defendant Labat's failure to correct these widespread, dangerous practices, his conduct constituted deliberate indifference to severely mentally ill inmates, such as Shane, and their constitutional rights to receive proper medical care.

271.

Shane's death on February 1, 2021 was proximately caused by Defendant Labats's failure to fix known deficiencies in mental health care and emergency care and promulgate, supervise and implement practices that comply with standard emergency medical care protocols, training, and constitutional obligations.

272.

The above-discussed, unconstitutional customs of jail staff and Defendant

NaphCare medical providers that contributed and proximately caused Shane's

death also contributed to (too) many more untimely, senseless, preventable deaths

of mentally ill inmates in the Jail throughout Defendant Labat's tenure.

273.

The known, dangerous, widespread pattern of providing insufficient

supervision for mentally ill inmates at the Jail as well as the systemic, gross

deficiencies in the provision of emergency medical and mental health care of

severely, mentally ill inmates has not been corrected and, sadly, has persisted long

after Shane's death (causing the death of many more inmates at the Jail).

274.

In 2022, alone, there were fourteen (14) deaths in the Jail, only three (3) of

which were considered homicides. Many of these senseless deaths involved

mentally ill inmates, like Shane. For a few, brief examples:

   a)  In January, 2022, it was reported a 32-year-old veteran who had been

       detained for less than a week when he died by suicide.

b) In September, 2022 Lashawn Pannell Thompson, a 35 yr. old mentally ill patient dies at Fulton County Jail that were precipitated by the final days of widespread neglect.

c) In October, 2022 an unnamed inmate an inmate on the mental health floor of the jail was found dead in his cell with his wrists and ankles bound.

### 275.

Accordingly, Defendants' deliberate indifference to Shane's serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Fourteenth (14th) Amendment.

### 276.

As a direct and proximate result of Defendant Labat's violation of his Fourteenth (14th) Amendment rights, Shane suffered physical injuries, pain and suffering, and mental and emotional distress and death.

**COUNT III**
**(DEFENDANT ALBERNISHA BLACKMAN AND**
**DEFENDANT RAYSHAUN CLARK)**
**42 U.S.C. §1983: FOURTEENTH AMENDMENT VIOLATION**

277.

At all times relevant to this action, Cadet Albernisha Blackman D3519 ("Defendant Blackman") and Detention Officer Rayshaun Clark D1492 ("Defendant Clark") were employees of Fulton County Sheriff's Office and acted under the color of state law.

278.

Both Defendant Blackman and Defendant Clark were responsible for supervising inmates within the Fulton County jail and ensuring their safety and protection.

279.

Both Defendant Blackman and Defendant Clark were responsible for acting in a manner consistent with their training, jail procedures, protocol and customs, and relevant law, which include required training in and the ability to perform basic emergency medical care such as CPR and the use of an AED.

280.

On the morning of February 1, 2021, Defendant Blackman looked inside Shane's cell 6N402 of the Fulton County jail along with Defendant Clark and saw

Shane slouched over, with his feet on the ground and a blue bed sheet tied to the bunk, and a knot around Shane's neck.

281.

It would have been obvious to a layperson at that moment that the Shane was experiencing an objectively serious medical need that, if not immediately treated, he would almost surely die.

282.

Defendant Blackman and Defendant Clark also subjectively knew that there was a substantial risk of harm to Shane if immediate medical care was not provided to Shane, as evidenced by Defendant Blackman's quick, emergency call to the on-site medical providers, asking for their urgent assistance and a stretcher for an unconscious, breathing inmate, who had apparently attempted suicide in his jail cell.

283.

Knowing that time was of the essence, both Defendant Blackman and Defendant Clark failed to act with any urgency and delayed emergency medical care to Shane for five minutes as they waited for another jail staff member to bring

a rescue tool to the scene so they could remove the bedsheet from around Shane's neck.

284.

While waiting for this rescue tool, Defendant Blackman and Defendant Clark walked in and out of Shane's cell and did not perform CPR continuously, if at all, or take any other action consistent with the Jail's procedures, protocol and training required in emergency medical care situations at the Jail.

285.

The failure of both Defendant Blackman and Defendant Clark to take immediate action to get Shane down from the makeshift noose tied around his neck and consistently perform CPR until medical personnel arrived amounted to a total disregard of the serious risk of harm to Shane and constituted willful ignorance of a serious medical need and an intentional delay in medical care that ultimately caused his death.

286.

As soon as Defendant Blackman and Defendant Clark identified Shane as experiencing a serious medical emergency, their failure to immediately take action

to help Shane during his obvious, serious medical emergency constituted "deliberate indifference" to Shane's Fourteenth (14th) Amendment right to adequate medical care in the Jail.

287.

Their failure to act was the proximate cause of Shane's death, which was avoidable within a reasonable degree of medical certainty.

288.

As a direct and proximate result of Defendant Blackman's and Defendant Clark's deliberate indifference to Shane's obvious, urgent medical needs, Shane suffered physical injuries, pain and suffering, and mental and emotional distress and the loss of his life—in violation of Shane's Fourteenth (14th) Amendment right to free from unnecessary and wanton infliction of pain.

289.

As a result of Defendant Blackman and Defendant Clark actions and inactions, Plaintiff is entitled to compensatory damages for the loss of Shane's life and damages in an amount to be proven at trial for Shane's pain and suffering

## COUNT IV
## (DEFENDANT ROBERT GRADY AND DEFENDANT JIMMY KENNEDY)
## 42 U.S.C. §1983: FOURTEENTH AMENDMENT VIOLATION

290.

At all times relevant to this action, Lieutenant Robert Grady #2680 ("Defendant Grady") and Lieutenant Jimmy Kennedy #2804 ("Defendant Kennedy") were employees of Fulton County Sheriff's Office and acted under the color of state law.

291.

Both Defendant Grady and Defendant Kennedy were responsible for supervising inmates within the Jail and ensuring their safety and protection.

292.

Both Defendant Grady and Defendant Kennedy were responsible for acting in a manner consistent with their training, jail procedures, protocol and customs, and relevant law, which includes required training in and the ability to perform basic emergency medical care such as CPR and use of an AED.

293.

On the morning of February 1, 2021, it took Defendant Grady and Defendant

Kennedy ten (10) minutes after getting the emergency call from Defendant

Blackman and Defendant Clark (regarding Shane's attempted suicide in progress)

to respond to Shane's cell 6N402 and assist with resuscitation efforts.

294.

Video evidence reveals that Defendant Grady and Defendant Kennedy walked

towards Shane cell at a slow to normal pace, even though they both knew that time

was of the essence, when it came to performing CPR and providing emergency

medical care to an unconscious inmate.

295.

Defendant Grady and Defendant Kennedy, per their training and protocol, knew

that an unconscious inmate who was hanging by a bedsheet to his bunk was

experiencing an objectively serious medical need and that if the inmate was not

immediately resuscitated and provided with medical care, he would likely die.

296.

Defendant Grady and Defendant Kennedy also subjectively knew that there was a substantial risk of harm to Shane if they failed to provide emergency medical care to him upon arriving at Shane's cell and seeing Shane's dire condition firsthand.

297.

Upon their arrival on scene, Defendant Grady and Defendant Kennedy entered Shane's cell and then quickly exit in less than twenty (20) seconds later. They basically stood around outside Shane's cell the entire time that Shane was experiencing a medical emergency. In contradiction with their witness statements, Defendant Grady and Defendant Kennedy could not have performed continuous CPR on Shane and blatantly violated Shane's rights as well as their training standards and Jail procedure, protocol and customs.

298.

Defendant Grady's and Defendant Kennedy's unreasonable delay in arriving at Shane's cell during his medical emergency and failing to consistently participate in resuscitation efforts demonstrated a willful disregard for the risk of serious harm to

Shane, constituting ignorance of his serious medical need and an intentional delay
of necessary medical care.

299.

The failure of both Defendant Grady and Defendant Kennedy to perform CPR
at all also demonstrates their total disregard for the risk of serious harm to Shane,
constituting ignorance of his serious medical need and an intentional delay in
medical care.

300.

The failure to arrive promptly at Shane's cell and the failure of both Defendant
Grady and Defendant Kennedy to perform CPR were both proximate causes of
Shane's death, which was avoidable to a reasonable degree of medical certainty.

301.

Defendant Grady and Defendant Kennedy actions and inactions in this case
therefore constitute "deliberate indifference" to Shane's Fourteenth (14th)
Amendment's right under the United States Constitution to adequate medical care
as a pre-trial detainee.

302.

As a direct and proximate result of Defendant Grady and Defendant Kennedy violating Shane's Fourteenth (14th) Amendment rights, Shane suffered physical injuries, pain and suffering, and mental and emotional distress and the loss of his life.

303.

As a result of Defendants' actions and inactions, Plaintiff is entitled to compensatory damages for the loss of Shane's life and damages in an amount to be proven at trial for Shane's pain and suffering.

## COUNT V
## (DEFENDANT NAPHCARE, INC.)
## 42 U.S.C. §1983:  FOURTEENTH AMENDMENT VIOLATION
## "MONELL LIABILITY"

304.

Defendant NaphCare was at all times relevant to this action acting under the color of state law, having been contractually obligated, pursuant to the NaphCare Contract, to provide a variety of inmate medical services at the Jail on behalf of Defendant Labat and Defendant Fulton County.

305.

Shane was a pretrial detainee inmate at the Jail during all times relevant to this Action.

306.

Defendant NaphCare was contractually responsible for, and knowingly promulgated, enforced and allowed to persist a series of policies and procedures in the Jail that collectively constituted widespread practices that resulted in their failure to adequately provide mental health treatment and emergency medical services to inmates in the Jail.

307.

Defendant NaphCare had customs and practices in the Jail that caused the following widespread deficiencies to exist:

a)  Too few qualified medical personnel to be hired at the jail,

b)  A failed intake program to regularly assign severe mentally ill inmates to general population housing and permit its providers to make classification decisions before thoroughly examining an inmate's prior medical history and hospitalizations

c) Psychiatric progress Notes to be auto-populated with answers that indicate inmates are medication compliant and without side effects even when the provider did not actually see or evaluate the inmate,

d) Inadequate space to enable it to perform adequate medical care to inmates.

e) Inadequate resources to enable it to provide adequate medical care to inmates, particularly inmates with severe mental illness.

f) Inadequate training and supervision of its medical personnel, resulting in a failure to follow proper accreditation standards and address various inmate medical needs such as significant weight loss while on medications that cause significant weight gain, blood tests to determine whether inmates are compliant with their medication regimen and to ensure their blood levels remain within safe parameters, and communication and approaches to discipline with severely mentally ill inmates.

g) Inadequate and deliberately indifferent responses to the emergency medical needs of inmates in the Jail, including attempted suicides.

h)  The medical providers to show up at the Jail despite being physically and/or mentally unfit to provide medical care to inmates, in compliance with Defendant NaphCare's obligations under the NaphCare Contract.

i)  The Jail to ignore the widely accepted standards of emergency medical care, fail to provide standard, readily accessible, emergency medical equipment and tools (i.e. AEDs and rescue tools) and fail to provide adequate, emergency medical services to inmates in serious need of medical attention and care.

308.

Since Defendant NaphCare became legally responsible for providing medical services to inmates in the Jail on January 1, 2018, there have been several deaths caused by Defendant NaphCare's widespread unconstitutional practices. For example:

a)  In May 2019, 18-year-old Tyrique Tookes had been detained in the Fulton County Jail for about seven weeks was found dead in his cell May 4, 2019, after complaining of chest pain for about two weeks due to an undetected ruptured aorta.

b) On July 22, 2019, William Barnett, died as a result of a failure to properly treat a low potassium condition.

c) In January, 2022, it was reported a 32-year-old veteran who had been detained for less than a week when he died by suicide.

d) In September, 2022 Lashawn Pannell Thompson, a 35 yr. old mentally ill patient dies at Fulton County Jail that were precipitated by the final days of widespread neglect.

e) In October, 2022 an unnamed inmate an inmate on the mental health floor of the jail was found dead in his cell with his wrists and ankles bound.

309.

These above-discussed examples of inmate deaths at the Jail, caused by Defendant NaphCare and their deficient practices, just scratch the surface as it relates to Defendant NaphCare's systemic inability to provide adequate medical care to inmates, especially mentally ill ones, at the Jail. There are likely several more examples of Defendant NaphCare's substandard practices that proximately caused the death of additional inmates in the Jail but they are hard to discover because most Jail deaths (and the circumstances of them) are not publicly

discussed or reported on and, records related to those deaths often require

litigation. Shane's death never publicly discussed or acknowledged by any of the

named Defendants nor did his death ever hit the media.


310.

In 2022 alone, fourteen (14) inmates died at the Fulton County Jail with an

estimated population of 3,000 inmates. By comparison, Riker's Island in New

York has lost eighteen (18) people with 100,000 inmates.


311.

Such an astonishing, shocking inmate death rate in the Jail, when compared to

other, larger detention facilities, is further evidence of Defendant NaphCare's

inability to provide adequate medical care to inmates in the Jail.


312.

Defendant NaphCare is well-aware of the number of deaths in the Jail and the

role their staff played in causing them.

313.

In fact, in 2020, Defendant NaphCare had the highest nationwide death rates among the top 5 jail healthcare providers.

314.

The failure of Defendant NaphCare to make necessary corrections to the widespread, substandard medical care provided in the Jail and prevent senseless deaths violate the constitutional rights of the inmates they are tasked with providing for, including Shane.

315.

Shane's death on February 1, 2021 was a tragic, foreseeable and direct result of Defendant NaphCare's widespread unconstitutional practices that caused:

a)  Shane being housed in the general inmate population, despite having been previously hospitalized for and diagnosed with ADHD, schizophrenia, autism, bipolar and visual hallucinations. The failure to provide him the specialty medical care required for his severe mental illness was equivalent to ignoring his condition altogether.

b) Not properly responding to Shane loss of sixty-five (65) pounds while in the Jail (and he was not overweight or purposely dieting to lose weight) during his incarceration at the Jail.

c) The failure to do anything about learning that Shane was possibly giving away his medication or having his medication taken away from him by other inmates in his pod

d) Ignoring the findings of their own staff. On January 28, 2021, during Shane's annual evaluation with a NaphCare mental health provider, the staff member reported that Shane suffered from psychotic disorders, mood disorders, and impulsiveness. She also reported that he felt more depressed. This provider did not change Shane's his housing assignment, supervision level, medication regimen or refer him to an actual, licensed psychiatrist. And, Defendant Agyei, who saw Shane on January 31, 2021, following the altercation with his cellmate, had easy access to the entirety of Shane's file and could have and should have looked at it when assessing Shane's well-being and safety.

e) Failing to respond to the various warning signs of fear and mental illness on the evening before Shane attempted suicide. Shane was

found balled up in a fetal position on the floor telling Jail Staff he just
wanted to get out of the cell. When told "no," Shane then instigated an
physical altercation with his cellmate so he could get out. Shane then
was sent up to the medical floor for a brief time and quickly returned
to his cell, which he would be housed in alone, after being told was
facing up to forty-eight (48) days in solitary confinement for his
actions. Such a callous, willful disregard for Shane's rapidly
deteriorating mental and physical state by Defendant NaphCare
providers stemmed from their pervasive pattern of deliberately
ignoring the special needs of mentally ill inmates, like Shane, when
assessing their medical status and emotional stability.

f) Once Shane was discovered slouched to the floor with a bed sheet tied
around his neck on the morning on February 1, 2021, it took
approximate five (5) minutes for jail staff to receive a rescue tool to
cut Shane down once he was found hanging in his cell. No such
rescue tool was readily available or able to be easily retrieved by
Defendant Blackman or Defendant Clark in the Jail.

g) Defendant Nwankwo was the first NaphCare medical provider to
arrive at Shane's cell. It took her more than five (5) minutes receiving

after the emergency call to respond to the scene. She walked towards

Shane serious medical emergency at a normal pace as if there was no

emergency whatsoever. Then, in violation of her duties to Shane as

well as her training and Jail protocol, Defendant Nwankwo refused to

take over medical treatment of Shane, refused to assist with

performing CPR, and utterly failed to do her job, at the expense of

Shane's life. Defendant Nwankwo, in fact, told Defendant Blackman

and Defendant Clark that she had a bad knee. As a licensed medical

professional, Defendant Nwankwo was well-aware of the seriousness

of Shane's medical emergency and how crucial it was to his survival

that she respond with urgency and expertise to his aid. Despite

knowing the imminent risk of death to Shane if she refused to provide

immediate care to him, Defendant Nwankwo shockingly chose to

refuse to do her assigned job in a life-threatening situation, that would

have been obvious to any layperson.

h) Upon the arrival of Defendants Grady and Kennedy to the scene of

Shane's medical emergency, they directed Defendant Nwankwo to

follow protocol and take over the provision of medical care to Shane.

Again, a second time, Defendant Nwankwo refused to perform CPR

or provide any care to Shane whatsoever, repeating her story about having a bad knee.

i)  Defendant Agyei, a certified Physician Assistant, was the highest qualified medical provider at the Jail on February 1, 2021. For unknown reasons, Defendant Agyei delayed responding to Shane's medical emergency with any urgency. Defendant Agyei arrived on scene more than ten (10) minutes after receiving the emergency call. He was seen on video surveillance walking at a normal pace towards Shane's obvious medical emergency. Upon arrival, Defendant Agyei failed to adequately perform CPR on Shane. Jail staff had to ask Defendant Agyei to stop performing CPR on Shane as it became obvious to them that he was physically unable to provide medical aid to Shane. Jail staff also described Defendant Agyei as visibly disoriented during his response to Shane's medical emergency.

j)  The first attempt at using an AED to resuscitate Shane occurred more than fifteen (15) minutes after the emergency call was first made, which violates all standard emergency care protocols and medical provider obligations when there is an unresponsive inmate.

316.

The Expert Affidavits from Keith Wesley and Michael McMunn, attached

hereto as Exhibits 2 and 3, confirm that Shane's death was avoidable to a

reasonable degree of medical certainty. But for the multitude of errors in providing

emergency medical care to Shane, Shane could have and likely would have

survived.

317.

As a direct and proximate result of Defendant NaphCare's deliberate

indifference to Shane's serious medical needs, which were caused by a series of

widespread, common practices not unique to Shane, he experienced unnecessary

pain, suffering, mental and emotional distress and senselessly, lost his life.

318.

As a result of Defendant NaphCare's actions and inactions, Plaintiff is

entitled to compensatory damages for the loss of Shane's life and damages in an

amount to be proven at trial for Shane's pain and suffering.

**COUNT VI**
**(DEFENDANT MICHAEL AGYEI AND**
**DEFENDANT EDITH NWANKWO)**
**42 U.S.C. §1983: FOURTEENTH AMENDMENT VIOLATION**

319.

Plaintiff realleges and incorporates herein the allegations contained in Count VII of this Complaint as if fully restated herein, since the exact same allegations give rise to a cause of action for individual liability against both Defendants Agyei and Nwankwo under 42 U.S.C. §198 for their violation of Shane's constitutional rights.

320.

Defendants Agyei and Nwankwo were acting under color of state law as a result of being employed by Defendant NaphCare and working at the Jail at all times relevant herein.

321.

Defendants Agyei and Nwankwo acted with deliberate indifference to Shane's life-threatening, urgent medical needs by intentionally refusing to provide and/their inability to provide required standard emergency care including but not limited to the refusal to check Shane's vitals, provide continuous life support/CPR and AED services in a timely manner.

322.

The failure of both Defendants to provide such basic level of medical care was the proximate cause of Shane's death on February 1, 2021. But for the inactions of Defendants Agyei and Nwankwo, Shane likely could have lived.

**COUNT VII**
**(DEFENDANT NAPHCARE, INC., DEFENDANT MICHAEL AGYEI,**
**AND DEFENDANT EDITH NWANKWO)**
**STATE MEDICAL MALPRACTICE O.C.G.A. § 51-1-27**

323.

At all times relevant, Defendant Agyei and Defendant Nwankwo were employees/agents of Defendant NaphCare. As such, Defendant NaphCare is liable for their negligence under the doctrine of Respondeat Superior.

324.

Defendant Agyei and Defendant Nwankwo had medical provider-patient relationships with Shane because of their respective positions working in the Jail on behalf of Defendant NaphCare, ostensibly providing adequate medical and mental health care to inmates there.

325.

Defendant Agyei, and Defendant Nwankwo breached their professional duty to Shane by failing to exercise the requisite degree of skill and care requirement in emergency care life-threatening situations, as more fully described herein, and therefore committed medical malpractice in violation of O.C.G.A. § 51-1-27.

326.

On February 1, 2021, at 6:10am, Defendant Nwankwo was notified of an inmate (Shane) who had attempted suicide by hanging and was unresponsive and in need of urgent medical attention in cell 6N402 of the Jail. It would have been obvious to a layperson, at that time, that the inmate (Shane) needed immediate medical care.

327.

Defendant Nwankwo did not respond reasonably to the risk. Instead, Defendant Nwankwo failed to respond with any urgency to Shane's medical emergency and failed to provide any medical care to him. Upon her arrival at the scene of Shane's medical emergency, Defendant Nwankwo refused to provide any medical care to

Shane; she would not and did not check his vitals, ensure his airway was clear, perform CPR or assist in any way with resuscitation efforts or medical care.

328.

In response to receiving this emergency call, NaphCare, Inc. medical provider, Defendant Nwankwo called her NaphCare coworker, Defendant Agyei, who was also on duty and in the building but unaccounted for. When he failed to answer her calls, Edith Nwankwo did not take initiative or respond with an urgency to the scene of Shane's medical emergency.

329.

Deputy Henry, who was assigned to the medical floor that morning, had to suggest to Defendant Nwankwo that they not wait for Defendant Agyei and instead, respond to the emergency call without him. Only after urging from Deputy Henry did Defendant Nwankwo head towards Shane's cell, which was just three (3) floors up from their location, with a stretcher.

330.

Defendant Nwankwo did not bring an Automated External Defibrillator ("AED") with her to Shane's cell when she arrived.

331.

Not only was there an unreasonable delay in providing proper medical treatment to Shane once notified by jail staff of Shane's medical emergency by Defendant Nwankwo, but more egregiously, she deliberately refused to provide any medical treatment or resuscitation efforts to Shane.

332.

Defendant Nwankwo failed to appropriately assess, monitor, diagnose, respond and manage Shane's obvious, serious medical needs on February 1, 2021.

333.

Defendant Agyei also failed to appropriately assess, monitor, diagnose, respond and manage Shane's obvious, serious medical needs on February 1, 2021.

334.

On February 1, 2021, at 6:10am, Defendant Agyei, who was the most qualified medical provider on duty for Defendant NaphCare at that time, was notified of an inmate (Shane) who had attempted suicide by hanging and was unresponsive and in need of urgent medical attention.

335.

It would have been obvious to a layperson, at that time, that the inmate (Shane) needed immediate medical care.

336.

Defendant Agyei did not respond reasonably to the risk. Instead, Defendant Agyei also failed to respond with any urgency to Shane's medical emergency, arriving approximately fifteen (15) minutes after receiving the call for help and only then, bringing the AED to the scene to attempt resuscitation efforts.

337.

In essence, Defendants NaphCare, Agyei and Nwankwo:

a) Failed to provide Shane with adequate, continuous emergency medical care as required;

b) Failed to clear Shane's airway and administer oxygen when it was known Shane was no longer breathing;

c) Refused and/or failed to provide continuous basic life support/CPR services to Shane;

d) Failed to bring an Automated External Defibrillator ("AED") to the scene of Shane's medical emergency in a timely manner;

e) Failed to respond within a reasonable time to the emergency call for medical assistance for Shane;

f) Failed to adequately complete required forms related to Shane's medical care, including but not limited to, suicide risk assessments, psychological evaluations and narrative reports regarding medical care administered in response to Shane's medical emergency on February 1, 2021;

g) Failed to respond and protect Shane, despite observing, reporting and being aware of his multiple, well-identified risk factors for suicide; and,

h) Failed to adequately supervise, train, hire, and enforce policies and procedures with respect to mental health care, housing classifications, attempted suicide treatment and medical emergencies.

338.

The standard of care for all emergency medical providers (such as Defendants NaphCare, Agyei and Nwankwo and others that were present at the Jail during the early morning hours of February 1, 2021) when it is known that a patient is not breathing to clear the patient's airway and administer oxygen as soon as possible.

339.

Within a reasonable degree of medical certainty, the wrongful acts and omissions of Defendants NaphCare, Agyei and Nwankwo constituted a breach of the applicable standard of care placed and proximately caused Shane's death. Had they followed the requisite standard of care, Shane's death was avoidable and could have been prevented.

340.

Pursuant to O.C.G.A § 9-11-9.1, Plaintiff attaches as Exhibit 2 and incorporates by reference herein the affidavit of Dr. Michael McMunn, a duly qualified expert competent to testify in this matter, alleging at least one act of medical malpractice by each medical defendant, and thus fulfilling the requirements of O.C.G.A. § 9-11-9.1.

341.

Pursuant to O.C.G.A § 9-11-9.1, Plaintiff attaches as Exhibit 3 and incorporates by reference herein the affidavit of Dr. Keith Wesley, a duly qualified expert competent to testify in this matter, alleging at least one act of medical malpractice by each medical defendant, and thus fulfilling the requirements of O.C.G.A. § 9-11-9.1.

342.

As a direct and proximate result of the actions and inactions of Defendants NaphCare, Agyei and Nwankwo, which constitute medical malpractice in violation of O.C.G.A. § 51-1-27, Shane experienced unnecessary pain, suffering, mental and emotional distress and senselessly, lost his life.

343.

As a result of Defendants NaphCare, Agyei and Nwankwo violation of O.C.G.A. § 51-1-27, Plaintiff is entitled to compensatory damages for the loss of Shane's life and damages in an amount to be proven at trial for Shane's pain and suffering.

**COUNT VIII**
**(DEFENDANT NAPHCARE, INC., DEFENDANT MICHAEL AGYEI**
**AND DEFENDANT EDITH NWANKWO)**
**ORDINARY NEGLIGENCE**

344.

Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs of this Complaint as if fully restated.

345.

Defendants, whether themselves or through their agents, employees, or personnel, had a duty to exercise ordinary and reasonable care in their provision of services to Shane.

346.

The Defendants failed to exercise ordinary and reasonable care in their provision of services to Shane, including but not limited to the refusal to even

provide basic continuous life support, CPR and AED services on a reasonable, timely basis, which constitute ministerial acts.

347.

As a direct and proximate result of the ordinary negligence committed by the Defendants, whether themselves directly or through their agents, employees, or personnel, Shane suffered physical and mental pain and suffering prior to his death, including, without limitation, the pain and suffering caused by the events laid out above.

348.

Accordingly, Plaintiff Harold Joseph Kendall, as the Administrator of the Estate of Shane Kendall, is entitled to recover damages for the pain and suffering, medical expenses and funeral/burial expenses incurred due to the ordinary negligence of the Defendants.

349.

Defendants are liable to Plaintiff Harold Joseph Kendall, as the Administrator of the Estate of Shane Kendall, for the pain and suffering, medical

expenses and funeral/burial expenses incurred due to the ordinary negligence of the Defendants.

350.

As a direct and proximate result of the ordinary negligence of the Defendants, whether directly or by and through their employees, agents or personnel, Shane died.

351.

Accordingly, Plaintiff Harold Joseph Kendall, as the sole surviving heir of Shane, is entitled to bring a wrongful death action for the death of Shane and is entitled to recover for the full value of the life of the decedent from said Defendants.

352.

Defendants are liable to Plaintiff Harold Joseph Kendall for the full value of the life of Shane Kendall.

**COUNT IX**
**(DEFENDANT NAPHCARE, INC., DEFENDANT MICHAEL AGYEI AND DEFENDANT EDITH NWANKWO)**
**PUNITIVE DAMAGES**

353.

Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs of this First Amended Complaint, as if fully restated herein.

354.

The conduct of Defendants NaphCare, Agyei and Nwankwo , as described above, rose to the level of  a reckless, willful, and wanton failure to act, which demonstrates a conscious, deliberate indifference to the consequences of their actions and entitles Plaintiff to an award of punitive damages under 42 U.S.C. §1983.

355.

The conduct of Defendants NaphCare, Agyei and Nwankwo, as described above, as active tort-feasors, rose to the level of a reckless, willful, and wanton failure to act, which constitutes conscious, deliberate indifference to the consequences of their actions and entitles Plaintiff to an award of punitive damages under O.C.G.A § 51-12-5.1.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff prays that this Court award the following relief from Defendants:

a) An award of compensatory damages in an amount to be proven at trial, including interest;

b) An award of punitive damages in favor Plaintiffs against Defendant NaphCare;

c) All costs of court, including attorney's fees and expert fees under 42 U.S.C. § 1988;

d) Plaintiff have a trial by jury; and,

e) Such other and further relief as the Court may deem just and proper.


Respectfully submitted, this the 16th day of March, 2023.


/s/ *Rachel Kaufman*
Rachel M. Kaufman
Attorney for Defendant
Georgia Bar No. 491375

Kaufman Law Firm LLC
133 Nassau Street NW
Atlanta, GA 30303-2035
T: 404.615.7588   F: 404.759.2339
rachel@rachelkaufmanlaw.com