UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HAROLD JOSEPH KENDALL,
individually and as administrator of the
ESTATE OF SHANE MIGUEL
KENDALL,

      Plaintiffs,

  v.

FULTON COUNTY, GEORGIA, et
al.,

      Defendants.

CIVIL ACTION NO.
1:23-CV-00416-JPB

## <u>ORDER</u>

This matter is before the Court on two motions:  Defendants Fulton County and Sheriff Patrick Labat's Motion to Dismiss [Doc. 23] and Defendants NaphCare, Inc., Michael Agyei and Edith Nwankwo's Motion to Dismiss [Doc. 24] (all five collectively, the "Moving Defendants").  This Court finds as follows:

### FACUTAL BACKGROUND

The instant case, brought by Harold Joseph Kendall ("Plaintiff"), individually and as the Administrator of the Estate of Shane Miguel Kendall ("Decedent"), arises from the death of Decedent on February 1, 2021, while

housed in Fulton County Jail (the "Jail") as a pretrial detainee.  [Doc. 15, pp. 7, 11].

On the morning of Decedent's death, at approximately 6:10 AM, jail staff found Decedent in his cell, slouched over with a bed sheet tied to his bunk and around his neck, unconscious from an apparent suicide attempt.  Id. at 31–32. Upon discovering Decedent, jail staff put out an emergency call to on-site medical providers at approximately 6:11 AM, requesting immediate medical assistance for "an unconscious, breathing inmate."  Id.

### 1. Medical Care Provided to Decedent

At this time, Defendant NaphCare, Inc. ("NaphCare") was contracted with Fulton County to provide medical services at Fulton County jail facilities.  Id. at 55–57.  Pursuant to its contract with Fulton County, NaphCare hired personnel to provide medical services in the Jail, including emergency medical care and mental health services.  Id. at 56.  Defendants Edith Nwankwo ("Nwankwo"), a registered nurse, and Michael Agyei ("Agyei"), a certified physician's assistant (collectively, the "Medical Provider Defendants"), were two NaphCare medical providers on duty in the Jail when Decedent was found.  Id. at 32, 68–70.

Nwankwo answered the jail staff's emergency call for immediate medical assistance.  Id. at 32.  Upon receiving the call, she attempted to contact Agyei, but

Agyei did not respond.  Id.   Nwankwo initially chose to wait for Agyei before responding to the call herself.  Id. at 33.  However, after a jail officer suggested she respond without him, Nwankwo began "casually walking" towards Decedent's cell.  Id. at 32, 36.

Nwankwo arrived at Decedent's cell shortly after at 6:16 AM.  Id. at 36.  By this time, jail staff had cut Decedent down from his bedsheet and had begun performing CPR to some degree.  Id. at 35 ("[S]poradic, inadequate, inconsistent CPR was performed by [jail staff] as they waited for medical providers to arrive.").  Nwankwo refused to provide any medical treatment to Decedent, "including but not limited to checking his breathing, checking his pulse, ensuring his airway was clear, administering CPR" or otherwise assisting with resuscitation efforts.  Id. at 37.  Around this time, Decedent stopped breathing and was unresponsive.  Id.

Agyei arrived at the cell at 6:22 AM, "walking at a slow to normal pace." Id. at 38.  Upon his arrival, Agyei "walked in and out of [Decedent's] cell several times" before beginning to prepare an automated external defibrillator ("AED") for use on Decedent.  Id.  While Agyei was preparing the AED, jail staff directed Nwankwo to provide emergency medical aid to Decedent.  Id.  She again declined, informing jail staff that she had a bad knee and did not want to bend over to assist Decedent.  Id. at 7, 38.

At 6:24 AM, jail staff instructed Agyei to take over CPR efforts; however, after Agyei attempted CPR, "jail staff observed that he was utterly incapable of performing the task." Id. at 39.  Jail staff then instructed Agyei to stop performing CPR on Decedent and resumed resuscitation efforts.  Id.  At 6:25 AM, fourteen minutes after the initial emergency call, Agyei brought an AED into the cell, at which point no shock was advised.  Id.  EMS arrived at 6:36 AM and pronounced Decedent dead at 6:49 AM.  Id. at 40.

According to expert affidavits provided by Plaintiff, Decedent's death was avoidable to a reasonable degree of medical certainty and resulted from errors made while providing Decedent with emergency medical care.  Id. at 109; see [Docs. 15-2, 15-3].

## 2. Labat's Concerns About Poor Jail Conditions and Inadequate Funding

As Fulton County's Sheriff, Defendant Patrick Labat ("Labat" or "Sheriff Labat") was responsible for the Jail's operations, including the provision of medical care to inmates.  [Doc. 15, p. 59].  Funding for operations is determined by the Fulton County Board of Commissioners (the "Board").  Id. at 52–53.

Around the time of Decedent's death, the Jail was overcrowded, underfunded and understaffed, which Plaintiff contends resulted in the provision of inadequate medical care.  Id. at 8, 14–15.  Sheriff Labat recognized the Jail's

problems with underfunding, and during a public meeting with the Board in January 2021, expressed an urgent need for additional funds.  Id. at 24.  Plaintiff alleges that during this meeting, Labat warned the Board that more funds were necessary in order to fulfill Labat's constitutional obligations to the inmates in the Jail.  Id.  Labat "described the [Jail's] deplorable conditions . . . and admitted his inability to protect and supervise inmates, especially mentally ill ones."  Id.  Labat further stated that without additional funds and space, the conditions "could be a life or death situation for thousands of people."  Id. at 47.

### 3. NaphCare and Inmate Deaths at Fulton County Jail

Plaintiff alleges that NaphCare maintains various practices at the Jail that, taken together, constitute a custom or policy of providing inadequate medical care to inmates, which has resulted in several deaths like Decedent's.  See id. at 99–102.[1]  Plaintiff contends that since NaphCare became the medical provider at the Jail in 2018, the number of inmate deaths has steadily increased.  Id. at 43.  Plaintiff alleges that in 2020, NaphCare had the highest nationwide death rate among the top five jail healthcare providers.  Id. at 104.  Plaintiff also asserts a

---

[1] These practices include, among other things:  (1) too few qualified medical providers in the Jail; (2) inadequate training and supervision of medical personnel; (3) inadequate space and resources for medical personnel; (4) medical providers being "physically and/or mentally unfit" to provide adequate medical care; (5) inadequate responses to emergency medical needs; and (6) a failure to comply with emergency care standards.  Id.

disproportionately high number of deaths at the Jail when compared to other prisons, alleging that in 2022, the Jail experienced almost the same number of deaths as a prison containing thirty-three times as many inmates.  Id. at 103.  Plaintiff further states that an internal NaphCare report from 2022—issued in response to Jail deaths—describes the Jail's widespread neglect of mentally ill inmates in particular.  Id. at 48.

Moreover, Plaintiff alleges five specific inmate deaths at the Jail—two in 2019 and three in 2022—that he maintains resulted from NaphCare's practice of failing to provide adequate medical care to inmates.  Id. at 43–44.  Plaintiff argues that the actual number of Jail deaths caused by NaphCare's inadequate medical care is likely larger, but because most Jail deaths (and their surrounding circumstances) are not publicized, they are difficult to discover without litigation.  Id. at 102–03.  Further, Plaintiff asserts that despite knowledge of the Jail's serious issues and prior deaths, NaphCare failed to make necessary corrections to its practices to avoid continued constitutional violations.  Id. at 103–04.

## PROCEDURAL HISTORY

Plaintiff brought suit on January 27, 2023.  [Doc. 1].  After Moving Defendants initially moved to dismiss on February 23 and 24, 2023, Plaintiff filed his First Amended Complaint ("Amended Complaint") on March 16, 2023.  [Doc.

15].  In it, Plaintiff brings several counts under 42 U.S.C. § 1983 and various state law claims against Moving Defendants.  Id. at 72–122.  In each of the § 1983 counts, Plaintiff alleges a violation of the Fourteenth Amendment to the United States Constitution.  [Doc. 15, pp. 72–89, 98–109].  The Moving Defendants have moved to dismiss all of the § 1983 claims against them.  [Docs. 23-1, 24].

## LEGAL STANDARD

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).  In determining whether an action should be dismissed for failure to state a claim, Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The pleading must contain more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  Detailed factual allegations are not necessary; a plaintiff's statement need only give the defendant fair notice of the plaintiff's claim

and the grounds upon which it rests.  See Erickson v. Pardus, 551 U.S. 89, 93

(2007) (citing Twombly, 550 U.S. at 555).

## ANALYSIS

### 1. **NaphCare, Agyei and Nwankwo's Motion to Dismiss**

Against NaphCare and the Medical Provider Defendants, Plaintiff has

brought two claims under 42 U.S.C § 1983 based on an alleged violation of

Decedent's constitutional rights under the Fourteenth Amendment (Counts V and

VI).  [Doc. 15, pp. 98–111].  NaphCare and the Medical Provider Defendants

move to dismiss both Counts V and VI on the grounds that Plaintiff has failed to

state a § 1983 claim upon which relief can be granted.  They also argue that

Plaintiff's Amended Complaint constitutes an impermissible shotgun pleading in

violation of Rule 8(a)(2) and 10(b), making it subject to dismissal.  See Fed. R.

Civ. P. 8(a)(2), 10(b).  The Court considers these arguments in turn.

### a. *Sufficiency of § 1983 Claims Against the Medical Provider Defendants*

The Court will first analyze Plaintiff's § 1983 claim against the Medical

Provider Defendants (Count VI).  Generally, the requirements of a § 1983 claim

are (1) the conduct complained of was conducted by someone acting under the

color of state law,[2] and (2) the conduct deprived the plaintiff of legally recognized or constitutional rights, privileges or immunities.  Hall v. Tallie, 597 F. App'x 1042, 1044 (11th Cir. 2015).

### i.   Violation of a Constitutional Right

As stated above, "[a] constitutional claim brought pursuant to § 1983 must begin with the identification of a specific constitutional right that has allegedly been infringed."  Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019).  Here, Plaintiff contends that Decedent's constitutional rights under the Fourteenth Amendment were violated due to the Medical Provider Defendants' deliberate indifference to Decedent's serious medical need.  [Doc. 15, p. 110].

It is well settled that prison officials' deliberate indifference to a prisoner's serious medical need gives rise to a constitutional claim.  Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994); see also Hill v. Clayton County, No. 21-CV-5300, 2022 WL 17558831, at *6 (N.D. Ga. Dec. 9, 2022) ("The Eighth Amendment prohibition on cruel and unusual punishment encompasses the right of incarcerated people to receive medical treatment, and any 'deliberate indifference

---

[2] Upon review of both motions, no Moving Defendant has moved to dismiss Plaintiff's case on the grounds that a defendant was not acting under the color of state law.  See [Docs. 23, 24].  Therefore, the Court will focus its § 1983 analysis on whether the alleged conduct deprived the Decedent of a constitutional right.

to serious medical needs of prisoners constitutes' a violation of that right.")

(quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)).  And, under the Fourteenth

Amendment, a pretrial detainee, like Decedent, is afforded the same rights as

would be available to a convicted person under the Eighth Amendment.  <u>See</u>

<u>Denham v. Corizon Health, Inc.</u>, 675 F. App'x 935, 940 (11th Cir. 2017).

To establish deliberate indifference to a serious medical need, a plaintiff

must show "(1) a serious medical need, (2) . . . deliberate indifference to that need,

and (3) causation between that indifference and [the] injury."  <u>Id.</u> at 941 (citing

<u>Craig v. Floyd County</u>, 643 F.3d 1306, 1310 (11th Cir. 2011)).

*1. Serious Medical Need*

"A serious medical need is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention.'"  <u>Mann v. Taser Int'l, Inc.</u>, 588

F.3d 1291, 1307 (11th Cir. 2009) (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40

F.3d 1176, 1187 (11th Cir. 1994)).  Alternatively, a serious medical need may be

determined by whether a delay in treating the need worsens the condition.  <u>Id.</u>  The

essential inquiry is whether the need is "one that, if left unattended, poses a

substantial risk of serious harm."  <u>Id.</u> (quoting <u>Farrow v. West</u>, 320 F.3d 1235,

1243 (11th Cir. 2003)).

Here, Plaintiff alleges that jail employees observed Decedent slouched over in his cell with a bed sheet tied to his bunk and around his neck.  [Doc. 15, p. 31]. In their call for emergency medical assistance, jail staffed described him as "an unconscious, breathing inmate, who had apparently attempted suicide."  Id. at 31– 32.  Decedent's condition at the time he was found clearly required immediate medical attention—this much would be clear to anyone.  See Mann, 588 F.3d at 1307.  Moreover, as the situation progressed, Decedent stopped breathing and became unresponsive.  [Doc. 15, p. 37].  Such facts demonstrate a medical need so obvious that any lay person "would easily recognize the necessity for a doctor's attention" and that delay in treatment would pose a "substantial risk of serious harm."  See Mann, 588 F.3d at 1307.  Plaintiff sufficiently alleged the existence of a serious medical need.

### 2.  Deliberate Indifference

Moving to the next prong of the analysis, Plaintiff must "allege acts or omissions sufficiently harmful to [show] deliberate indifference to serious medical needs."  Id.  To constitute deliberate indifference, a plaintiff must allege "(1) subjective knowledge of a risk of serious harm;  (2) disregard of that risk; and (3) conduct that is more than mere negligence."  Id. (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004)).  To establish subjective knowledge, the

defendant "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [ ] must also draw the inference." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  Whether the Medical Provider Defendants had this level of subjective knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. (quoting Farmer, 511 U.S. at 842).

Here, Nwankwo, a registered nurse, received the emergency call reporting an "unconscious, breathing inmate, who had apparently attempted suicide."  [Doc. 15, p. 32].  She then arrived at the cell and personally observed the inmate.  Id. at 37, 70.  During this time, Decedent became unresponsive and stopped breathing, and jail staff instructed Nwankwo to provide emergency medical aid.  Id. at 38.

Agyei, a certified physician's assistant, also arrived at Decedent's cell and had the opportunity to observe the Decedent in his very serious state.  Id. at 38, 68. Agyei was likewise instructed to perform—and, indeed, attempted to perform— CPR on Decedent due to his critical condition.  Id. at 39.  Under such facts, Plaintiff has sufficiently alleged the Medical Provider Defendants' subjective knowledge of a risk of serious harm.

Next, the Court considers whether Plaintiff has plausibly pleaded that the Medical Provider Defendants disregarded Decedent's risk of serious harm by conduct that is more than mere negligence.  The Eleventh Circuit Court of Appeals has instructed that deliberate indifference may be demonstrated by a showing of "grossly inadequate care" or "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all." Johnson, 387 F.3d at 1351 (quoting Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989)).  Moreover, when acts or omissions result in "an unnecessary and wanton infliction of pain" or are "repugnant to the conscience of mankind," they constitute deliberate indifference.  See Mann, 588 F.3d at 1307 (quoting Estelle, 429 U.S. at 106–07).

Deliberate indifference may also arise from a delay in medical care that is "tantamount to unnecessary and wanton infliction of pain." Wright v. Martin, No. 17-12014, 2017 WL 9324512, at *3 (11th Cir. Dec. 19, 2017) (quoting Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995)).  Although some delay in medical care may be tolerable, whether it is tolerable depends on the nature of the medical need and the reason for the delay.  Harris, 21 F.3d at 393.  Notably, "[a] delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured . . . in a few minutes." Bozeman, 422 F.3d at 1273.

Taken as true and viewed in a light most favorable to Plaintiff, the following occurred:  Nwankwo, having received an emergency call for immediate medical assistance, did not immediately respond to it.  [Doc. 15, p. 31].  She instead attempted to contact Agyei and initially opted to wait for him before responding. Id. at 33.  Following some delay, and after jail staff suggested that she not wait, Nwankwo began "casually walking" to Decedent's cell.  Id.  Upon her arrival, however, Nwankwo "refused to provide any medical treatment whatsoever" to Decedent despite being obligated to do so by NaphCare's contract with Fulton County.  Id. at 36–37.  Even after Decedent had become unresponsive and stopped breathing, and after jail staff directed her to assist, Nwankwo still declined to provide medical care to Decedent, apparently indicating her "bad knee" prevented her from rendering aid and informing jail staff that she did not want to bend over. Id. at 7, 37–38.

According to the Amended Complaint, at no point did Nwankwo provide medical assistance to Decedent.  Such facts, taken as true, constitute "medical care which is so cursory as to amount to no treatment at all."  See Johnson, 387 F.3d at 1351.  Moreover, even construed as only a delay in Decedent's medical care (since Agyei ultimately appeared to assist), the nature of Decedent's medical need was dire and the alleged reasons for Nwankwo's delay—preferring to wait for a

colleague and her bad knee—plausibly show that Nwankwo's delay was intolerable and "tantamount to unnecessary and wanton infliction of pain." See Harris, 21 F.3d at 393; Wright, 2017 WL 9324512, at *3.  Thus, Plaintiff has sufficiently pleaded that Nwankwo disregarded Decedent's risk of serious harm by conduct that is more than mere negligence.  See Johnson, 387 at 1351.

Turning to Agyei, Plaintiff alleges that he failed to respond to the initial emergency call for eleven minutes.  [Doc. 15, p. 32].  When he arrived, he was "walking at a slow to normal pace."  Id. at 32, 38.  After his arrival, when directed by a jail officer to take over CPR, Agyei attempted to administer CPR but "was utterly incapable of performing that task," such that the jail staff instructed "him to stop and to let jail staff switch in instead."  Id. at 39.

Although the Amended Complaint indicates no reason for Agyei's substantial delay, the delay itself in response to the Decedent's "especially time-sensitive" condition indicates deliberate indifference.  See Bozeman, 422 F.3d at 1273.  Moreover, Plaintiff has alleged that once Agyei did arrive, he was incapable of basic emergency medical care and so inferiorly equipped that jail staff had to intervene.  As such, the facts as pleaded constitute "grossly inadequate care" demonstrating that Agyei disregarded Decedent's risk of serious harm by conduct that is more than mere negligence.

Thus, Plaintiff has sufficiently alleged deliberate indifference by the Medical Provider Defendants.

### 3. Causation

Finally, causation between a defendant's deliberate indifference and the injury requires "proof of an affirmative causal connection" between the state actor's conduct and the constitutional violation.  Martinez v. Burns, 459 F. App'x 849, 851 (11th Cir. 2012).  A state actor's personal involvement in the acts resulting in the constitutional violation can establish the requisite causal connection.  Id.

Plaintiff alleges the Medical Provider Defendants' delayed and inadequate medical care resulted in Decedent's death.  [Doc. 15, p. 41].  Moreover, Plaintiff attached to his Amended Complaint two affidavits of medical experts indicating that Decedent's death could have—and likely would have—been avoided if not for the "multitude of errors in providing emergency medical care" to Decedent.  Id. at 109; see [Docs. 15-1, 15-2].  Thus, Plaintiff has plausibly alleged an affirmative causal connection between the Medical Provider Defendants' acts and omissions and Decedent's death.

Based on the foregoing, Plaintiff has sufficiently pleaded a § 1983 claim for deliberate indifference to a serious medical need against the Medical Provider Defendants.

### b.  Sufficiency of § 1983 Claims Against NaphCare

The Court next analyzes Plaintiff's § 1983 claim against NaphCare (Count V).  When a private entity like NaphCare contracts with a county to provide medical services to inmates, "it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of the municipality."  Craig, 643 F.3d at 1310 (quoting Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997)).  A municipality—or, as in the case of NaphCare, its "functional equivalent"—is not liable under § 1983 on the basis of *respondeat superior*; rather, it is properly subject to suit only where the municipality had a policy or custom that inflicted the constitutional injury.  See Monell v. Department of Social Services of New York, 436 U.S. 658, 694 (1978).

Thus, in order to state a claim for relief against NaphCare, Plaintiff must—in addition to showing that Decedent's constitutional rights were violated—establish: (1) that NaphCare had a custom or policy that constituted deliberate indifference to Decedent's constitutional rights and (2) that the policy or custom caused the

violation.  See Denham, 675 F. App'x at 941 (citing McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)).

> i.   Policy or Custom Constituting Deliberate Indifference

"In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice."  McDowell, 392 F.3d at 1290 (internal quotation marks omitted).  A policy is a statement or other decision "officially adopted and promulgated" by a government or its officers, while a custom receives no such "formal approval through . . . official decision-making channels."  Monell, 436 U.S. at 690–91.  A custom, rather, is "a practice that is so settled and permanent that it takes on the force of law."  McDowell, 392 F.3d at 1290.

Because a municipality will rarely have an official policy that endorses a constitutional violation, most plaintiffs must show that the municipality has a custom or practice of permitting it.  See Craig, 643 F.3d at 1310.  To show this, a pattern of similar constitutional violations is "ordinarily necessary."  Id. (quoting Connick v. Thompson, 536 U.S. 51, 62 (2011)).

Here, Plaintiff alleges that NaphCare "knowingly promulgated, enforced and allowed to persist a series of policies and procedures in the Jail that collectively constituted widespread practices that resulted in their failure to adequately provide

mental health treatment and emergency medical services to inmates in the Jail."

[Doc. 15, p. 99].  Plaintiff's primary theory of liability, then, appears to be that

NaphCare had an overall custom or policy of failing to provide adequate medical

care.  Plaintiff contends that several NaphCare practices demonstrate this custom

or policy: (1) understaffing; (2) failing to perform intake procedures correctly; (3)

auto-populating psychiatric progress notes without evaluation; (4) providing

insufficient space for adequate medical care; (5) under-resourcing; (6) failing to

train and supervise its medical personnel; (7) failing to provide adequate responses

to emergency medical needs of inmates, including attempted suicides; (8)

employing medical providers who are physically and/or mentally unfit to provide

medical care to inmates; (9) failing to adhere to accepted standards of emergency

medical care; and (10) failing to provide adequate, emergency medical services to

inmates in serious need of medical attention.[3]  Id. at 99–101, 104.

 Plaintiff also alleges that at least five other Jail deaths in the years

surrounding Decedent's death were likewise caused by NaphCare's failure to

---

[3] The Court notes that certain of these discrete practices—under the right set of facts—
may, alone, constitute a custom or policy of deliberate indifference to a constitutional
right.  However, in the instant case, Plaintiff does not appear to plead those practices as
separate, constitutionally infirm policies or customs.  Rather, Plaintiff's Amended
Complaint states that they *collectively* constituted a widespread practice (i.e., a custom or
policy) of providing inadequate care to inmates.  [Doc. 15, p. 99].  Thus, the Court will
not consider the sufficiency of each individual practice under a Monell theory of liability.

provide adequate medical care.[4]  See id. at 101–02.  Moreover, Plaintiff states that NaphCare had the highest nationwide death rates among the top five jail healthcare providers in 2020 and a disproportionately high number of inmate deaths when compared to much larger institutions in 2022.[5]  Id. at 103–104.

Taking these allegations as true, Plaintiff has sufficiently alleged that NaphCare has a policy or custom of providing inadequate medical care to inmates constituting deliberate indifference to their constitutional rights.  See Herr v. Armor Corr. Health Servs., Inc., No. 19-CV-394, 2019 WL 12021672, at *5 (M.D. Fla. Sept. 9, 2019) (denying motion to dismiss when plaintiff "alleged [defendant] has a policy or custom of repeated delayed or denied medical care that directly resulted in the constitutional violation"); Cineus v. Fla. Dep't of Corr., No. 21-CV-1659, 2022 WL 4448599, at *6 (M.D. Fla. Sept. 23, 2022) (denying motion to dismiss when the court could "reasonably infer" from the allegations that

---

[4] Plaintiff further contends that, following discovery, he will likely uncover additional similar incidents of inmate deaths but that additional examples of NaphCare's failure to provide inadequate medical care resulting in inmate deaths "are hard to discover" because most Jail deaths are unpublicized and "records related to those deaths [showing instances of inadequate medical care] often require litigation."  See id. at 102–03.

[5] Specifically, Plaintiff alleges that in 2022, New York's Riker's Island, with an inmate population of 100,000, had eighteen inmate deaths, while the Jail, with an inmate population of 3,000, had almost as many in the same year (fourteen).  Id. at 103.  Plaintiff contends that "such an astonishing, shocking inmate death rate . . .  when compared to other, larger detention facilities, is further evidence of Defendant NaphCare's inability to provide adequate medical care to inmates in the Jail."  Id.

defendant had a "persistent and wide-spread practice of refusing to provide constitutionally adequate medical care to inmates").

In addition to stating several specific objectionable practices that make up NaphCare's custom of failing to provide adequate medical care, Plaintiff has asserted other Jail deaths allegedly due to that custom, as well as a disproportionately high number of deaths at the Jail when compared to other prisons and jail healthcare providers.   From these allegations, the Court can reasonably infer a pattern of similar constitutional violations demonstrating NaphCare's custom of providing inadequate medical care to inmates, constituting deliberate indifference to their constitutional rights.[6]  See Craig, 643 F.3d at 1310.

ii.   Causation

Having concluded that Plaintiff sufficiently alleged the existence of a municipal policy or custom constituting deliberate indifference to a constitutional

---

[6] The Court recognizes that the extent of the similarities between the five specific inmate deaths Plaintiff alleges—as well as the many other deaths Plaintiff asserts but provides no details about—are unknown.  The facts may ultimately show that these prior instances were not sufficiently similar to demonstrate deliberate indifference.  See Denham, 675 F. App'x. at 941 (explaining, at the summary judgment stage, that the plaintiff failed to establish a deliberately indifferent custom of providing inadequate medical care because, "at most, she submitted evidence suggesting that [the defendant] provided inadequate medical care on only a single prior occasion").   However, at this early stage, Plaintiff's allegations are enough to "to raise a reasonable expectation that discovery will reveal evidence" supporting Plaintiff's claim. Twombly, 550 U.S. at 556.

right, the Court turns to causation.  To prove causation under <u>Monell</u>, a plaintiff must show the policy or custom was the "moving force" behind the constitutional violation.  <u>McDowell</u>, 392 F.3d at 1292.

As already discussed, Plaintiff has sufficiently alleged that the Medical Defendants' provision of inadequate medical care resulted in Decedent's death. Having also sufficiently alleged the existence of NaphCare's custom or policy of providing inadequate medical care, which resulted in the Medical Defendants' actions, causation is plausibly established.  Taken as true, Plaintiff has alleged sufficient facts to show that NaphCare's alleged policy or custom was the "moving force" behind the constitutional violation at issue here.

For these reasons, Plaintiff's § 1983 claim against NaphCare may proceed.

### c.  *Alleged Shotgun Pleading*

NaphCare and the Medical Provider Defendants also argue that Plaintiff's Amended Complaint is an impermissible shotgun pleading which should be dismissed in its entirety.  [Doc. 24-1, pp. 14–17].  "Courts in the Eleventh Circuit have little tolerance for shotgun pleadings," which violate Rule 8's requirement that a complaint contain a short and plain statement of the claim.  <u>Vibe Micro, Inc. v. Shabanets</u>, 878 F.3d 1291, 1295 (11th Cir. 2018).

Typically, shotgun pleadings are characterized by any one of the following:

> (1) multiple counts that each adopt the allegations of all preceding
> counts; (2) conclusory, vague, and immaterial facts that do not clearly
> connect to a particular cause of action; (3) failing to separate each
> cause of action or claim for relief into distinct counts; or (4)
> [combining] multiple claims against multiple defendants without
> specifying which defendant is responsible for which act.

McDonough v. City of Homestead, 771 F. App'x 952, 955 (11th Cir. 2019).  These

categories "do not have precise and clearly marked boundaries."  Tran v. City of

Holmes Beach, 817 F. App'x 911, 913 (11th Cir. 2020).  Significantly, the

"unifying characteristic" of all shotgun pleadings is that they fail "to give the

defendants adequate notice of the claims against them and the grounds upon which

each claim rests."  Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313,

1323 (11th Cir. 2015).

NaphCare and the Medical Provider Defendants argue that the Amended

Complaint is a shotgun pleading because it reincorporates preceding paragraphs of

the Amended Complaint.  [Doc. 24-1, p. 16].  The Amended Complaint twice

reincorporates all previous allegations.  [Doc. 15, pp. 119, 122].  However, such

reincorporation does not "materially increase[] the burden of understanding the

factual allegations underlying each count" in the Amended Complaint.  Weiland,

792 F.3d at 1324.  Defendants additionally argue the Amended Complaint is a

shotgun pleading because it contains conclusory and vague allegations.  [Doc. 24-

1, p. 16].  The Court finds the Amended Complaint is not so plagued by

"conclusory, vague, or immaterial facts" that the pleading subject to dismissal in its entirety.

However, the Court is of the view that Count II of Plaintiff's Amended Complaint (Plaintiff's § 1983 claims against Sheriff Labat in his individual capacity) contains the types of deficiencies often found in impermissible shotgun pleadings.  The Court discusses this issue below.

**2.     Fulton County and Labat's Motion to Dismiss**

Plaintiff also brought claims against Fulton County and Sheriff Labat (in his individual capacity) pursuant to 42 U.S.C § 1983.  [Doc. 15].  These claims are likewise based on the alleged violation of Decedent's constitutional rights under the Fourteenth Amendment.  See id.  Fulton County and Sheriff Labat move to dismiss Plaintiff's Amended Complaint on the grounds that it (1) fails to allege all material elements necessary to sustain recovery for their §1983 claims and (2) Sheriff Labat is entitled to qualified immunity.  [Doc. 23, p. 5].

*a.  Sufficiency of § 1983 Claims Against Fulton County*

The same Monell standard applicable to NaphCare also applies to Fulton County.  As discussed previously, Plaintiff must show (1) violation of a constitutional right; "(2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the

policy or custom caused the violation." <u>Denham</u> 675 F. App'x at 941 (quoting

<u>McDowell</u>, 392 F.3d at 1289).  As discussed above, Plaintiff has sufficiently

alleged a constitutional violation based on the Medical Provider Defendants'

deliberate indifference to Decedent's serious medical need.  The Court next must

examine whether Plaintiff has sufficiently alleged the existence of a Fulton County

policy or custom constituting deliberate indifference to that constitutional right and

the causal relationship between the policy or custom and the constitutional

violation.

       i. <u>Policy or Custom Constituting Deliberate Indifference</u>

Here, Plaintiff alleges that Fulton County had a persistent and widespread

practice of underfunding the Jail so as to deny Decedent's constitutional rights.  In

the context of budgeting decisions, a plaintiff must show that the constitutional

violation complained of is a "highly predictable consequence" of the budgeting

practice.  <u>McDowell</u>, 392 F.3d at 1292.  To make such a showing, a plaintiff must

allege facts sufficient to identify a pattern of injuries linked to the budgetary

practice and establish that "a reasonable member of the [decision-making body]

would conclude that the . . . budget decisions would lead to" the constitutional

violation at issue.  <u>See</u> <u>id.</u>

Here, Plaintiff asserts that Fulton County "has a long, troubled history of providing inadequate funding for . . . operations" at the Jail.  [Doc. 15, p. 74]. Plaintiff further contends that Sheriff Labat, since taking office in January 2021, has recognized this problematic practice and made continued pleas to Fulton County for additional funding for the Jail, communicating his "profound safety concerns for inmates in the Jail."  Id. at 46–47.  Indeed, Plaintiff alleges that less than two weeks before Decedent's death, Sheriff Labat specifically told the Board that without additional funding, he would be unable to fulfill his constitutional obligations to provide adequate medical care to inmates.  Id. 24, 74.  At this meeting, Labat "described the deplorable conditions [in the Jail] and admitted his inability to protect and supervise inmates, especially mentally ill ones," because the Jail was overcrowded, understaffed and underfunded.  Id. at 24.  Plaintiff alleges that "[w]hile pleading for funding" at the Jail, Labat acknowledged that if funding were not increased, it could result in serious danger for inmates, saying, "I'm walking in a space where lives are at risk" and "it could be a life or death situation for thousands of people."  [Doc. 15, p. 47].   In short, viewing the alleged facts and making reasonable inferences in a light most favorable to Plaintiff, Sheriff Labat warned the Board of his specific concerns that continued

underfunding would result in inadequate medical care for inmates, especially mentally ill ones.

Moreover, Plaintiff has also identified a pattern of injuries—jail deaths between 2019 and 2022—that he alleges are linked to the Board's decision not to increase funding for the Jail because that decision led to the continued provision of inadequate medical care.  Viewed in this light, Plaintiff has sufficiently alleged that Fulton County had a persistent and widespread practice of underfunding the Jail and that a reasonable member of the Board would conclude that its decision to continue underfunding would lead to a violation of inmates'—or, in particular, mentally ill inmates'—rights to receive medical care.

ii. Causation

To prove causation under Monell, a plaintiff must show the policy or custom was the "moving force [behind] the constitutional violation."  City of Canton, 489 U.S. at 389; McDowell, 392 F.3d at 1292.  A plaintiff may establish a policy or custom under Monell liability only where "a complete review of the budget decision . . . reveals that the Board should have known that [the] injuries were a 'plainly obvious consequence' of [the] decision."  McDowell, 392 F.3d at 1292 (quoting Board of Cnty Com'rs v. Brown, 520 U.S. 397, 412 (1997)).  A municipality's liability cannot be based on a "scant likelihood that its budget

decision would trickle down the administrative facets and deprive a person of his constitutional rights." Id.  Rather, liability must be premised on a finding that [the Board's] budget decision was 'highly likely to inflict the particular injury' [Decedent] suffered." Id. (quoting Brown, 520 U.S. at 411).

For the same reasons already discussed, viewed in a light most favorable to him, Plaintiff has alleged sufficient facts to show causation.  As described in more detail above, Labat spoke directly to the Board before Decedent's death and alerted the Board to his inability to meet his constitutional obligations to the Jail's inmates at existing funding levels.  [Doc. 15, p. 10].  Labat described his inability to protect inmates, especially mentally ill ones, stating that "lives are at risk" and that the matter was an issue of "life or death."  Id. at 10–11, 47.  Due to Fulton County's decision to continue underfunding the Jail despite Sheriff Labat's specific warnings, one can reasonably infer that the Jail deficiencies Sheriff Labat warned about persisted and ultimately resulted in the inadequate medical care provided to Decedent, resulting in his death.  Id. at 76.  Viewed in a light most favorable to Plaintiff, such facts plausibly state that the Board's budgeting decision was "highly

likely" to inflict Decedent's alleged constitutional rights violation (deliberate

indifference to his serious medical needs).[7]  See McDowell, 392 F.3d at 1292.

Thus, Plaintiff has sufficiently alleged a § 1983 Monell claim against Fulton

County.

### b.  Sufficiency of § 1983 Claims Against Labat

The nature of Plaintiff's § 1983 claims against Sheriff Labat are difficult to

decipher.  In Count II of the Amended Complaint, Plaintiff alleges that Labat is

liable under § 1983 for the constitutional violations of his subordinates.  [Doc. 15,

p. 78].  Supervisory liability can be established when "the supervisor personally

participates in the alleged constitutional violation or when there is a causal

connection between actions of the supervising official and the alleged

constitutional deprivation."  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.

1999) (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)).  In his

---

[7] In reviewing Plaintiff's alleged facts, the Court recognizes that it is not clear what specific issues Sheriff Labat was concerned about when communicating to the Board.  Id. at 47–48.  However, given that Plaintiff alleges that inmate lives were at stake, in conjunction with Plaintiff's other allegations about the provision of inadequate medical care at the Jail during this time, a reasonable inference can be drawn that Sheriff Labat's concerns regarding underfunding and understaffing related to inadequate medical care. That said, whether Labat's warnings to the Board did, in fact, specifically concern inadequate medical care for inmates such that Decedent's constitutional violation would have been a "plainly obvious consequence" of the Board's budgeting decisions is an allegation that may ultimately be refuted through discovery.

Amended Complaint, Plaintiff alleges both Sheriff Labat's personal participation in the violation and a causal connection to the same.  See [Doc. 15, pp. 78–89].  In attempting to show a "casual connection," Plaintiff alleges various Jail deficiencies of which Sheriff Labat was aware or permitted and failed to correct.[8]  Id. at 87.

However, in his response to Fulton County and Sheriff Labat's motion to dismiss, Plaintiff does not appear to address this claim for relief.  Indeed, Plaintiff's response is devoid of argument regarding Sheriff Labat's alleged personal participation and, apart from a vague reference in a section heading, appears to contain no argument on casual connection either.  Rather, in his response, Plaintiff argues deliberate indifference based on Sheriff Labat's failure to train employees in emergency medical care.  See [Doc. 27, pp. 19–25].

A "failure to train" claim for relief is separate from the § 1983 supervisory liability claim that Plaintiff alleged in his Amended Complaint, and it implicates a different rule.  See Keith v. DeKalb County, Georgia, 749 F.3d 1034, 1047–52 (11th Cir. 2014) (discussing the different tests for the plaintiff's alternate claims for relief:  supervisory liability based on a casual connection and failure to train).

---

[8] A causal connection supporting supervisory liability can be established, inter alia, when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  See Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007).

Although the Court acknowledges that Plaintiff included certain factual allegations in his Amended Complaint (and specifically in the count against Sheriff Labat) that may relate to a "failure to train" claim, it is not clear from the pleading that such factual allegations are being offered as an alternative claim for relief.

In this way, Plaintiff's claims against Sheriff Labat contain deficiencies consistent with those typically found in shotgun pleadings. Indeed, it appears that Plaintiff's pleading as to Labat "commits the sin of not separating into a different counts each cause of action or claim for relief." Weiland, 792 F.3d at 1322. As a result, Plaintiff has failed to give Defendant Labat "adequate notice of the claims against [him] and the grounds upon which each claim rests," and the Court is ill-equipped to evaluate the merits of Plaintiff's claims. Id. at 1323.

In deciding whether to evaluate certain claims when faced with a shotgun pleading, the Eleventh Circuit has stated: "We could perhaps decide whether some of these claims were subject to dismissal under Rule 12(b)(6), leaving for another day a decision about other claims following repleading on remand. Piecemeal adjudication of that kind, however, does not promote judicial efficiency." Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001). Thus, this Court could have declined to analyze whether any of Plaintiff's claims were subject to dismissal at this stage. However, because only certain claims contained within Plaintiff's

Amended Complaint possess characteristics of a shotgun pleading, the Court believes judicial efficiency is better served in this case by dismissing without prejudice only Plaintiff's claims against Sheriff Labat and affording Plaintiff an opportunity to amend those claims.

Thus, Plaintiff will have fourteen (14) days to amend his claims against Sheriff Labat in his individual capacity. If Plaintiff chooses to amend, Defendant Labat will be granted another opportunity to move to dismiss within thirty (30) days of any potential amendment. Labat's arguments regarding the issue of qualified immunity will be considered when the Court is able to analyze Plaintiff's claims against Sheriff Labat on the merits.

## CONCLUSION

For the foregoing reasons, Defendants NaphCare, Inc., Agyei and Nwankwo's Motion to Dismiss [Doc. 24] is **DENIED**. Defendants Fulton County and Sheriff Labat's Motion to Dismiss [Doc. 23] is **DENIED IN PART**. Count II of Plaintiff's Amended Complaint is **DISMISSED WITHOUT PREJUDICE**. Plaintiff may amend his complaint *only as* to Sheriff Labat in his individual capacity in order to adequately plead the specific § 1983 claim or claims against him within fourteen (14) days of the date of this Order. If an amended complaint is filed, Sheriff Labat may move to dismiss within thirty (30) days after an amended

complaint is filed.  Plaintiff is notified that the failure to submit an amended complaint within the fourteen-day time period may result in dismissal of Count II with prejudice.  The Clerk is **DIRECTED** to resubmit this matter in the event that an amended complaint is not filed.

Further, Local Rule 16.2 requires parties to submit a Joint Preliminary Report and Discovery Plan.  "The completed form must be filed within thirty days after the appearance of the first defendant by answer or motion or within thirty days after a removed case is filed in this Court."  LR 16.2.  To date, the parties have not submitted their plan even though the first defendant appeared in this case in February 2023.

The parties are **HEREBY ORDERED** to file the Joint Preliminary Report and Discovery Plan no later than thirty (30) days from the date of this Order.  The parties are notified that a failure to comply with this Order may result in sanctions, including dismissal.  In the event a Joint Preliminary Report and Discovery Plan is not filed, the Clerk is **DIRECTED** to submit the case at the expiration of the applicable time period.

**SO ORDERED** this 22nd day of March, 2024.

J. P. BOULEE
United States District Judge