**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| HAROLD JOSEPH KENDALL, individually, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE NO. |
| FULTON COUNTY, GEORGIA, a political subdivision of the State of Georgia; et al. | ) ) ) ) | 1:23-cv-00416-JPB |
| Defendants. | ) ) | |

## THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Harold Joseph Kendall, individually and as Administrator of the Estate of Shane Kendall, by and through undersigned counsel, and hereby files this Third Amended Complaint for Damages and Demand for Jury Trial against the above-named Defendant. Plaintiffs' Third Amended Complaint removes claims which are purported to be Released for the purpose of clarifying the separate and distinct counts and claims against the remaining Defendant, i.e. "FULTON COUNTY, GEORGIA, a political subdivision of the State of Georgia", and otherwise shows this Honorable Court as follows:

INTRODUCTION AND OVERVIEW

1.

All pretrial detainees, no matter their station in life, are entitled to Constitutionally adequate medical care when confined behind bars, as well as medical care that complies with the inmate's Constitutional right to adequate medical care.

2.

This is an action under 42 U.S.C. § 1983 arising from the events and circumstances leading up to and causing the attempted suicide and eventual death of eighteen (18) year-old Shane Kendall ("Shane") on the morning of February 1, 2021, while he was an inmate in the custody of Fulton County Jail ("Jail"), located at 901 Rice Street, Atlanta, Georgia, 30318, Fulton County, Georgia.

3.

As previously alleged in Plaintiff's First Amended Complaint for Damages and Plaintiff's Second Amended Complaint for Damages, Defendant Fulton County had a custom and policy of underfunding the Jail despite knowledge that deficiencies in Jail funding were causing severe injuries and deaths and had significant potential to cause severe injuries and deaths in the future, such that this this custom and policy of underfunding the Jail constituted deliberate

indifference to Shane Kendall's Fourteenth (14th) Amendment due process right to receive medical treatment for illness and injuries while incarcerated, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide. Jackson v. West, 787 F.3d 1345 (11th Cir. 2015).

4.

Defendant Fulton County's violation of Shane Kendall's Constitutional due process right to receive adequate medical and mental healthcare was a highly predictable consequence of Fulton County's custom and practice of routinely denying and withholding funding requested or otherwise known to be needed for the Jail and the Constitutionally adequate medical and mental health treatment of inmates therein.

5.

At age fifteen (15), in June of 2017, Shane was arrested and charged as an adult for the homicide of his adopted mother, who neglected him, failed to provide him with his prescribed anti-psychotic and mood-stabilizing medications as instructed, and permitted her new partner to leave a loaded handgun lying around the home while Shane was there, unsupervised.

6.

Shane was a young man who had a lifelong history of severe mental illness

and developmental delay, and who tested positive at birth for crack/cocaine. He struggled socially, emotionally and academically his entire life.

7.

At the Jail between 2018 and 2021, Shane was housed in general population despite his known diagnoses of bipolar disorder, schizophrenia, ADHD, and visual hallucinations, which are diagnoses for severe mental illness.

8.

Shane's severe mental illness required mental health treatment and medication to prevent the potentially catastrophic consequences of said illness, if left untreated or substantially aggravated.

9.

At the Jail, Shane was prescribed and administered high daily doses of Seroquel, Depakote and Benadryl, all of which were used for the treatment of Shane's severe mental illness. These medications are known to cause weight gain in patients, particularly/especially Depakote.

10.

In the early morning hours of February 1, 2021, Jail staff located Shane in his cell, hanging by a bed sheet, unconscious and in urgent need of medical attention and treatment.

11.

After several minutes, a rescue tool was brought to Shane's jail cell, and he was removed from the makeshift noose.

12.

The claims herein arise from Defendant Fulton County's budgeting practice of underfunding Jail operations while knowing the highly predictable consequence of underfunding a Jail, i.e. the injurious, pervasive and persistent violation(s) of the Constitutional rights of the inmates in the Jail, especially severely mentally ill ones, thereby resulting in severe injuries and death. Here, Shane Kendall endured foreseeable pain, suffering, and a fatal injury as the result of Defendant Fulton County's ongoing decision to act with deliberate indifference in underfunding Jail operations.

13.

Shane's tragic death occurred at a time when Fulton County was well-aware of widespread budgeting practices within their organization that contributed to the Jail's inability to fulfill Constitutional obligations to severely mentally ill inmates at the Jail, including Shane.

14.

Defendant Fulton County engaged in a pervasive pattern of underfunding the Jail despite knowing the deplorable, unsafe conditions therein and learning

from Fulton County Sheriff Pat Sheriff Labat ("Sheriff Labat"), on several occasions, that he could not fulfill his Constitutional obligations to inmates without additional funding from Defendant Fulton County.

15.

Defendant Fulton County knew that the Jail was severely overcrowded and understaffed at all times that Shane Kendall was an inmate at the Jail.

16.

Defendant Fulton County knew that there was a widespread custom at the Jail of housing mentally ill inmates amongst general population inmates (without notifying jail staff which inmates were severely mentally ill such that they could be treated accordingly with appropriate protection, services or accommodations) due to a lack of resources like staffing and facility space, which were caused by Defendant Fulton County's failure to adequately fund the Jail. Defendant Fulton County knew that their budgeting practices did and would continue to have the highly predictable consequence of causing pain, suffering, injury and even, death, to mentally ill inmates in the Jail.

17.

On January 20, 2021, less than two weeks before Shane's death, during a Fulton County Board of Commissioners ("BOC") meeting, Sherrif Sheriff Labat explained that he could not fulfill his constitutional obligations at the Jail

without additional funding. He described the deplorable conditions therein as well his inability to protect inmates - especially mentally ill ones - due to the jail being overcrowded, understaffed and underfunded.

18.

Fulton County had a policy and custom of routinely underfunding the Jail despite the specific warnings from Sheriff Labat and others about the Jail's deficiencies and corresponding dangers. These specific deficiencies and corresponding dangers, which Sheriff Labat warned Defendant Fulton County about, persisted and ultimately resulted in the Constitutionally inadequate medical services, including mental health services, provided to Shane at the Jail, which resulted in his death.

19.

Given the pervasive, Unconstitutional practices known to be occurring in the Jail and the failure of the Defendant to provide proper funding to fix them, Shane's death, though preventable, was tragically predictable and unsurprising.

20.

Such a callous disregard for human life by Defendant Fulton County must not be tolerated under our judicial system.

FACTS

A. Shane's pre-trial incarceration in Fulton County

21.

Shortly after Shane's arrest in 2017, he was evaluated by a psychiatrist, Dr. Shane Savage, at the request of his attorney, Daniel Kane, to determine whether Shane was competent to stand trial.

22.

Upon Dr. Savage determining that Shane was not competent to stand trial, Shane was transferred from the youth detention center to a lockdown juvenile psychiatric facility called Pathways-Turner Center in Greenville, Georgia.

23.

Shane spent almost two years at Pathways-Turner Center, where he received mental health care, adequate supervision, and restoration services and curriculum (aimed at "restoring" him to competency). He suffered no injuries, made no suicide attempts, and had no issues with his medical compliance while at Pathways.

24.

While at Pathways-Turner Center, Shane was evaluated by several medical providers, who diagnosed him with ADHD, schizophrenia, autism, bipolar disorder and hallucinations. Shane carried each of these mental illness

diagnoses for the remainder of his life, including during the entirety of his incarceration at the Jail.

25.

In August of 2019, after completing his restoration curriculum, Shane's first competency trial took place in Fulton County Superior Court before Judge Robert McBurney. The case ended in a mistrial due to a hung jury.

26.

Between his first competency trial and his second one in December 2019, Shane did not return to Pathways-Turner Center (because he completed his curriculum there) nor did he go to a youth detention center (because Shane was now seventeen (17)). Instead, Shane was housed in the Jail.

27.

In December of 2019, Shane's second competency trial took place, and the jury found him competent to stand trial. Thereafter and until his death, Shane remained in the Jail, awaiting trial.

28.

When Shane arrived at the Jail, aging into it in 2019, the Jail's third-party healthcare providers documented Shane's psychiatric problems and history, including his recent psychiatric hospitalization, his psychiatric diagnoses, his heavy medication regimen and his obvious need for ongoing, regular mental

health services.

29.

Defendant Fulton County knew that the Jail lacked the space, resources, staffing and funding to provide adequate supervision or medical care to mentally ill inmates, including Shane, in a manner consistent with its Constitutional obligations, contractual obligations, training and standard operating procedures.

30.

Due to its inadequate facilities, including the lack of a mental health unit, as well as widespread overcrowding and understaffing issues, the Jail had no space to provide mentally ill inmates with safe housing, adequate supervision, or proper medical/mental health services care. As a result, Shane was housed in the "general population" of the Jail, specifically on the 6th Floor of the North Tower, which was known to house "general population" inmates accused of the most serious violent crimes.

31.

During Shane's incarceration in general population at the Jail, Shane was bullied by other inmates and physically assaulted on several occasions due to his perceived sexual orientation and mental health issues.

32.

During Shane's incarceration at the Jail, he was prescribed and medicated with increasingly high dosages of Depakote, Seroquel and Benadryl by the Jail's third-party medical providers.

33.

One of those medical providers, a physician's assistant, reported that Shane lost approximately 65 pounds between his initial incarceration in August 2019 (when he weighed 225 pounds) and July 14, 2020 (when he weighed just 168 pounds).

34.

At one point during Shane's incarceration, Jail staff and medical providers learned that Shane was giving away his medication to other inmates (likely to avoid suffering further physical abuse at their hands or otherwise under duress).

35.

The underfunding from Defendant Fulton County during the period of Shane's incarceration in the Jail significantly limited and diminished the ability of the Fulton County Sheriff and the relevant third-party healthcare provider(s) to meet their respective Constitutional obligations to severely mentally ill inmates of the Jail, including Shane, during that period.

36.

A month before Shane's death, on January 1, 2021, Jail employee, Lieutenant Jones, asked a third-party medical provider in the Jail to clarify whether Shane's "issues" (which were clearly apparent to Jail staff and medical providers as they were the subject of this conversation) were mental health or behavioral in nature. In response, the third party medical provider told Lieutenant Jones that Shane suffered from mental health problems. So, Jail staff and third-party medical providers were aware of Shane's severe mental health issues but nonetheless, they had to house him in "general population" housing because Defendant Fulton County did not provide the Jail with adequate funding to provide adequate, safe mental health housing and care for Shane and other similar inmates.

B. A New Fulton County Sheriff

37.

In the beginning of January 2021, a month before Shane's death, top leadership at the Jail changed as Sheriff Patrick Labat ("Sheriff Labat") took office as the newly-elected Fulton County Sheriff after winning the November 2020 election against the then-incumbent Fulton County Sheriff Ted Jackson.

38.

On January 20, 2021, less than two weeks before Shane's death, Sheriff

Labat addressed the Fulton County Board of Commissioners ("BOC") at a public meeting regarding the need for immediate additional funding for Jail operations to fulfill his Constitutional obligations. He described the deplorable conditions therein and admitted his inability to protect and supervise inmates, especially mentally ill ones due to the jail being overcrowded, understaffed and underfunded. *See* Exhibit 1 - Fulton County BOC Meeting Minutes (Jan.20 2021**),** pp. 78-83

39.

On January 28, 2021, a third-party healthcare provider at the Jail conducted an annual mental health evaluation with Shane. Although Shane denied suffering from visual hallucinations or delusional thinking, the provider indicated that Shane reported feeling more depressed. The provider also reflagged Shane in the third-party medical provider's internal patient records system as suffering from Psychotic Disorders and Mood Disorders as well as Impulsiveness.

C. January 31, 2021- The night before Shane's death

40.

On January 31, 2021, the night before Shane's death, Fulton County Detention Officer Kawana Jenkins #D1453 (hereinafter "Officer Jenkins") and Officer Ebony Thomas #3362 (hereinafter "Officer Thomas") were conducting

security rounds when they observed Shane balled up in a fetal position on the floor of his cell.

41.

Concerned about him, Officer Jenkins and Officer Thomas opened the door to Shane's cell, which he shared with another inmate at that time, and asked him what was going on with him.

42.

In response, Shane told Officer Jenkins and Officer Thomas that he was tired of being in his cell and wanted to be moved somewhere else.

43.

Officer Jenkins and Officer Thomas told Shane that he couldn't be moved because he did not like his cell. Then, they locked Shane back in his cell.

44.

Moments later, Shane assaulted his cellmate, Tyrell Curry, who later reported that Shane told him he started a fight with him to get out of his cell. Shane told Tyrell Curry that he just really wanted to get out of there and knew that the physical altercation would cause Jail staff to immediately remove them from the cell, at least for a short period of time. There were no reported injuries to either of them.

45.

Officer Jenkins and Officer Thomas quickly provided a summary of what occurred with Shane so that their supervisor, Fulton County Detention Officer Willie Walker #3083 ("Officer Walker"), could create his supervisory investigation report and send the report up the pipeline for disciplinary review.

46.

Officer Walker determined that Shane assaulted his cell mate because he didn't want to be in his cell with anyone else. Based on his findings, Officer Walker also recommended that Shane be charged with Assault and Interference with Security Operations.

47.

By 10:30 p.m. on January 31, 2021, Watch Commander, Bumice Howard #2797 ("Watch Commander Howard"), had approved the investigative findings of Officer Walker and sent the case along the path towards punitive, disciplinary action.

48.

At approximately 11:00 p.m., Shane received notice that he was being accused of Assault/Battery and Interference with Security Operations and faced forty-eight (48) days in disciplinary lockdown (which, essentially, is twenty-four (24) hours in solitary confinement).

49.

Officers Jenkins and Thomas sent Shane to the medical floor, where a third-party healthcare provider reportedly took Shane's vitals, which were normal, and noted he had no injuries.

50.

Shane was cleared by the third-party healthcare provider to be returned to his cell, which had an inoperable light, and where he would remain alone until the following morning. There was not an adequate mental health unit available for Shane Kendall on the night of January 31, 2021 or morning of February 1, 2021 at the Jail.

51.

As a direct result of Shane's severe mental illness (which was documented in his medical records as including "visual hallucinations in small, closed, dark spaces"), Shane was experiencing a strong, unrelenting fear of his assigned jail cell, which was dark due to the light in his cell being broken/out.

52.

Shane's very strange, fearful behavior (being balled up in the fetal position on the floor of his cell and then, assaulting his cell mate) was not reasonably commensurate with the current conditions he was actually in. His actions were consistent with the signs and symptoms of aggravated mental illness.

53.

In the early morning hours of February 1, 2021, at approximately 5:26am, Jail staff conducted security rounds and noted no issues or concerns regarding Shane or anything else occurring in his pod area (6N400).

54.

Despite Shane being a severely mentally ill inmate, who was being housed alone on February 1, 2021, facing forty-eight (48) days in disciplinary lockdown and who had exhibited strange behavior and showed obvious signs of severe mental disturbances within the last twenty-four (24) hours, there was not sufficient Jail staff available to provide security rounds more regularly to Shane's cell to ensure he was properly supervised or kept safe in light of his recent, concerning behavior and obvious aggravation of his mental illness.

C. February 1, 2021-Response to Shane's attempted suicide

55.

At approximately 6:10 a.m. on February 1, 2021, Cadet Albernisha Blackman D3519 ("Blackman") and Detention Officer Rayshaun Clark D1492 ("Clark") while conducting their security rounds, walked past Shane's cell (6N402) and discovered him slouched over, with his feet on the ground and a blue bed sheet tied to the bunk and a knot around Shane's neck.

56.

Blackman put out an emergency call to the on-site third-party medical providers at approximately 6:12 a.m., asking for their immediate assistance and a stretcher for an unconscious, breathing inmate, who had apparently attempted suicide in cell 6N402.

57.

During the evening of January 31, 2021 through the morning of February 1, 2021, Defendant Fulton County's third-party healthcare provider was the on-site medical provider that was responsible for providing medical care, evaluation and treatment to inmates, including Shane, in the Jail and which received the 6:12 a.m. call.

58.

The 6:12 a.m. emergency call was received by a registered nurse employed by the third-party healthcare provider and Fulton County Deputy Synclare Henry ("Deputy Henry"), who was assigned to the medical floor during the early morning hours of February 1, 2021. Deputy Henry and the registered nurse responded to the emergency call by reporting to Shane's cell with a stretcher and oxygen tank.

59.

At the time that Deputy Henry and the registered nurse received the 6:12

a.m. emergency call, they were situated on the medical floor of the Jail, which is three floors below the floor on which Shane was housed and requires the use of an elevator to access.

60.

A physician's assistant employed by the third-party healthcare provider, who was working on the medical floor at the time, was unable to hear the emergency call because he was in the bathroom, but responded to the emergency after Deputy Henry and the registered nurse, and he brought an Automated External Defibrillator ("AED") with him to Shane's cell.

61.

Around the same time of the 6:12 a.m. emergency call to Deputy Henry, Blackman also radioed to have fellow jail staff open cell 6N402 and drop down the "9 key," an emergency key.

62.

Blackman and Clark were then able to cut Shane down from the bedsheet, which was tied to the lower bunk bed, place Shane on the floor of his jail cell, and begin resuscitation efforts.

63.

At 6:20 a.m., the registered nurse arrived at Shane's cell. At that point, it was obvious to all Jail staff and medical providers on scene that Shane was

experiencing a life-threatening, serious medical need as he was unresponsive and no longer breathing.

64.

The physician's assistant arrived at the scene of Shane's medical emergency at 6:22 am, bringing the AED into Shane's cell by around 6:25 a.m., at which time. no shock was advised.

65.

At 6:36 a.m., EMS arrived and took over CPR, but were unsuccessful in their resuscitation efforts and pronounced Shane dead at 6:49 a.m.

66.

An autopsy performed by Jacqueline Benjamin, M.D., of the Fulton County Medical Examiner's Office, listed Shane's cause of death as hanging.

67.

In the medical examiner's report, Jacqueline Benjamin, M.D., noted that there was a faint red discoloration and abrasions on Shane's neck. She also noted the absence of petechiae or purpura on his skin, conjunctiva or oral mucosa. She did not report any cervical or spine fractures.

68.

Shane Kendall died from a respiratory arrest that resulted from suffocation and strangulation while an inmate at the Jail on February 1, 2021.

69.

Shane's death was foreseeable and preventable had proper funding for a mental health unit, supervision of mental health inmates, and sufficient facilities been provided by Fulton County for the operations of the Jail.

D. Fulton County's custom and practice of Constitutional violations

70.

The Fulton County Jail ("Jail") has been troubled from the day it opened in 1989 and has a long history of problems of fulfilling its duties to provide funding for the Jail such that the inmates' due process right to receive medical treatment for illness and injuries (which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide) were consistently violated.

71.

Inadequate supervision and understaffing have been an ongoing, acknowledged problem at the Jail and have been blamed for several deaths within the Jail, before and after Shane's death.

72.

As a result of the lawsuit *Harper v. Bennett* (U.S. District Court for the Northern District of Georgia, 1:04-cv-01416), a federal Court found that the Jail's conditions in 2006 were Unconstitutional and placed the Jail under strict federal Court

oversight with a Court-appointed third-party monitor to ensure compliance with the resulting Consent Decree in 2006. Pursuant to this Consent Decree, Fulton County agreed to correct Unconstitutional living conditions due to overcrowding, understaffing and hazardous infrastructure.  During the ten years of federal oversight that followed, improvements and investments were made by Defendant Fulton County, and in 2015 they were finally deemed to be in substantial compliance. At that point the Consent Decree and federal monitoring ended.

73.

Once federal eyes left, the County failed to provide adequate funding to maintain the upkeep they had achieved, which led to a predictable (and preventable) steep regression in inmate access to safe housing, supervision and adequate health care.

74.

Between 2015 and 2018, Fulton County contracted with two third-party medical providers, both these providers were unable to provide Constitutionally adequate healthcare at the Jail due to the unsafe and inadequate conditions of the Jail. Their contracts had to be terminated as a result. The current third-party healthcare provider was contracted in 2018 and remained the third-party healthcare provider for the entirety of Shane's incarceration.

75.

The ongoing, widespread pattern of Defendant Fulton County failing to properly fund Jail operations in order to provide Constitutionally adequate mental

health and medical treatment to mentally ill inmates in their care and custody was also the subject of a class action lawsuit brought on behalf of female detainees housed at the South Fulton Annex jail in Union City, Georgia. *See Georgia Advocacy Office et al v. Sheriff Labat et al* (U.S. District Court for the Northern District of Georgia, 1:19-cv-01634).

76.

Between April 2, 2019 and February 1, 2021, the following individuals died in the Jail as a direct and proximate result of unsafe housing, inadequate staffing and underfunded facilities, which were the highly predictable consequence of Fulton County underfunding the Jail:

a) April 2, 2019 -Traylor, Emil (#JA19-0699): killed in a fight with his cellmate and could not be resuscitated by the time any assistance arrived.

b) May 4, 2019 -Tookes, Tyrique (#JA 19-0980):  found "frozen" and pulseless and only because his roommate informed Jail staff that Tookes was not responding to headcount;

c) July 22, 2019 -  Barnett, William (JA#19-1720): apparent suicide or respiratory issue while Barnett was on suicide watch;

d) November 6, 2019 -  Holley, Raymond ("Jail Bureau Incident Report"): died from cardiopulmonary arrest and appears that he was dead before an EMS transfer could be made

e) December 12, 2019 -  Burson, Contravious (# JA19-2923):  Burson was found dead but revived and breathing with chest compressions but was ultimately too late for resuscitation.

f) March 19, 2020 -  Seay, James (#JA20-0723):  had a seizure in the intake area, was transferred and pronounced dead at Emory Midtown Hospital.

g) April 20, 2020 -  Gasier, Ray (#JA20-0980):  appears to be a homicide/conflict between inmates.

h) June 12, 2020 -  Sapp, Evan (#JA20-1484) suicide in the same manner as Shane Kendall - with blue mattress clothing - inmates are seen on surveillance footage looking into Sapp's cell before suicide.

77.

The failure of Defendant Fulton County to correct their egregious, widespread customs and practice of underfunding, as described above and herein, demonstrate a willful, deliberate indifference to the lives and Constitutional rights of mentally ill inmates in the Jail. This deliberate indifference has been identified by the U.S. Department of Justice, who has been forced to take over control of the Jail from Fulton County both in 2006-2015 (as described above) and presently (since January 2025).

78.

In January 2025, Defendant Fulton County, agreed to, signed, and entered into a Consent Decree with the U.S. Department of Justice, in which it tacitly acknowledged that it had violated inmates' Constitutional rights prior to 2025, including that it had provided inadequate staffing and facilities and also lacked appropriate and sufficient space to for Constitutionally adequate mental health services to inmates at the Jail.

79.

Facing an investigation by the U.S Department of Justice following Shane's death, Fulton County devoted significantly more resources to the Jail, including the funding of contracts for inmate relocation that substantially

decreased the inmate population from the time that Shane was an inmate there. It otherwise provided money for much-needed updates and improvement in Jail facility.

80.

Despite the additional funding and the substantial decrease in the inmate population between 2022 and 2025, the U.S. Department of Justice still found that a Consent Decree was necessary because the Constitutional rights of inmates were *still* being violated.

81.

Defendant Fulton County provided substantially less funding for the Jail between 2019 and 2021 than it did during the U.S. Department of Justice investigation from 2022 to 2025 and admitted in 2025 the Jail was violating the Constitutional rights of its inmates due to inadequate staffing, facilities, and the lack of appropriate and sufficient space to provide adequate mental health services.

82.

Since entering office in January 2021, Sheriff Labat has openly communicated to the media, the general public and Defendant Fulton County, through the BOC, that he had profound safety concerns for inmates in the Jail, especially mentally ill ones, due to severe overcrowding therein and the lack of

adequate funding and space available for them.

83.

The Jail is designed to hold 2,500 inmates at an absolute maximum. However, since the COVID-19 pandemic hit in March 2020, upwards of 3,000 inmates, on average, were housed there.

84.

Despite this significant increase in the Jail's inmate population, Sheriff Labat's requests to Defendant Fulton County for adequate funding and more space to carry out his jail operations were not met with approval from the Fulton County Board of Commissioners, who knew Fulton County's refusal to substantially increase funding for jail operations would have the likely consequence of severe injury, suffering, and death to inmates in their care.

85.

Less than two months after Shane Kendall died, Sheriff Labat told The Atlanta Journal-Constitution that "We have an obligation as a Sheriff's office to treat people like they're humans." "He was also quoted saying that "he needs a new jail to offer the services that would help inmates, including proper mental health services and substance abuse care, because he can't provide them in the current space." *See* Exhibit 2 – AJC -New Sheriff Wants $400-500m for New Jail.

86.

While pleading for proper funding and additional space to house Fulton County inmates in early 2021, Sheriff Labat publicly stated, and thus alerted Defendant Fulton County to the dire nature of his request for help with the Jail, saying "I'm walking in a space where lives are at risk" and it "could be a life or death situation for thousands of people" if these obvious problems are not corrected immediately. *See*, Exhibit 3 -WSB-TV - Fulton Sheriff begs to move inmates to Atlanta detention center.

87.

Prior to Shane's death in February 2021, Fulton County was aware that their underfunding practices (regarding Jail operations) caused pervasive understaffing and insufficient housing for special populations, like mentally ill inmates.

88.

Prior to Shane's death in February 2021, Fulton County was aware that its third-party health care provider was not provided with adequate space, facilities, services or support such that it could adequately provide mental health services to inmates.

89.

An internal report by the third-party health care provider in 2022,

following the death of another mentally ill inmate in the Jail, described widespread, unimaginable neglect of mentally ill inmates in the Jail, noting that that they were collectively wasting away and living in unsanitary, deplorable housing conditions.

90.

In 2022, Sheriff Labat said during at an Atlanta City Council meeting: "I've been sounding this alarm for 365 days, if not longer.". *See* Exhibit 4, AJC - Jail Study a Stall Tactic.

91.

For each of the reasons stated above, and the additional reasons and details provided below, Defendant Fulton County had a persistent and widespread practice of underfunding the Jail and a reasonable member of the Fulton County BOC would conclude that its decision to continue underfunding would lead to a violation of Jail inmates' (and particularly, mentally ill inmates') Constitutional rights.

92.

Defendant Fulton County's acts and omissions led to the wrongful death of Shane, his pain and suffering before he died and the infliction of emotional distress of Plaintiff Harold Joseph Kendall, Shane's father.

93.

As a direct, proximate, and foreseeable result of the underfunding practices

of Defendant Fulton County, including the negligent acts and omissions of their agents, servants and employees, all of which amounted to deliberate indifference, Shane suffered excruciating mental, physical and emotional pain up until the time of his tragic death.

94.

In accordance with O.C.G.A. §§ 36-11-1 and 50-21-26, on September 13, 2021, this Defendant was sent an Anti Litem Notice on via certified mail, return receipt requested (attached to First Amended Complaint as Exhibit 1).

JURISDICTION

95.

Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §1983 and §1988

96.

Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a) over the state law claims addressed herein, if any.

97.

All relief available under the foregoing statutes is sought herein by Plaintiff.

VENUE

98.

Venue is proper pursuant to 28 U.S.C. § 139 (b) because a substantial part

of the acts and omissions giving rise to Plaintiffs claims occurred in this District.

99.

Assignment to the Northern District of Georgia is proper pursuant to Northern District of Georgia Local Rules, because a substantial part of the acts and omissions giving rise to Plaintiffs claims occurred in this division.

PARTIES

A. Plaintiff

100.

Shane Miguel Kendall ("Shane") was at all times relevant to this Complaint a resident of the State of Georgia in the custody and care of the Fulton County Jail in Fulton County, Georgia.

101.

Plaintiff Harold Joseph Kendall ("Plaintiff") is a resident of the State of Georgia. Plaintiff is the adopted father and sole heir of Shane Miguel Kendall. Plaintiff is the Administrator of the Estate of Shane Kendall. Plaintiff brings this action individually and in his representative capacity on behalf of the Estate of Shane Miguel Kendall as the Administrator of the Estate of Shane Miguel Kendall.

B. Defendant Fulton County

102.

Defendant Fulton County is a governmental entity and political subdivision of the State of Georgia and thus is constitutes a state actor. Through its Board of Commissioners ("BOC"), Defendant Fulton County provides funding to operate the Fulton County Jail operations. Defendant Fulton County is subject to the jurisdiction of this Court, and venue is proper.

103.

Defendant Fulton County, as a persistent policy and customary practice, failed to adequately fund Jail operations, which caused too few qualified employees, staff, and agents, including medical personnel and guards, to be hired at the Jail; caused the Jail to have inadequate space to enable it to perform adequate medical and mental care and security services to its inmates; caused the Jail to have inadequate resources to enable it to provide adequate medical care, mental health care and security services to inmates.

104.

At all times relevant to this Complaint, Defendant Fulton County knew that the Jail was overcrowded, understaffed, and in deplorable condition.

105.

At all times relevant to this Complaint, Defendant Fulton County knew that it was not providing adequate funding to ensure inmates received Constitutionally adequate mental health treatment because it knew that its

facilities could not provide adequate mental health treatment in the condition that the Jail was in during the entirety of Shane's incarceration, including a lack of a separate mental health housing unit (or other appropriate space) for inmates like Shane with severe mental illness. It was well known to Defendant Fulton County that there were inadequate housing options within the Jail for mentally ill inmates and additional funding was needed for a Jail mental health unit.

106.

Defendant Fulton County's actions and inactions exhibited deliberate indifference to the safety and well-being of inmates at the Fulton County Jail, including Shane, and subjected him to the unnecessary and wanton infliction of pain and ultimately, death, which constituted cruel and unusual punishment.

**CAUSE OF ACTION**
**42 U.S.C. §1983 AND 14th AMENDMENT TO THE U.S. CONSTITUTION aka "MONELL LIABILITY" AS TO DEFENDANT FULTON COUNTY**

107.

All of the above paragraphs are incorporated by reference to this Count of Plaintiffs' Third Amended Complaint for Damages.

108.

This private cause of action against Defendant Fulton County is based on the holding in Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978), where the Court held that a state actor can be held liable under 42 U.S.C. §1983 "when

execution of a government's policy or custom" is responsible for the alleged deprivation of civil rights. ("Monell Liability").

109.

A custom is defined "a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it". Craig v. Floyd County, 643 F.3d 1306 (11th Cir.2011).

110.

Defendant Fulton County is a governmental entity and political subdivision of the State of Georgia and thus is constitutes a state actor.

111.

Through its Board of Commissioners ("BOC"), Defendant Fulton County provides funding for the Fulton County Jail operations.

112.

The standard for analyzing pretrial detainee claims under the Fourteenth (14th) Amendment is the same as claims made by prisoners under the Eighth (8th) Amendment. Goodman v. Kimbrough, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013).

113.

Pretrial detainees plainly have a Fourteenth (14th) Amendment due process right to receive medical treatment for illness and injuries, which encompasses a

right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide. Jackson v. West, 787 F.3d 1345 (11th Cir. 2015).

114.

Defendant Fulton County has a long, troubled history of providing inadequate funding for Jail operations. Plaintiff realleges and incorporates the allegations contained in the above paragraphs of this Third Amended Complaint as if fully restated herein.

115.

Ever since the COVID-19 pandemic and the temporary shutdown of the Court system, Defendant Fulton County knew that the Jail was becoming increasingly overcrowded, understaffed and frankly, very dangerous.

116.

In January 2021, Sheriff Labat notified Defendant Fulton County that he could not fulfill his Constitutional obligations (to provide adequate supervision and medical care to inmates), without additional funding or space from Defendant Fulton County.

117.

In January 2021, Sheriff Labat also notified Defendant Fulton County that he specifically feared for the safety of mentally ill inmates, telling the Fulton

County Board of Commissioners that the Jail lacked adequate space, equipment, services or resources to properly protect, treat or provide medical care for mentally ill inmates.

118.

So, as early as January 2021 (but likely earlier), Defendant Fulton County knew of the deplorable conditions within the Jail and knew of Sheriff Labat's inability to fulfill his Constitutional obligations to inmates under then-existing conditions without additional funding.

119.

Defendant Fulton County knew that the highly predictable consequence of their failure to provide proper funding for Jail operations between 2015 and 2021 would likely lead to imminent, predictable, senseless suffering and deaths of inmates and/or jail staff.

120.

Defendant Fulton County also knew that it could face potential liability for acknowledging both the atrocious conditions at the Jail and the imminent risk of injury and death to inmates due to those conditions but still decided not to provide adequate funds to correct/rectify the atrocious conditions therein.

121.

The known, dangerous, widespread pattern of providing insufficient

supervision for mentally ill inmates at the Jail as well as the systemic, gross deficiencies in the provision of mental health care of severely, mentally ill inmates has not been corrected and, sadly, has persisted long after Shane's death (causing the death of many more inmates at the Jail) and is the highly predictable consequence of Defendant Fulton County's failure to adequately fund Jail operations.

122.

In 2019-2022, alone, there were fourteen (14) deaths in the Jaill. Many of these senseless deaths involved mentally ill inmates, like Shane. For example:

a) April 2, 2019 - Traylor, Emil (#JA19-0699): killed in a fight with his cellmate, and could not be resuscitated by the time any assistance arrived.

b) May 4, 2019 -Tookes, Tyrique (#JA 19-0980): found "frozen" and pulseless and only because his roommate informed FCSO that Tookes was not responding to headcount

c) July 22, 2019 - Barnett, William (JA#l9-l 720): apparent suicide or respiratory issue while Barnett was on suicide watch;

d) November 6, 2019 - Holley, Raymond ("Jail Bureau Incident Report"): died from cardiopulmonary arrest and appears that he was dead before an EMS transfer could be made

e) December 12, 2019 - Burson, Contravious (# JA19-2923): Burson was found dead but revived and breathing with chest compressions but was ultimately too late for resuscitation.

f) March 19, 2020 - Seay, James (#JA20-0723): had a seizure in the intake area, was transferred and pronounced dead at Emory Midtown Hospital.

g) April 20, 2020 - Gasier, Ray (#JA20-0980): appears to be a homicide/conflict between inmates.

h) June 12, 2020 - Sapp, Evan (#JA20-1484) suicide in the same manner as Shane Kendall - with blue mattress clothing - inmates are seen on surveillance footage looking into Sapp's cell before suicide

123.

Accordingly, Defendant Fulton County's deliberate indifference to Shane's serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Fourteenth (14th) Amendment, and therefore violated Shane's due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide

124.

Defendant Fulton County failed to provide its third-party healthcare provider(s) with adequate space and resources to enable it to provide adequate mental health and medical services to Jail inmates.

125.

Under the above-discussed circumstances, by delaying the provision of desperately needed funds to Sheriff Labat and prior Fulton County Sheriffs, Defendant Fulton County knowingly permitted the deplorable conditions to continue and knowingly accepted the risk of preventable suffering and death to at-risk inmates.

126.

Defendant Fulton County is well-aware of the number of deaths in the Jail and

the role that its custom and practice of underfunding decisions had on the deaths in the Jail, as evidenced by their budget decisions made from 2019 to 2021 in comparison to the budget decisions made from 2022 to the present.

127.

In January 2025, Defendant Fulton County, agreed to, signed, and entered into a Consent Decree with the U.S. Department of Justice, in which it tacitly acknowledged that it had violated inmates' Constitutional rights prior to 2025, including that it had provided inadequate staffing and facilities and also lacked appropriate and sufficient space to for Constitutionally adequate mental health services to inmates at the Jail.

128.

Shane Kendall was obviously and demonstrably unable to survive within the general population housing units of the Jail (based on the incident report and events of January 31, 2021 to February 1, 2021) and should not be treated as a general population inmate, especially for the purpose of discipline. A lack of adequate housing and services for mentally ill inmates results in severely mentally ill inmates, including Shane Kendall, being punished for mental health issues misperceived as behavioral infractions. That punishment being restrictive housing (solitary confinement), which is cruel and inappropriate for such individuals.

129.

Defendant Fulton County's policy and custom of underfunding the Jail was the moving force behind the violation of Shane Kendall's Fourteenth (14th) Amendment due process right to receive medical treatment for illness and injuries (which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide) because it failed to provide the adequate facilities, particularly a mental health unit, and adequate supervision such that Constitutionally adequate mental health services could be provided to Shane.

130.

Shane's death on February 1, 2021 was a tragic, foreseeable and direct result of Defendant Fulton County's unconstitutional practice of underfunding the Jail and a denial of Shane's due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.

131.

For the reasons stated above and otherwise in this Complaint, Fulton County should have known that pain, suffering, severe injuries and deaths, like

Shane's, were a plainly obvious consequence of its policy and custom of underfunding the Jail and that its decision to underfund the Jail would be highly likely to inflict severe injuries and cause deaths, including the deaths of mentally ill inmates, such as occurred with Shane.

132.

Shane's death on February 1, 2021 was the foreseeable proximate cause of Fulton County's underfunding of the Jail because the Jail facility was overcrowded, understaffed, lacked an adequate mental health unit, lacked safe housing for severely mentally ill inmates and also lacked sufficient space for the provision of adequate mental health care to mentally inmates, and Shane Kendall was clearly severely mentally ill for the reasons stated above.

133.

Defendant Fulton County's Chief Operating Officer for Public Safety, Alton Adams, testified in this matter that the Jail was not designed with the ability to address the mental health challenges at the time that it was built 40 years ago, and added that "the physical plant [for the Jail] wasn't necessarily designed to address mental health and other modern issues with inmates in the jail". COO Adams also testified that Sheriff Labat had been requesting space for mentally ill inmates.

134.

Shane's death on February 1, 2021, was the foreseeable proximate cause of Fulton

County's underfunding of the Jail because the Jail did not have sufficient funds for a mental health unit and because of that, Shane Kendall was not compliant with his medications, and likely had his medication taken from him by general population inmates. This is most clearly demonstrated by Shane's loss of sixty-five (65) pounds during his incarceration at the Jail because one or more of his prescribed mental health medications (Depakote, Benadryl and Seroquel) are known to cause weight gain, and also, relevant Jail reports show that Shane was giving his medication to other general population inmates, likely under duress, which would not have occurred in a mental health unit.

135.

Defendant Fulton County's repeated failure to provide funding for adequate mental health housing, despite its knowledge of the dangers that not having such a space created for mentally ill inmates in the Jail, was the equivalent of ignoring the condition and circumstances of those inmates, including Shane Kendall, altogether.

136.

Shane's death on February 1, 2021, was the foreseeable proximate cause of Fulton County's underfunding of the Jail because the Jail did not have sufficient staff to supervise mentally ill inmates who were housed in general population, like Shane Kendall -- especially while they were experiencing aggravation of their mental illness. As a result,

while Shane was in the middle of a psychotic episode as an inmate housed in "general population" , he was placed in restrictive housing because there was no mental health unit available and was only supervised briefly approximately once every hour. During that time, general population inmates were in the hallway outside of room and able to, at least, taunt and harass Shane unsupervised. In addition, there was no operable light in Shane's cell and he was alone, which were known triggers of his mental illness.  Fulton County Commissioner Hausman stated that "I mean I've long said that we under pay our Sheriff deputies and that the turnover rate reflects that" at a Fulton County Board of Commissioners meeting on January 20, 2021 – just about one week prior to Shane's death.

137.

Shane's death on February 1, 2021, was the foreseeable proximate cause of Defendant Fulton County's underfunding of the Jail because the Jail was generally in a horrific, unsafe and inhumane condition for the entirety of Shane's incarceration there from 2018-2021. Indeed, Fulton County Board of Commissioners' Vice Chair Natalie Hall stated at Board of Commissioners meeting on January 20, 2021 that the conditions of the Jail were a "travesty" and "really terrible" and pointed out that "if the [Fulton County Board of Commissioners] BOC keeps a constitutional officer [referring to Sheriff Labat] from being able to meet his required constitutional obligations, then [Fulton County is] held liable".

138.

Defendant Fulton County's unconstitutional practice of failing to provide necessary funding for Jail operations deprived Shane Kendall of access to adequate mental health care (including inadequate supervision and inadequate facilities) which are protected by the Fourteenth (14th) Amendment of the United States Constitution and constitutes deliberate indifference to Shane's serious medical needs in violation of his due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide

139.

Defendant Fulton County's widespread and sustained practice of failing to adequately fund Jail operations was the foreseeable proximate cause and significant contributing factor in the cause of Shane's death. Like a domino effect, Defendant Fulton County's failure to adequately fund operations directly led to the Jail's widespread inability provide:

a) Constitutionally adequate facilities and housing for inmates, including appropriate and reasonably safe residential/housing facilities for mentally ill inmates, including Shane, such that he could receive constitutionally adequate mental health treatment while an inmate of the Jail.

b) Constitutionally adequate supervision of inmates, including supervision for mentally ill inmates such as Shane, particularly when they are placed in restrictive housing or subject to discipline;

c) Constitutionally adequate and humane living conditions that would prevent the unnecessary deterioration of an inmate's ongoing mental health issues and/or aggravation of an inmate' pre-existing mental health condition.

### 140.

As a direct and proximate result of Defendant Fulton County violating Shane's Fourteenth (14th) Amendment rights, his due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide was violated, and, as a result, Shane's mental health deteriorated, his mental illness became aggravated, and he then attempted to injure himself while unsupervised and also being potentially harassed or threatened by unsupervised inmates near his cell, all of which resulted in ongoing injuries, pain and suffering, and mental and emotional distress and, ultimately, death while an inmate in the Jail.

### 141.

As a result of Defendant Fulton County's conscious indifference, Plaintiff

is entitled to compensatory damages for the loss of Shane's life and damages in an amount to be proven at trial for Shane's pain and suffering.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays that this Court award the following relief from Defendant:

a)   An award of compensatory damages in an amount to be proven at trial, including all damages for Shane's pain and suffering during the time that he was living, including interest;

b)   An award for all available wrongful death and survival damages, including for pain and suffering experienced while he was living.

c)   An award of punitive damages in favor Plaintiff against Defendant Fulton County;

d)   All costs of court, including attorney's fees and expert fees under 42 U.S.C. § 1988;

e)   Plaintiff have a trial; by jury; and

f)   Such other and further relief as the Court may deem just and proper.

Plaintiffs Respectfully submitted, this the 25th day of June, 2026.

**KAUFMAN LAW FIRM LLC**
*/s/ Rachel Kaufman*
RACHEL M. KAUFMAN
Georgia Bar No. 491375
*Counsel for Plaintiffs*

133 Nassau Street NW
Atlanta, Georgia 30303-2035
(404)615-7588
rachel@rachelkaufmanlaw.com

                                              **CHILDERS, SCHLUETER & SMITH**
                                              /s/ *Neil T. Edwards*
                                              Neil T. Edwards
                                              Georgia Bar No. 967177
                                              *Counsel for Plaintiffs*

1932 North Druid Hills Road
Suite 100
Atlanta, Georgia 30319
(404) 419.9500
nedwards@cssfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have presented the foregoing PLAINITFFS' THIRD AMENDED COMPLAINT FOR DAMAGES., upon all parties to this matte through the Court's CM/ECF electronic filing system via electronic mail, addressed to counsel of record for Defendant as follows:

**ROBBINS, ALLOY BELINFANTE LITTLEFIELD, LLC**
Chuck Boring
Melanie Johnson
Edwards A. Bedard
*Counsel for Defendant Fulton County*
500 Fourteenth Street NW
Atlanta, Georgia 30318
(404) 856-3263
cboring@robbinsfirm.com
mjohnson@robbinsfirm.com
ebedard@robbinsfirm.com

Respectfully submitted, this the 25th day of June, 2026.

**CHILDERS, SCHLUETER & SMITH**
/s/ *Neil T. Edwards*
Neil T. Edwards
Georgia Bar No. 967177
*Counsel for Plaintiffs*

1932 North Druid Hills Road
Suite 100
Atlanta, Georgia 30319
(404) 419.9500
nedwards@cssfirm.com

## LOCAL RULE 5.1(C) CERTIFICATION

I HEREBY CERTIFY by signature below, counsel for Plaintiff certifies that the foregoing pleading was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.l(C).

Respectfully submitted, this the 25th day of June, 2026.

**CHILDERS, SCHLUETER & SMITH**
/s/ *Neil T. Edwards*
Neil T. Edwards
Georgia Bar No. 967177
*Counsel for Plaintiffs*

1932 North Druid Hills Road
Suite 100
Atlanta, Georgia 30319
(404) 419.9500
nedwards@cssfirm.com





**FULTON COUNTY BOARD OF COMMISSIONERS**
**RECESS MEETING**
January 20, 2021
10:00 AM

Fulton County Government Center
**TELECONFERENCE**
141 Pryor Street SW
Atlanta, Georgia 30303

---

# MINUTES - RATIFIED

---

**This document is tentative, has not been ratified or approved by the Board of Commissioners, and is not binding on the County or any officer.**

---

**Ratification date:  February 17, 2021**

---

**CALL TO ORDER:** Chairman Robert L. Pitts                **10:00 a.m.**

**ROLL CALL:** Tonya R. Grier, Clerk to the Commission

| | |
|---|---|
| Chairman Robb Pitts (At-Large) | **PRESENT** |
| Commissioner Liz Hausmann (District 1) | **PRESENT** |
| Commissioner Bob Ellis (District 2) | **PRESENT** |
| Commissioner Lee Morris (District 3) | **PRESENT** |
| Vice Chair Natalie Hall (District 4) | **PRESENT** |
| Commissioner Khadijah Abdur-Rahman (District 5) | **PRESENT** |
| Commissioner Marvin Arrington (District 6) | **PRESENT** |

**INVOCATION:** Reverend Clifton Dawkins, Jr., County Chaplain

**PLEDGE OF ALLEGIANCE:** Recite in unison

**ALSO PRESENT**:  Dick Anderson, County Manager; Patrise Perkins-Hooker, County Attorney; Anna Roach, Chief Operating Officer; Sharon Whitmore, Chief Financial Officer; Ellis Kirby, Deputy COO; Pamela Roshell, Deputy COO; Alton Adams, Deputy COO; Harriet Thomas (Office of Chairman Pitts); Hakeem Oshikoya, Finance Director; Felicia Strong-Whitaker, Purchasing Director; Jessica Corbitt, Director of External Affairs; and Nikki Peterson (Office of the Clerk to the Commission)

---

EXHIBIT 1

**SHERIFF LABAT:**  "Yes ma'am."

**VICE CHAIR HALL:**  "Were you listening to the Board meeting when I addressed the letter that you sent to all of us on the Board of Commissioners?  Did you hear the conversation about your letter?"

**SHERIFF LABAT:**  "So if I can provide some background, if that's okay.  Quite simply, we have been in conversation with Mr. Anderson and his team for months.  I understand Ms. Whitmore, Alton Adams and everybody [inaudible]."

**VICE CHAIR HALL:**  "I can't hear you."

**SHERIFF LABAT:**  "And I -- what I -- can you hear me?  Can you hear me?"

**COMMISSIONER ABDUR-RAHMAN:**  "You're breaking up badly, Sheriff."

**SHERIFF LABAT:**  "Is that better?  I've been in conversation -- is that better?"

**VICE CHAIR HALL:**  "Yes, that's better."

**SHERIFF LABAT:**  "Okay.  I had to take the call on the phone because I'm having a few technical difficulties, but that said, and please let me know if anyone cannot hear.  I've had an opportunity to meet with Mr. Anderson and his team as well both in -- and some in person.  And it's hard for me to hear.  So if I am, please throw your hand up. Alton I can see you if, if that's possible if there's a problem with communication.  In short, what I predicted would happen did happen, and there was zero opportunity for us to transition.  And as part of that prediction, I knew we would be right where we are with respect to the budget.  And so as someone mentioned earlier, the only monies that moved were monies for the medical contract which came out of non-agency funding into the sheriff's office at my request, and then a few other items that Mr. Hakeem mentioned as well.  What really spawned the latter was an opportunity for us to talk to each commissioner and give them a true sense of where we are with the facility.  And so at -- so out of an abundance of caution, I would tell you that there are some things that have not been revealed and won't be until we do some further investigation.  One of the things that I did have an opportunity to do and meet with Mr. Chairman as well as Hermon -- Mr. Hermon on was competitive pay raises as Mr. Anderson pointed out as well as the pay raises for the actual detention officers.  Those numbers were vetted and whatever the system, I believe it was ICS from that perspective, and then as we started peeling back this onion, the best way for me to put it is to really just be honest and we looked at the fleet from 2020 which had 25 vehicles that are out of life cycle with the projection of another 25 this year.  We have been woefully underfunded as the Sheriff's office did have an opportunity to sit with Mr. Alton and some of the members on his team with respect to the jail camera system.  That system in and of itself would need the upgrades that Mr. Anderson spoke of earlier.  I was very satisfied with that piece.  The jail management system, I've made no bones about.  I am not a fan.  We are under --

we have less technology than the city jail down the street, let me be clear.  And some of the -- so here's where my confusion lies, because when I left the meeting with Mr. Alton and his team and some of Mr. Anderson's team, it was less about my operational budget and the things that would be funded as we got ready to move forward with respect to my constitutional obligations, whether it be the canine team, whether it be -- it probably would be a mess for us to do a better job at managing the facility.  And so where we were not budgeted for it last year, we certainly wouldn't be budgeted for this year.  The renovations from the ninth floor, for instance, the Sheriff's office is still dated back to the 80's, if you will.  But I was led to believe, and I certainly appreciate Alton and his team and certainly Mr. Kirby and the DREAM team, if you will, that there were monies in that -- in their line items to accomplish such things and only to find out later that -- well that money maybe in those streams, it was not intended for the Sheriff's office.  Going back to, and I'm going down this list as I see it, so if anyone has any questions, I certainly can answer that; and when we start talking about which avenue.  Come to find out even since our meeting at English Avenue's still inventory for both the jail as well as the Sheriff's office as a whole to include the motor pool, and they have no tracking system.  So out of abundance of caution and not understanding the direction totally of this meeting, I've already partnered with, not Georgia State, but Georgia Tech in supplying supply and demand logistic chain to try and get y'all [inaudible]."

**COMMISSIONER ARRINGTON, JR.:**  "You broke up.  You broke up."

**SHERIFF LABAT:**  "We were turning the corner on that."

**COMMISSIONER ARRINGTON, JR.:**   "You broke up on that."

**COMMISSIONER ABDUR-RAHMAN:**  "You broke up again, Sheriff.  You broke up."

**SHERIFF LABAT:**  "Okay, so what I was referring to with the inventory and us being able to track or not track with respect to our inventory, is I am going to partner with Georgia Tech to see how we can get -- hopefully, get some things donated to us from their class participation from -- they actually lead the industry when it comes to supply chain and command or control in the inventory.  So we're working on that project to get a more robust completion of this project.  But right now, we're still doing everything on paper and so that in and of itself is new to us.  As I get to the next topic in terms of branding again -- and please, I want everybody to understand.  I certainly appreciate everyone's efforts.  But these are things that we tried to get done really late November and December so that we can understand even coming in, the basic things that we need.  And so the other thing I'll do is I'll defer to Madam Vice Chair with respect to -- and let me say thank you, Commissioner Hall, because between her and one or two other commissioners, let me be clear, I've had an opportunity to express my concerns.  That's how I came up with this price tag.  Everything's been vetted.  I have had an opportunity to meet with Alton and certainly Dick to some degree, and so while I am trying to be considerate on both sides, we are in need of everything on this paper.  Now does it mean that -- and out of abundance of cooperation, if you will, when we start

EXHIBIT 1

talking about the deputies, I'm okay if it is a County function and we are able to hold those positions in a point that the Board, we can create an environment that I can talk to the Board and say okay, we've filled these obligations, this is what I need.  Maybe it will and maybe it won't function that way.  But that is one that I've been led to believe that is an option. And so I also was told that there may not be an opportunity to do a midyear review.  And so I did hear Commissioner Hausmann when she asked about the different gap between the incumbent and myself and I actually pointed out that the incumbent did ask for a $13 million budget enhancement, and it was turned down.  And so when I asked for the information, I like being very clear, I was told when I was Sheriff elect that I could not have it without his approval and that it, in fact, could not be extracted from the finance tool to give me a view of what was really needed.  I actually happened to agree a lot with the incumbent once I was actually sworn in, able to get those numbers, and prepared to move forward from there.  So with that said, I think that provides a little background on where we are, and I certainly hope we can move forward together."

**COMMISSIONER ARRINGTON, JR.:**  "Okay.  Let me ask you this.  The County Manager -- of the $15 million request, the County Manager said -- I think he was able to resolve about 8.8 million and that there's only about 6.6 million unresolved.  And so --"

**SHERIFF LABAT:**  "And so I heard that part.  I do believe that he is very in line with at least my thought processes, but I would like to see and add with respect to our vehicles.  Excuse me -- we need to do more there.  So whatever consideration can be given to that, and I certainly want to be -- make sure that we take care of our team as a whole.  So if there's an opportunity for us to -- and it doesn't have to be all in this line item, and certainly with respect to Commissioner -- Deputy COO Kirby, if we can figure a path forward to resolve some of these fleet issues a little quicker, that will certainly help me in that space.  But I believe to that extent, I certainly agree with the ability, if it is, in fact, something we can do, we can come back midyear and deal with -- or try and deal with the remainder of the $8 million, seven or $8 million if that is more appropriate.  But at the same time, that allows us a path forward."

**COMMISSIONER ARRINGTON, JR.:**  "Wait, I thought the 8 million, 8.8 million had already been resolved through existing budgets, through capital budget, your budget and that there was only 6.6 outstanding that needed to be resolved."

**VICE CHAIR HALL:**  "No, no.  That's not -- that's not it, unfortunately, Commissioner Arrington."

**COMMISSIONER ARRINGTON, JR.:**  "Okay.  Okay."

**SHERIFF LABAT:**  "That's some --"

**COMMISSIONER ARRINGTON, JR.:**  "[inaudible]."

**SHERIFF LABAT:**  "That's some well --"

**COMMISSIONER HAUSMANN:**  "I heard County Manager say that."

**SHERIFF LABAT:**  "Well, I won't say roadblock.  There's some opportunity there and we just -- and so we have to figure that part out.  And so I was under the impression after our meeting that, for instance, if it had been resolved, at least it wasn't communicated directly to me.  And if we can agree that has been resolved, I'll certainly err on the side of the County Manager in getting it resolved and with the understanding I am completely transparent in everything we do.  So I hope that is a path forward and then we can -- we can move from there.  The other thing I will do, if it is okay with the County Attorney, at some point, we need to have a very transparent conversation about the condition of the facility.  I have taken -- I've taken the opportunity to document some of the things that we need to talk about and they're very serious issues.  But I need to make sure our County Board of Commissioners understand this.  And so to that end, I am working with Mr. Adams to make sure we do that in the most expeditious way and the proper way because I don't want to open us up to any unnecessary obligations and oversight but I will certainly partner with our law department to make sure that we do that in a proper manner."

**VICE CHAIR HALL:**  "Thank you, Sheriff, can we say that 6.6 would suffice for now to help you meet your constitutional obligations if we visit the --"

**SHERIFF LABAT:**  "We can say that --"

**VICE CHAIR HALL:**  "Go ahead."

**SHERIFF LABAT:**  "Yeah, I think -- Madam Vice Chair, I think to your point, I would say in all honesty, it would be closer to 6.8 to help me go down that road because any constitutional obligations, as long as we're moving forward together to suffice in that perspective and then as each of you know this about me, I will certainly be very, very transparent about what we need at the Sheriff's office and we say -- my goal is for us to work together to be very transparent about that and see how we do what's best for the County as a whole."

**VICE CHAIR HALL:** "And Sheriff Labat, I also want to echo the same concern about the jail and the condition of it.  I have visited that jail not too long ago pre-COVID, and it was a travesty.  And so I hope that, you know, we are -- if we are not doing what you need to help rectify the situation with the jail, please let me know because I want to be very proactive in ensuring that I'm doing everything that I can do to help with that situation, because it's really terrible."

**SHERIFF LABAT:**  "First of all, I'd happy to -- and an invitation is extended to all of the Board.  Please, at your convenience, I'd love to walk through the facility with y'all so that we can better understand together and then at the same time I do want to take an opportunity to compliment Mr. Joe Davis, our director, Joe Davis and certainly Mr. Kirby with respect  to their responsiveness.  I think that may have been part of the problem is

that there is opportunity on both sides.  And so we are learning to communicate better. And as we do that, that puts us in a better position. And so I do want to give them a compliment but there are some things as a Board, we need to be able to discuss that."

**VICE CHAIR HALL:**  All right.  So the motion is on the floor for a substitute -- a substitute motion to amend the budget to include the Sheriff's needs.  And at this point, we have $6.8 million as what the sheriff is saying that he needs immediately to meet his constitutional obligations and so does that change the motion since the total amount has changed?"

**CHAIRMAN PITTS:**  "Okay, the motion on the floor that has been made, properly made and seconded was to increase the proposed budget by 15.2 million.  That's what's before us now."

**VICE CHAIR HALL:**  "So I make a motion to amend -- a substitute motion to amend that to $6.8 million."

**CHAIRMAN PITTS:**  "The same motion was 6 point -- change that.  From 15.2 to 6.8?

**VICE CHAIR HALL:**  "Uh-huh."

**CHAIRMAN PITTS:**  "All right.  So the motion then before us to be corrected, properly moved and seconded."

**PATRISE PERKINGS-HOOKER, COUNTY ATTORNEY:**  "It hasn't been agreed to."

**CHAIRMAN PITTS:**  "It was -- I think, Commissioner --"

**COMMISSIONER ABDUR-RAHMAN:**  "Seconded it."

**CHAIRMAN PITTS:**  "Wasn't seconded.  You object -- are you okay with going from 15.2 to 6.8?"

**COMMISSIONER ABDUR-RAHMAN:**  "Yes, Chair.  I agree to the 6.8."

**CHAIRMAN PITTS:**  "Okay.  So that motion and the motion before us now is to amend the proposed budget by increasing it by $6.8 million.  Properly moved and seconded. Any further discussion at this time?  All right.  Let's vote.  Commissioner Hausmann."

**COMMISSIONER HAUSMANN:**  "Yes, I'll support it."

**CHAIRMAN PITTS:**  "Commissioner Ellis."

**COMMISSIONER ELLIS:**  "No."

EXHIBIT 1

**CHAIRMAN PITTS:**  "Commissioner Morris."

**COMMISSIONER MORRIS:**  "No."

**CHAIRMAN PITTS:**  "Commissioner Hall, Vice Chair Hall."

**VICE CHAIR HALL:**  "Yes."

**CHAIRMAN PITTS:**  "Commissioner Arrington."

**COMMISSIONER ARRINGTON, JR.:**  "Yes."

**CHAIRMAN PITTS:**  "Commissioner Abdur-Rahman."

**COMMISSIONER ABDUR-RAHMAN:**  "Yes."

**CHAIRMAN PITTS:**  "And I vote, no."

**CLERK GRIER:**  "And the motion passes --"

**CHAIRMAN PITTS:**  "The motion passes, all right.  Next item.  The translation -- are we still on -- that's one.  Are we still on the budget?  Anything else?  Vice Chair, you still have the floor."

**VICE CHAIR HALL:**  "I'm sorry.  I couldn't hear you for some reason.  It's wavy."

**CHAIRMAN PITTS:**  "You still have the floor.  That motion was approved.  We have increased the budget by -- proposed budget by $6.8 million.  And Madam CFO, you would have to work that magic that you've been -- you're going to have to come up with it someway.  Commissioner -- Vice Chair, you still have the floor.  Can you hear me okay?"

**VICE CHAIR HALL:**  "Yes, now I hear you.  Thank you so much, Mr. Chairman.  I have no further questions."

**CHAIRMAN PITTS:**  "Okay.  Commissioner Hausmann, you were next."

**COMMISSIONER HAUSMANN:**  "Yes. Thank you, Mr. Chairman.  My item seems somewhat insignificant compared to the last request.  But it's very, very important.  For about as many years as I've been on the commission, my office has received numerous complaints about how long it takes to be served if you need probate services.   As you know, we now have a new probate judge, and she is willing to add staff and services to accommodate the needs that we have throughout the County.  In North Fulton, the area that is designated for her services is not adequate.  There's not space.  She has visited our facility at Maxwell Road and is agreeable, if we are agreeable, to providing her

EXHIBIT 2

# Fulton's new sheriff wants a $400M-$500M new jail. Will he get it?

Credit: Elijah Nouvelage

Local representatives Angelika Kausche, center, David Dreyer, center right, and Josh McLaurin, right, are seen during a tour of the Fulton County Jail on Monday, December 9, 2019, in Atlanta. (Elijah Nouvelage/Special to the Atlanta Journal-Constitution)

## LOCAL NEWS

By **Ben Brasch**, The Atlanta Journal-Constitution

March 16, 2021

Jail is something most people don't think about until it confronts them.

Newly elected Fulton County Sheriff Patrick Labat is confronting county commissioners and taxpayers with what he says is a desperate need for a new jail that will allow for the more humane treatment of prisoners — and its estimated price tag of between $400 million and $500 million.

Fulton County leaders acknowledge the Rice Street jail has been insufficient almost since the day it opened in 1989. Just last month, multiple Atlanta City Council members were left stunned after a tour of the facility. With 400 prisoners over the 2,500-prisoner capacity, many inmates were sleeping in common areas.

"We have an obligation as a sheriff's office to treat people like they're humans," Sheriff Patrick Labat told The Atlanta Journal-Constitution during a recent interview.

Labat is trying to convince county leadership to renovate the existing jail or build a new facility, and said he's open to selling the land on Rice Street and building on another site. Labat said he wants shovels in the ground in 18 months and for the new facility to open in 4 to 5 years.

All of that figures to be a tough sell.

No votes have been cast for or against a new jail. Not a single penny has been allocated to explore the idea. And it isn't clear if there will be the support from budget-conscious county commissioners, who may be reluctant to commit so much money in an era when public protests are demanding alternatives to arrest and incarceration. But Labat says he needs a new jail to offer the services that would help inmates, including proper mental health services and substance abuse care, because be can't provide them in the current space.

Caption

EXHIBIT 2



There isn't consensus among commissioners, but it's fair to say several are skeptical of Labat's proposal.

"That's a very premature thing to throw out without a feasibility study and further understanding," said Commissioner Bob Ellis. " ... There's a lot of sheriffs that like to talk a big game."

'Lipstick on a pig'
This is all happening as Labat also makes a pitch to buy the Atlanta City Detention Center, which he ran for more than a decade. Mayor Keisha Lance Bottoms has vowed to close the city-owned facility and turn it into an equity center, but some on the city council are pushing back.
Labat says he needs a new main jail regardless of what happens with the detention center, because the Rice Street facility won't let him provide restorative services.

But Xochitl Bervera, director of Racial Justice Action Center and a member of the task force that recommended razing Atlanta's detention center, says Labat's mission is flawed and beyond him.

"Sheriff Labat's expertise and experience is in jailing people, not in the kind of specialty expertise needed to provide culturally competent mental health services to a person in need," she said. "It's a very different skillset."

Bervera said spending money on housing or another social service on the front-end of society is better than trying to help people after they've been incarcerated.

"You can put lipstick on a pig, but it's still a pig," she said. "You can have these services in a jail, but evidence bears out that mental health services based in communities are far more effective."

Newly elected Fulton commissioner Khadijah Abdur-Rahman is the only member of the legislative body who has endorsed Labat's plan. After the recent jail tour, she said conditions there are "worse than what we see in third-world countries or war zones."
"It's just outdated, physically, technologically," she said.

EXHIBIT 2

Abdur-Rahman supports a study, but is interested in selling the 55-acre property because the market is drooling over Westside real estate.

"It would be such a win-win should they decide to keep it and build it, or sell it and use that money to build somewhere else and have more money is the coffers for Fulton County," she said.

Caption



Abdur-Rahman said her fellow commissioners agree privately that something must be done, but some are scared of the high price tag for one of the largest and most complex capital projects Fulton could undertake.

On the low end, a new jail's cost would roughly equal the amount Cobb County spent to help build the Braves a ballpark.

"We don't have anything to show the public how much money they're losing definitely versus what they'll gain in the long run," from a new jail, Abdur-Rahman said.

Commissioner Liz Hausmann said she would support a feasibility study.

"I don't want to use the word 'crisis' but it's a serious situation," she said.

'Different environment'
The county has changed a lot since the jail opened 31 years ago: Fulton's population has nearly doubled, and there is no unincorporated residential part of the county because the cityhood explosion of the early 2000s scooped up all such land.
Besides paying taxes and vehicle fees, cityhood means the only time most people directly interact with the county is inside a voting booth, courtroom or jail.

But some things don't change.

The county's jail has been the subject of federal legal scrutiny on and off since 1982. The construction of today's jail building was rushed along because of a federal lawsuit regarding over-crowding. It cost taxpayers $50 million when it opened in October 1989 and, despite being 6.5 times larger than the previous jail, immediately filled up because of the nation's war on drugs.

Caption

EXHIBIT 2



Credit: Elijah Nouvelage

Martin L. King III, a Fulton commissioner at the time, said: "If we don't do something — while we are opening this facility today, six months from now it will be obsolete."

He was off by a month.

Just five months after opening the new jail, county officials were considering a bond referendum for a $35 million expansion.

Stressed to unprecedented levels for years, the jail began to fail. Inmates escaped from windows using bedsheets as ropes. The walls leaked when it rained. Some inmates waited nine months for a grand jury indictment. Drains backed up because 70 people shared two showers.

U.S. District Judge Marvin Shoob got involved in April 2000 when HIV-positive inmates claimed they were not receiving adequate care or medicine. His scope quickly expanded.

By 2004, Shoob had taken control of the jail away from Fulton and given it to a former jail administrator. The then-sheriff decided not to run for re-election under accusations that she made risky investments with public money.

That meant an open sheriff's election, and the centerpiece issue was jail over-crowding.

One of the contenders was Labat. A summary of his platform in the AJC read: "The county, he says, may need a new jail, and if that's the case, he plans to finance it with something other than a bond referendum. If elected, Labat says he wants to take control of the jail as soon as he takes office."

EXHIBIT 2

He lost. And the jail would be under federal oversight for 11 more years. During that time, Fulton taxpayers spent $1 billion to bring the jail into compliance.

Caption



Credit: Elijah Nouvelage

Now, seventeen years later, Sheriff Labat says bonds would almost assuredly be needed to build a jail, but he's still interested in private money. That doesn't mean he's pitching a Coca-Cola or Delta wing to the jail. Instead, he hopes a local executive or philanthropist with personal or close experience in mental health or substance abuse may be willing to fund programs.

Alton Adams, Fulton's deputy chief operating officer in charge of public safety, said the idea of improving the jail isn't novel — but the jail itself has changed over the years.

"The definition of jail, in addition to providing incarceration has changed," he said. "We've learned a lot. Therefore the demands and the opportunity for someone while they're in jail, including better ability to treat mental health, better ability for learning and GED and better ability to sustain health crisis — is something that wasn't built into the current construct of the jail."

Adams said they've already received pushback from people not wanting any more jail space for fear that it will just fill up.

To those people, he has a word of caution: "Building a new jail doesn't mean building a bigger jail. What it means is that whatever the need ... that you are building a different environment."

Adams said a feasibility study would take six to nine months, but that hasn't even been proposed to commissioners.

"These are early days ... but we'd be failing in our jobs if we didn't take a look at this," he said.

EXHIBIT 2

*(SCROLL TO EXPLORE TIMELINE)*

Credit: WSBTV Videos

**About the Author**



## Ben Brasch

Ben Brasch is the reporter tasked with keeping Fulton County government accountable. The Florida native moved to Atlanta for a job with The AJC. If there's something important to you going on in Fulton, he wants to know about it. Help him better metro Atlanta by dropping a line, anonymously or otherwise.

 AJC      Gift the AJC

Metro Atlanta     Georgia News     Legislature     National & World News     Investigations     Business

METRO ATLANTA

# Fulton sheriff calls Atlanta's request for jail study 'a stall tactic'



Fulton County Sherrif Patrick Labat looks over the street outside the Fulton County Court during the selection of the special grand jury to investigate allegations that former President Donald Trump criminally interfered with Georgia's elections in 2020. Monday, May 2, 2022. Miguel Martinez /miguel.martinezjimenez@ajc.com

**By Wilborn P. Nobles III**

Oct 4, 2022

 Share          Gift

EXHIBIT 4

𝔄𝔍ℭ

Metro Atlanta      Georgia News      Legislature      National & World News      Investigations      Business

Detention Center to Fulton, which is something Labat has sought after since he was sworn in last year. But when the council approved Atlanta's side of the lease, the legislation included a last-minute amendment requiring the Justice Policy Board to analyze Fulton's jail population.

The study would also gather data showing why detainees are booked, the amount of time inmates are held there, and more. Although the study's outcome won't terminate the lease agreement, the lease can't take effect until the review is complete.

Advertisement

Labat said the county can give them the information they're seeking without the 90-day study, which he called "a stall tactic."



The Atlanta City Detention Center and the Fulton County Jail.

"The building is deteriorating by the day," Labat said. "I've been sounding this alarm for 365 days if not longer."

EXHIBIT 4

AJC

Metro Atlanta    Georgia News    Legislature    National & World News    Investigations    Business

Michael Julian Bond said the city needs to act because 473 people are sleeping on the county jail's floor. Atlanta City Councilman Jason Dozier, who created the amendment, said residents have sought Fulton's jail data for a long time.

Advertiser Content

**Wave chasers: Experience Daytona Beach's aquatic fun**

By Daytona Beach Area Convention & Visitors Bureau



"We need to understand why people are in there and I will not in the blink of an eye damn people's lives to be in jail without questioning it," said Councilmember Liliana Bakhtiari.



Atlanta Council members Liliana Bakhtiari and Jason Dozier talk during a meeting on Monday, August 15, 2022. One of the subjects on the agenda that attracted the attention of activists and the public is leasing Atlanta jail beds to Fulton County jails. Miguel Martinez / miguel.martinezjimenez@ajc.com

More than 60 national and local civil rights organizations on Monday sent a letter to Dickens and the council asking the city to revoke its lease decision with Fulton. Tiffany Roberts, public policy director for the Southern Center for Human Rights, told the council that Atlanta would be surrendering what little power they have left over the jail if the study requirement is removed.

EXHIBIT 4

AJC

instance, has said that attempts to remove the study amendment would violate the city and the county's agreement.

Advertisement

"There are many things that we want to agree on," Waites said. "This is just not one of them today."

## About the Author



### Wilborn Nobles

Wilborn P. Nobles III covers Atlanta City Hall for The Atlanta Journal-Constitution. He began covering DeKalb County Schools for The AJC in November 2020. He previously covered Baltimore County for The Baltimore Sun and education for the Times-Picayune in New Orleans. He interned at the Washington Post. He graduated from Louisiana State University.



## More Stories

### The Latest

AJC

Metro Atlanta      Georgia News      Legislature      National & World News      Investigations      Business



**Cobb County moves to dismiss suit over fatal PIT maneuver**
1h ago

**Chick-fil-A's newest business side hustle isn't a restaurant**

**LIVE UPDATES**

**World Cup: Morocco beats Haiti in Atlanta match**

**Keep Reading**

EXHIBIT 4

# AJC

Metro Atlanta    Georgia News    Legislature    National & World News    Investigations    Business



**V-103's Big Tigger responds after arrest on charges of aggravated battery**

**Kemp appoints top ethics official, prosecutor to Fulton bench**

**DeKalb Commission votes against amendment that would regulate data centers**

**Featured**

EXHIBIT 4

# AJC

Metro Atlanta     Georgia News     Legislature     National & World News     Investigations     Business



**AJC EXCLUSIVE**

**Flight attendants accused instructor of harassment. Delta gave him a new job.**

**Party switcher losses show Georgians that labels still matter**

**'Spectacular' arena between Atlanta and Savannah is part of city's $1B 'flex'**

Advertiser Content

**Drive your dreams: Flexcar liberates you from limiting commitments**

By Flexcar

About

Help Center

About The Atlanta Journal-Constitution

EXHIBIT 4



Metro Atlanta      Georgia News      Legislature      National & World News      Investigations      Business

Contact Us

Send a News Tip

Advertise

AJC Newsroom

**Our Products**

ePaper

Newsletters

All AJC Podcasts

AJC Events

Download iOS App

Download Android App

**Subscription**

Digital Subscription

Manage Subscription

Group Subscriptions

Subscription Terms & Conditions

NIE/Newspapers in Education

**Follow Us**

© 2026 The Atlanta Journal-Constitution. All Rights Reserved.

By using this website, you accept the terms of our

Online Services Terms of Use, Privacy Policy, Do Not Sell or Share My Personal Information, and understand your options regarding CCPA.
Learn about Ad Choices.

Cookie Settings

EXHIBIT 3





Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!



81° WATCH

NEWS    WEATHER    STREAM NOW    2 INVESTIGATES    SPORTS    TRIPLE TEAM TRAFFIC    COMMUNITY

HOUSE 2 HOME    STEALS AND DEALS    DESTINATIONS DISCOVERED    WORLD CUP




## Fulton sheriff begs to move inmates from overcrowded jail...

Nearly 500 inmates are sleeping on the floor of the Fulton County Jail while nearly 1,300 beds are empty at the Atlanta Detention Center.

Resize:

### Live Streams





ATLANTA

# Fulton sheriff begs to move

Drag to Resize Video

NOW PLAYING ABOVE

 

By **WSBTV.com News Staff**

October 04, 2022 at 6:37 pm EDT



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

GET TICKETS NOW

EXHIBIT 3

# from overcrowded jail to Atlanta detention center

empty at the Atlanta Detention Center.

   

By **WSBTV.com News Staff**

October 04, 2022 at 6:37 pm EDT

FULTON COUNTY, Ga. — Fulton County Sheriff Pat Labat says lives are in danger if inmates at the Fulton County Jail aren't transferred somewhere else.

Sheriff Labat says eight inmates have died in the overcrowded jail in 2022. He says if things don't change, that number could grow.

**Channel 2 Investigative Reporter Mark Winne** learned that there are currently 489 inmates sleeping in "boats" on the floor of the Fulton County Jail. Over at the Atlanta Detention Center, only 48 of the 1,314 beds are occupied.

ADVERTISEMENT

EXHIBIT 3



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

GET TICKETS NOW

**[DOWNLOAD: Free WSB-TV News app for alerts as news breaks]**

"I am moving in a space where people's lives are in danger. Since you met last, we had someone **openly murdered in our facility**," Labat told the Atlanta City Council during its Monday night meeting.

Labat told the council that the overcrowded and understaffed jail could be a life or death situation for thousands of people, but that he believes they can speed up a potential fix.

"I talked to our county attorney to see what are our options if we believe that there's an emergency. One of them is to go to court, which is still on the table," Fulton County Commission Chair Robb Pitts told Winne.

Sheriff's Office Lt. Col. Adam Lee says eight inmates have died this year from a combination of medical issues, suicide and homicide.

"Each of us, when we're campaigning, ask people to go vote, and don't delay and do it. So why would we delay anything when it comes to people's lives?" Labat questioned the council on Monday evening.

**TRENDING STORIES:**

- **New image shows van of mother found naked and burned traveling near eventual crime scene**
- **North Georgia apple orchard ranked as 2nd best in America, according to USA Today**
- **Reporters not let into Walker event 1 day after bombshell report he paid for woman's abortion**

Atlanta City Council Public Safety Vice Chair Byron Amos says that before they can allow the transfer of inmates, a jail population review needs to be conducted by an independent committee. He adds that, personally, he believes that the review can happen simultaneously with the inmate transfers.

"The genesis of this entire relationship is to put people in a more humane environment, to get people off of the floors and into cots and into cells," Amos said.



**Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!**

to four years, but nothing has been made official by the council.

Atlanta city officials **announced the plans to lease the beds back in August**, but the city council has not yet given its approval.

"What's the problem? The mayor wants it to happen, meaning he wants to give us the keys. We want the keys. The sheriff wants the keys, but there's a problem with city council on what certain council members are saying," Pitts explained.

[SIGN UP: **WSB-TV Daily Headlines Newsletter**]

Labat says he has been told the study should be complete by November 18, but he believes that is still too long to wait.

**IN RELATED NEWS:**



**Inmate killed during incident at Fulton County jail**

*©2022 Cox Media Group*



Norfolk Southern sued over claim derailment

EXHIBIT 3



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

 **0** Join the Conversation [ **View Comments** ]

**Amazon Nightmare Comes True: Shoppers Canceling Prime For This Clever Hack**
This simple extension tool can save tons of money on Amazon, but most prime members are ignoring it.

**Online Shopping Tools** | Sponsored                                                  ( **Learn More** )

**Japan's Oldest Doctors Say Cognitive Decline Isn't Age: Just Stop Drinking These 2 Drinks**

**Mind Health Journal** | Sponsored                                                   ( **Learn More** )

**Japan's MDs Warn: Brain Fog Now Linked to a Drink Millions Consume Daily. Stop Now**

**Beauty Review Today** | Sponsored                                                   ( **Learn More** )

**Thursday: IRS Forgives Millions In Tax Debt Before June 30th Tax Deadline**
As the tax relief deadline nears, thousands of Americans are rushing to resolve their tax debts as the IRS is imposing hefty penalties.

**Fresh Start Information** | Sponsored                                               ( **Learn More** )

**2026 - IRS Forgives Millions By June 30th Tax Deadline**
Americans with back taxes are urged to check their eligibility for tax relief. The IRS has made the Fresh Start Program available to a larger group of taxpayers.

**Fresh Start Information** | Sponsored                                               ( **Apply Now** )

**Side Sleepers Get Achy Shoulders, Few Know This "Side Sleeper" Trick**

**Rest Well** | Sponsored                                                            ( **Learn More** )

**The New Roofing Material Making Asphalt A Thing Of The Past**
The Days Of Asphalt Roofs Are Over, Thanks To Stone-Coated Metal

EXHIBIT 3



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

GET TICKETS NOW

Japan's Top Doctors Say Brain Fog Isn't Aging: Just Avoid These 4 Kitchen Items

**Beauty Review Today** | Sponsored

Learn More

Audiologists Tested 5 Hearing Aids for 6 Months. Only One Stood Out.

Most people assume expensive aids work best. An audiologist tested 5 top brands over 6 months. The winner wasn't what you'd expect

**Healthy Living Digest** | Sponsored

Learn More

Baking Soda: The Best Ally For Women To Lose A Hanging Tummy

**Jelly Lean** | Sponsored

Atlanta: 24 Hour Dental Implants

Take our 1-minute quiz to find out if you're eligible for our revolutionary 24-hour dental implants. Get a new smile in just 24 Hrs

**Nuvia Dental Implant Center** | Sponsored

U.S. Doctors Report: Brain Fog Now Associated With a Drink Millions Consume Daily

**Senior Health Bulletin** | Sponsored

Learn More

Armed robbery at Georgia grocery store; 3 charged

Oklahoma pastor who was backed by Trump exits GOP House runoff after reports of inappropriate texts

If you have one of these 50 names, you were probably a 1950s baby





EXHIBIT 3

Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

Date Mature Women Today In Atlanta

Join Over 476,000+ Single Women Nearby

**Global Match** | Sponsored

Search Now

Georgia: Hairdresser Shares The One Thing She Tells Clients Losing Hair

**Halogrow** | Sponsored

Click Here

Tested: Can This $137 AC Really Slash Power Bills? The Results Are Baffling

**Consumer World** | Sponsored

12 Expenses Retirees Are Quietly Dropping

**Greensprout** | Sponsored

Georgia: Say Hello To Cheaper Car Insurance If You Live In These Zip Codes

See if you can lower your rate — get a quote in seconds

**OTTO Insurance** | Sponsored

Get Quote

2 Georgia medical providers charged in nationwide healthcare fraud operation

**WSB-TV Channel 2 - Atlanta**

Husband kills wife, daughter in Walton County shooting, sheriff says

**WSB-TV Channel 2 - Atlanta**

Genius Gadget Or Total Waste? We Tried This This $138 AC

**Consumer World** | Sponsored



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

EXHIBIT 3

Japan's Oldest Doctors Say Memory Loss Isn't Age: Just Stop Eating These 3 Foods

**Healthy Today** | Sponsored

Learn More



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

EXHIBIT 3



*Forecast from Chief Meteorologist*

**Brad Nitz**



| NOW | 7 PM | 10 PM |
| --- | --- | --- |
|  81° |  81° |  76° |



GET BREAKING NEWS & SEVERE WEATHER ALERTS WHILE ON THE GO!

DOWNLOAD NOW



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

GET TICKETS NOW

EXHIBIT 3

## Most Read



**Husband kills wife, daughter in Walton County shooting, sheriff says**



**Lionel Richie cuts performance short due to health issue**



**2 Georgia medical providers charged in nationwide healthcare fraud operation**

EXHIBIT 3



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

GET TICKETS NOW



**Atlanta mayor says no more storage facilities**



**Manhunt for 'violent' sex offender in metro Atlanta**

AdChoices ▷                    Sponsored

**You May Like**

**Costco Shoppers Say This Fat-Burning Patc...**

Diet-masters

**Edema Is Not From Salty Food. Meet The Real Enemy ...**

EXHIBIT 3



Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!

GET TICKETS NOW

Can Now Fly
Business Cla...

Smart Travel Tips

### Could These Everyday Changes Be Early Signs o...

Memopezil

### The Average Walk-In Shower Cost in 2026

Kohler Showers

Sponsored Links by Taboola

ADVERTISEMENT

## NEWS

Local

Watch Live

Nation/World

Triple Team Traffic

## WEATHER

Current Conditions


EXHIBIT 3
Don't miss out on the Quaker State 400 at EchoPark Speedway on July 12, 2026!
GET TICKETS NOW

## CONTACT US

About WSBTV

What's On WSBTV

EEO Statement

Advertise with WSBTV

WSBTV Public File

FCC Applications

## FOLLOW US

© **2025 Cox Media Group.** This station is part of Cox Media Group Television. Learn about **careers** at Cox Media Group. By using this website, you accept the terms of our **Visitor Agreement** and **Privacy Policy**, and understand your options regarding **Ad Choices**.

**Manage Cookie Preferences** | **Do Not Sell or Share My Personal Information**